UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse 40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 26-847         Caption [use short title]

Motion for: Emergency Injunction Pending Appeal

Chen v. Mamdani

Set forth below precise, complete statement of relief sought:

Under 28 U.S.C. § 1292(a)(1) and Fed. R. App. P. 8(a)(2),

Plaintiff Yi Fang Chen seeks an emergency injunction ordering

that her son M.P. be admitted to Stuyvesant High School

for the 2026–27 school year, pending appeal of the

district court's denial of her preliminary injunction motion.

MOVING PARTY: Yi Fang Chen, on behalf of minor M.P.   OPPOSING PARTY: Zohran Mamdani, et al.

■ Plaintiff    ☐ Defendant

☐ Appellant/Petitioner    ☐ Appellee/Respondent

MOVING ATTORNEY: Dean McGee    OPPOSING ATTORNEY: Tonya Jenerette

[name of attorney, with firm, address, phone number and e-mail]

Pacific Legal Foundation    Corporation Counsel of the City of New York

1745 Shea Center Dr., Ste. 400, Highlands Ranch, CO 80129    100 Church St., New York, New York 10007

(916) 419-7111, GERoper@pacificlegal.org    (212) 356-1983, tjeneret@law.nyc.gov

Court- Judge/ Agency appealed from: Southern District of New York - Edgardo Ramos

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
■ Yes   ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed   ■ Opposed   ☐ Don't Know

Does opposing counsel intend to file a response:
■ Yes   ☐ No   ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below? ■ Yes ☐ No
Has this relief been previously sought in this court? ☐ Yes ■ No

Requested return date and explanation of emergency: 9/1/26

Plaintiff is requesting an injunction requiring Defendants to admit her son to Stuyvesant High School for the 2026–27 school year. This school year commences 9/10/26.

Is the oral argument on motion requested? ■ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set? ☐ Yes ■ No If yes, enter date: _____

**Signature of Moving Attorney:**

_Dean McGee_   Date: 8/3/2026   Service : ■ Electronic ☐ Other [Attach proof of service]

Form T-1080 (rev. 10-23)

# No. 26-847

————————————

### In The United States Court Of Appeals
### For The Second Circuit

————————————

YI FANG CHEN, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILDREN
M.P., MA.P., AND P.P.,

Plaintiff – Appellant,

v.

ZOHRAN MAMDANI, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF
NEW YORK; KAMAR H. SAMUELS, IN HIS OFFICIAL CAPACITY AS
CHANCELLOR OF THE NEW YORK CITY DEPARTMENT OF EDUCATION; AND
NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendants – Appellees,

TEENS TAKE CHARGE, DESIS RISING UP AND MOVING, COALITION FOR
ASIAN AMERICAN CHILDREN AND FAMILIES, VERONICA CARRASQUILLO, ON
BEHALF OF HER MINOR CHILD, A.C., WANG JIN HUA, ON BEHALF OF HER
MINOR CHILD, A.Z., HALIMATOU DIALLO, ON BEHALF OF HER MINOR CHILD,
K.D., JENNIFER VELEZ, ON BEHALF OF HER MINOR CHILD G.R.,

Intervenor-Defendants-Appellees.

————————————

On Appeal from the United States District Court
for the Southern District of New York

————————————

## APPELLANT'S EMERGENCY MOTION
## FOR INJUNCTION PENDING APPEAL

————————————

*attorneys listed on the next page*

Glenn E. Roper
PACIFIC LEGAL FOUNDATION
1745 Shea Center Dr., Ste. 400
Highlands Ranch, CO 80129
Telephone: (916) 419-7111
GERoper@pacificlegal.org

Dean McGee
Caitlyn Fellner
PACIFIC LEGAL FOUNDATION
3100 Clarendon Boulevard
Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
DMcGee@pacificlegal.org
CFellner@pacificlegal.org

*Counsel for Plaintiff Yi Fang Chen, individually
and on behalf of her minor children M.P., Ma.P., and P.P.*

## **INTRODUCTION**

In 38 days, 13-year-old M.P. will begin his high school career. Resolution of this motion will determine whether New York City may deny him entry into his dream school based on a racially engineered admissions policy—one designed to reduce the admission of Asian-American students like himself. Under 28 U.S.C. § 1292(a)(1) and Fed. R. App. P. 8(a)(2), Plaintiff Yi Fang Chen seeks an emergency injunction ordering that her son M.P. be admitted to Stuyvesant High School for the 2026–27 school year, pending appeal of the district court's denial of her preliminary injunction motion. An emergency injunction will uphold critical Equal Protection Clause precedent from this Court and the Supreme Court—precedent that the district court disregarded—and prevent imminent harm to M.P.

M.P. *should* be starting at Stuyvesant—the most selective of New York City's prestigious specialized high schools (SHSs). M.P. took the competitive examination required by state law (the SHSAT) and earned a score that would have secured his admission to Stuyvesant but for the City's restructuring of the admission policy. That restructuring was an explicit effort to rebalance the SHSs' racial demographics: internal

1

documents expose that the City modeled ways to use ostensibly race-neutral criteria as a "lever to admit more Black and Hispanic students" at the expense of others. This, of course, is precisely the type of "racial balancing" effort that the Supreme Court held to be "patently unconstitutional" in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) (*SFFA*). And in *Chinese American Citizens Alliance of Greater New York v. Adams*, 116 F.4th 161, 169 (2d Cir. 2024) (*CACAGNY*), this Court held that an Asian-American student denied admission to Stuyvesant would have a valid equal protection claim if the very policy at issue here was enacted with a racially discriminatory purpose.

Instead of following these monumental developments in Equal Protection Clause jurisprudence, the district court denied a preliminary injunction, hewing instead to its own 2019 decision in a related action. As further justification for its decision, the district court explicitly relied on a First Circuit decision—one that has been recognized by the Third Circuit as irreconcilable with this Court's decision in *CACAGNY*.

Because a faithful application of *SFFA* and *CACAGNY* confirms that Plaintiff will likely succeed on her Equal Protection Clause and Title

VI claims, and because M.P. will forever lose his freshman year at Stuyvesant without relief, this Court should enjoin the City from racially discriminating against him now. With the school year beginning on September 10, **Plaintiff respectfully asks this Court to rule on this motion by September 1**.

## BACKGROUND

### I. New York's Specialized High Schools

The SHSs are among the most academically rigorous public schools in the United States. "The two most selective SHSs [are] Stuyvesant and Bronx Science." *CACAGNY*, 116 F.4th at 169. Stuyvesant is the most selective and has produced four Nobel Laureates and numerous leaders in science, law, and public life.[1]

To ensure these schools maintain rigorous academic standards, New York's Hecht-Calandra Act requires admissions to focus "solely and exclusively" on the SHSAT. *See* N.Y. Educ. Law § 2590-g(12)(b)(1994).[2] Applicants rank their preferred schools, take the test, and starting with

---

[1] Stuyvesant High School, History of the School, https://stuy.enschool.org/apps/pages/index.jsp?uREC_ID=126631&type=d&pREC_ID=251657&hideMenu=1.

[2] This text no longer appears in the statute but has been incorporated by reference. *See* N.Y. Educ. Law § 2590-h(1)(b) (1998).

the highest scorer, each student is offered admission to their highest-ranked SHS with an available seat. *Id.* The SHSAT score of the last student admitted to each school is that school's "cutoff" score.

Hecht-Calandra also authorizes a "Discovery Program, for a limited number of disadvantaged students who demonstrated potential for success at the SHS, but did not obtain a qualifying score on the standardized entrance exam." *CACAGNY*, 116 F.4th at 165. By law, the Discovery Program may not "in any manner interfer[e] with the academic level of these schools." *Id.* (quoting N.Y. Educ. Law § 2590-g(12)(d) (1996)). "To be eligible for the Discovery Program, students must take the SHSAT, be certified as 'disadvantaged' and be recommended as having high potential by their middle schools, and pass a summer preparatory program." *Id.* The Discovery Program was traditionally small and left to the discretion of each SHS. *Id.* ("between 2006 and 2015, annually only approximately 1 percent to 3 percent of students admitted at the SHSs came through the Discovery Program").

## II.   The 2018 Admission Policy Changes

Around 2018, then-Mayor Bill de Blasio and then-Department of Education (DOE) Chancellor Richard Carranza decided that it was

problematic that the racial demographics of the SHSs differed from those of the New York City public schools as a whole—specifically, that Asian-American students were, in their view, overrepresented and Hispanic and black students underrepresented. *CACAGNY*, 116 F.4th at 166–67. On June 3, 2018, they announced a two-pronged plan to change the racial composition of the SHSs. The first prong, challenged here, was an expansion and reorganization of the Discovery program. [3] Under that plan, "the Discovery Program no longer would be a narrow alternative admission path. Instead, each SHS would now be required to set aside 20 percent of its seats for Discovery Program students, a dramatic increase from the 1 percent to 3 percent of seats that were previously reserved." *CACAGNY*, 116 F.4th at 167.

Critically, the plan also narrowed Discovery eligibility, limiting participation to students attending middle schools with an Economic Need Index (ENI) of 60% or higher. *Id*. ENI is a metric designed to

---

[3] Press Release, Office of the Mayor, *Mayor de Blasio and Chancellor Carranza Announce Plan to Improve Diversity at Specialized High Schools* (June 3, 2018), https://a860-gpp.nyc.gov/concern/nyc_government_publications/nc580q26h?locale=en. The second prong, which would have required legislative repeal of Hecht-Calandra, was to eliminate the SHSAT altogether and replace it with reserved seats for the top-ranked students at each NYC middle school. *Id*.

measure "the economic hardship of the community the school serves." *Id.* at 167 & n.3.[4] Under the new policy, an individual economically disadvantaged student is ineligible for Discovery if they attend a school with an ENI below 60%. *Id.* at 165. The restriction thus conditions eligibility not on the economic circumstances of the child, but on which middle school the child attends. If the goal were simply to help low-income students, a school-level metric would be an odd choice; it makes sense only if the goal was to exclude students attending particular schools.

## III. Public and Private Statements Show That Defendants Designed the Changes to Achieve Racial Balancing

In *CACAGNY*, this Court highlighted a series of public statements between 2017 and 2018 by Mayor de Blasio and Chancellor Carranza. They declared that "the racial demographics of the SHSs were a 'monumental injustice'" which they "sought to address … by overhauling

---

[4] ENI is the average of a school's individual students' economic needs value (ENV). Students are assigned an ENV of 1 if they are on public assistance, live in temporary housing, or come from a non-English speaking home. *Id.* "Otherwise, a student's ENV is the percentage, divided by 100, of families with school-age children in the student's census tract with incomes below the poverty level." *Id.* Each student's ENV, and by extension each school's ENI, falls between 0.0 and 1.0 (i.e., between 0% and 100%).

the Discovery Program" in a manner "designed to increase the numbers of Black and Latino students at the SHSs." *CACAGNY*, 116 F.4th at 166–67. This included a press release "touting" that "the City's modeling suggested that the revised Discovery Program would result in 16 percent of offers at SHSs going to Black and Latino students—up from the then-current 9 percent rate." *Id.* at 167. It also included Chancellor Carranza's response to allegations that the changes "unfairly discriminated against high-achieving Asian-American students," in which he told the media that he did not "buy into the narrative that any one ethnic group owns admission to these schools." *Id.*

Internal documents—which were not before this Court in its 2024 *CACAGNY* decision—confirm that racial balancing was the motivating factor for the Discovery program changes. For example, in an email less than a week before the policy was announced, the DOE Director of Research and Policy stated the goal was "to use the Discovery program as a lever to admit more Black and Hispanic students." Ex. 2 at ChMc_E_066808.[5] An internal DOE slide deck from April 2018 identified

---

[5] The Declaration of Glenn Roper submitted to the district court is attached as Exhibit B. For ease of reference, exhibits thereto are cited as "Ex." with the appropriate bates number identified where relevant.

"[i]ncreas[ing] the diversity of the Specialized High Schools" as a "guiding principle[]" for the admissions changes. Ex. 3 at ChMc_E_114807, 114809. The City dismissed alternative race-neutral options—recommendation letters, interviews, writing assessments—because they would not "change the racial makeup" or "substantial[ly] change … the percent of Black and Hispanic students offered seats at Specialized High Schools." *Id.* at ChMc_E_114808. In contrast, DOE expected its Discovery Program expansion "to achieve more racial diversity," with the ENI restriction in particular ensuring "[m]ore Black and Hispanic students would become eligible for Discovery." *Id.* at ChMc_E_114811, 114815. DOE similarly explained that the ENI restrictions were critical "since it would be easier to target Black students directly for that program." Ex. 4 at ChMc_E_065916. DOE also acknowledged that this approach would harm other racial groups, identifying in a "pro/con" list the "con" of "vociferous opposition" from Asian Americans and "those who would have received those seats in absence of change." Ex. 7.

DOE staff modeled the racial effects of different ENI thresholds and selected the one designed to produce its desired outcome. They evaluated ENI cutoffs of 40 percent, 60 percent, and 80 percent and reported that

8

the 60 percent model yielded a "more diverse" pool while the average proficiency of admitted students "barely change[d]." *Id.* at ChMc_E_065914.[6] A chart prepared for City Hall confirms that the "diversity" DOE cared about was *racial* diversity, and projected that under the new plan the Asian-American share of Discovery admittees would drop from 64 percent to 38 percent, while the black and Hispanic share would rise substantially:

| Ethnicity | Percent of students who received SHS offers through Discovery, for fall 2018 admissions [preliminary] | Model for expanded Discovery [20% of seats, 60% ENI minimum]* |
|---|---|---|
| Asian | 64% | 38% |
| Black | 10% | 22% |
| Hispanic | 12% | 31% |
| White | 11% | 7% |
| Other | 2% | 2% |
| Unknown | 2% | N/A |
| *Data for students who would have been eligible to apply for Discovery in summer 2017. Does not reflect income eligibility or student interest in participating. | | |

Ex. 5 at ChMc_E_075252. Under the new criteria, "11 of 24 majority-Asian-American middle schools were rendered ineligible for the Discovery Program," thereby excluding "Asian-American students at those 11 middle schools … from a fifth of all SHS seats under the new Discovery Program." *CACAGNY*, 116 F.4th at 177. By contrast, only

---

[6] Using an 80% cutoff significantly lowered the projected proficiency of Discovery admittees, which Hecht-Calandra prohibits.

9

about 8% of majority-black middle schools and 3% of majority-Hispanic middle schools were excluded.[7]

Put simply, the newly adopted ENI threshold excluded majority-Asian-American schools at a vastly higher rate than majority-black and majority-Hispanic schools. Combined with the fact that Asian Americans made up roughly two-thirds of Discovery participants under the pre-2018 rules, the targeting analysis makes the design unmistakable: the 60% ENI restriction was selected to produce a specific desired racial outcome.

## IV. Plaintiff Chen and the Related CACAGNY Litigation

In 2018, Plaintiff Yi Fang Chen, a Chinese-American immigrant, was among the group of plaintiffs who sued to enjoin the changes to the Discovery program, alleging that the City unconstitutionally used race to reduce the number of Asian-American students like her son. In early 2019, the district court dismissed Chen for lack of standing because it considered M.P., then in first grade, too young for his injury to be imminent. *Christa McAuliffe Intermediate Sch. PTO v. de Blasio*, 364 F.

---

[7] *See Demographic Snapshot 2020-21*, https://infohub.nyced.org/docs/default-source/default-document-library/demographic-snapshot-2016-17-to-2020-21-public.xlsx.

10

Supp. 3d 253, 272 (S.D.N.Y. 2019). It also denied the remaining plaintiffs'

request for a preliminary injunction. *Id.* at 284.

The case proceeded to summary judgment, which the district court

granted for the City on the ground that the plaintiffs had not shown that

the new admission policy caused an aggregate disparate racial impact on

Asian Americans. *CACAGNY,* 116 F.4th at 169. On appeal, this Court

reversed. While not making a ruling on the issue of discriminatory intent,

it emphasized that "SHS admission is a zero-sum game in that admitting

more students from a particular demographic means admitting fewer

from other demographics." *Id.* at 167. It also held that aggregate

disparate impact is not a required element of an equal protection claim;

if discriminatory intent is proven, a negative effect on *individual* Asian-

American applicants is sufficient to trigger strict scrutiny. *Id.* at 165. The

Court specifically rejected the City's argument "that a reduction of the

Asian-American students at ... Stuyvesant and Bronx Science, that

resulted from the changes to the Discovery Program[,] could not

independently satisfy the requisite discriminatory effect." *Id.* at 178. If

discriminatory intent was shown, "an equal protection claim would arise

11

if such discrimination resulted in certain Asian-American students being deprived of placement in their preferred high school." *Id.*

This is precisely the case here, as M.P. is an Asian-American student deprived of placement in his preferred school. Although Chen was dismissed from the *CACAGNY* lawsuit nearly eight years ago, her worst fears about the Discovery changes have come to fruition. Her son— who attended a middle school ineligible for Discovery because of ENI cutoffs—has missed the Stuyvesant cutoff by just three points, scoring 558 compared to a cutoff of 561. *See* Ex. C. (Declaration of Yi Fang Chen) at ¶ 13. That gap is directly traceable to the Discovery expansion, as DOE's own internal modeling concluded that setting aside twenty percent of seats for Discovery increased the Stuyvesant cutoff score by 10 points. Ex. 8.[8] In the absence of an injunction, he will be attending Brooklyn Tech, his second-choice school.

---

[8] The last two columns of the table calculate SHSAT cutoff scores using a 20% Discovery set-aside versus the original Discovery size. Stuyvesant's cutoff score increases 10 points, from 552 to 562. Although this analysis was done using 2019 data, DOE can conduct the same analysis using 2025 data, which is sure to show a similar effect.

## V. Denial of Chen's Preliminary Injunction Motion

Chen filed this action shortly after M.P. received the news of his high school placement, and she sought a preliminary injunction directing DOE to admit M.P. to Stuyvesant for the 2026–27 school year. Chen explained that the internal DOE documents produced after the district court's 2019 preliminary-injunction ruling, together with intervening decisions including *SFFA* and *CACAGNY*, required a fresh analysis of the challenged policy.

On July 21, 2026, following oral argument, the court denied the preliminary injunction motion from the bench, largely reiterating its conclusions from the *CACAGNY* litigation in 2019. The court concluded that Chen had not established discriminatory intent because she did not show that the Discovery revisions were adopted "because of their effects on Asian-American students." Tr. 50:21–51:3.[9] The court distinguished *SFFA* because those admissions policies explicitly used race, whereas the Discovery revisions are facially race neutral. Tr. 52:22–53:6. The court distinguished *CACAGNY* by saying this Court had not squarely

[9] The transcript of the preliminary injunction denial is attached as Exhibit A. Citations to that transcript are hereinafter abbreviated as "Tr."

13

addressed whether *SFFA* altered the analysis of facially neutral selective-school admissions policies. The district court instead adopted the First Circuit's reasoning in *Boston Parent Coalition for Academic Excellence Corp. v. School Committee for the City of Boston*, 89 F.4th 46 (1st Cir. 2023). Tr. 53:7–19. The district court acknowledged this Court's holding that an individual applicant may establish discriminatory impact even without aggregate harm to the racial group, but nevertheless concluded that M.P.'s individualized injury could not satisfy that standard because Chen had not established discriminatory intent. Tr. 53:24–54:13.

Having declined to apply strict scrutiny, the court applied rational-basis review to the policy and concluded that the Discovery expansion was rationally related to the legitimate interests of fostering diversity and expanding educational opportunity for economically disadvantaged students. Tr. 54:14–55:3. It therefore found that Chen had not demonstrated a clear or substantial likelihood of success. Tr. 55:4–13.

The court next concluded that Chen had not shown irreparable harm because she had not demonstrated likely success on her constitutional claims. Tr. 55:14–56:1. The court separately concluded

14

there was insufficient evidence that M.P. would have been admitted to Stuyvesant absent the Discovery revisions, notwithstanding DOE's own modeling showing that the 20-percent reservation increased Stuyvesant's cutoff by ten points. Tr. 56:2–10.

Finally, the court held that the equities and public interest favored maintaining the status quo of the revised admissions policy. Although it recognized that admitting one additional student would impose little administrative burden, it credited the City's argument that relief could encourage similar litigation and interfere with orderly administration of SHS admissions. Tr. 56:11–57:5.

Consistent with Fed. R. App. P. 8(a)(1) and Fed. R. Civ. P. 62(d), Chen requested that the district court enter an injunction pending appeal, which the district court denied. Dkt. No. 60. On July 30, Plaintiff's counsel notified all parties and the Clerk of this Court by email that this motion was forthcoming. Defendants and Intervenors oppose and will file responses.

## ARGUMENT

"[E]ntitlement to relief pending appellate review" is warranted when appellants show (1) "that their [constitutional] claims are likely to

15

prevail," (2) "that denying them relief would lead to irreparable injury, and" (3) "that granting relief would not harm the public interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16 (2020) (granting injunction pending appeal after this Court denied that relief).

Despite the prohibitory nature of the relief sought—stopping the City from enforcing a discriminatory policy— the district court found that Chen was instead seeking a "mandatory" injunction and therefore needed to show a "clear or substantial likelihood of success." Tr. 48:15–22. Such distinctions are often "more semantic than substantive." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). But even if Chen needs to satisfy that higher standard, it is easily satisfied here.

## I.    Chen Is Likely to Succeed on the Merits

When a facially race-neutral policy is adopted with discriminatory purpose and produces a discriminatory effect, strict scrutiny applies. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–66 (1977). And it was undisputed before the district court that if strict scrutiny applies here, the Discovery Program revisions must be found unconstitutional. This Court has already ruled that the "discriminatory

16

effect" requirement of *Arlington Heights* is satisfied for "Asian-American students being deprived of placement in their preferred high school under the new criteria." *CACAGNY*, 116 F.4th at 178. Thus, the only remaining question is whether discriminatory purpose was a motivating factor in the City's decision. *Arlington Heights*, 429 U.S. at 265–66. As discussed in detail below, the record, when read in light of *CACAGNY, SFFA,* and other recent Equal Protection Clause cases, mandates that conclusion because the City designed the Discovery revisions to balance racial outcomes in a zero-sum admissions process. Chen is therefore likely to establish discriminatory intent and succeed on the merits of her claim.

**A. Under modern Equal Protection Clause jurisprudence, facially race-neutral admissions policies implemented to achieve racial balancing must satisfy strict scrutiny**

In its most recent term, the Supreme Court could not have been clearer: the Constitution is "colorblind." *Allen v. Milligan*, 146 S. Ct. 1377, 1380 (2026) (per curiam). As such, the proper reading of *SFFA* is both simple and broad: "if race played a role in a decision made by a government actor, strict scrutiny applie[s]." *Louisiana v. Callais*, 146 S. Ct. 1131, 1146 (2026) (citing *SFFA* and *Arlington Heights*). Consistent with that rule, *Herrera v. New York City Department of Education* cited

17

*SFFA* in holding that strikingly similar statements by Mayor de Blasio and Chancellor Carranza—including general statements about achieving "equity" and statements that city officials should "look like New York City"—could support a finding of unlawful race-based decision-making. No. 1:21-CV-7555-MKV, 2024 WL 245960, at *1–2, *7–8 (S.D.N.Y. Jan. 23, 2024). Likewise, *American Council of Learned Societies v. National Endowment for the Humanities* recognized the impact of *Callais* on "race-based governmental decisionmaking," enjoining the termination of grants where race-based search terms were used because "[w]hen the government uses race to create a classification for purposes of official action, the government must satisfy strict scrutiny." No. 25-CV-3657-CM, 2026 WL 1256545, at *55, *57 (S.D.N.Y. May 7, 2026).

The District Court acknowledged that "diversity" (i.e., desire to reengineer the racial demographics at the SHSs) "was a guiding principle of the changes to the Discovery Program." Tr. 51:13–21. Nevertheless, it essentially reaffirmed its own 2019 decision from the *CACAGNY* case, finding that because the City's revised policy was "facially neutral" and sought to "improve racial diversity" it did not "carr[y] with it a discriminatory intent." Tr. 52:4–8. That approach would effectively

18

require Chen to prove outright animus against Asian-American students by the City. But *SFFA* recognized that the admissions programs there were likely "well intentioned and implemented in good faith" and still held them "patently unconstitutional." 600 U.S. at 213, 223 (quotation omitted). The reason is straightforward: in competitive admissions, "a benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218–19. This Court made the same point in *CACAGNY*: "SHS admission is a zero-sum game in that admitting more students from a particular demographic means admitting fewer from other demographics." 116 F.4th at 167 ("The City's modeling also projected that the changes to the Discovery Program would decrease the number of Asian Americans at the SHSs.").

Facial neutrality does not change the analysis. *CACAGNY* held that the facially neutral Discovery revisions would trigger strict scrutiny if motivated by discriminatory intent and producing a discriminatory effect. *Id.* at 171. As *SFFA* explained, "[w]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows." 600 U.S. at 230 (citation modified). That is the very point of

19

*Arlington Heights*, which commands courts to review circumstantial and direct evidence of the kind submitted here to determine whether "race played a role in a decision made by a government actor." *Callais*, 146 S. Ct. at 1146 (citing *Arlington Heights*, 429 U.S. at 265–66).

In a case that explicitly relied on this Court's decision in *CACAGNY*, the Third Circuit recently applied those principles to a facially neutral selective-school admissions policy in *Sargent v. School District of Philadelphia*, 165 F.4th 727 (3d Cir. 2026). Philadelphia argued that its geographic preferences were race neutral and applied equally to every student, but the court held that the relevant question was whether "the antecedent decision to implement the Admissions Policy itself" was made for a discriminatory purpose. *Id.* at 746–47. The court, in reversing a grant of summary judgment for the city, emphasized that selective-school admissions are a "zero-sum game in which the admission of one student means the rejection of another," making the process closely analogous to *SFFA*. *Id.* at 746. Evidence that officials implemented the policy to "alter the racial composition of the student body" or "achieve racial proportionality" could therefore support a finding of discriminatory purpose. *Id.* at 742–43. And in rejecting the First

20

Circuit's contrary analysis, *Sargent* expressly relied on *CACAGNY*, calling this Court's individualized-harm framework the "sounder approach." *Id.* at 748–50.

The same analysis applies here. DOE did not simply adopt economic or geographic criteria and later discover that they had racial effects. It modeled different ENI thresholds according to the racial outcomes they would produce, and selected the threshold projected to cut the Asian-American share of Discovery offers nearly in half. DOE officials described the revisions as a "lever to admit more Black and Hispanic students" and acknowledged that there would be opposition from Asian Americans. Ex. 2 at ChMc_E_066808; Ex. 7. The ENI threshold may have been facially economic, but the record shows that it was selected and used as a proxy to achieve a desired racial result. This Court has affirmed findings of racial motivation on far less evidence. *See, e.g.*, *MHANY Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 608–11 (2d Cir. 2016) (agreeing there was discriminatory intent where record contained only "code words" about neighborhood "character" without direct racial statements).

21

## B. The District Court relied on superseded and distinguishable precedent

On the issue of intent, the District Court cited *Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir. 1999), for the proposition that racial preferences may be appropriate to remedy past discrimination "even in the absence of specific and identified discrimination." Tr. 52:9–15. But *SFFA* foreclosed that approach, specifying that any remedial use of race must be limited to "specific, identified instances of past discrimination that violated the Constitution or a statute." 600 U.S. at 207. And in any event, *Hayden* is factually inapposite: there, a county redesigned a police entrance exam to reduce conceded past discrimination, and administered the application process identically to all of the candidates. 180 F.3d at 51. Here, by contrast, Defendants did not administer a truly neutral process—they created a set-aside aided by a racial proxy, reducing the seats available through the SHSAT while categorically excluding students at targeted middle schools from the alternative pathway.

*Jana-Rock Construction v. New York State Department of Economic Development*, 438 F.3d 195 (2d Cir. 2006), is similarly inapposite. There, the plaintiffs challenged the underinclusiveness of an affirmative-action definition, but conceded the validity of the remedial program as a whole.

22

438 F.3d at 200–01. And to the extent *Jana-Rock* suggests that a plaintiff must show a separate "intent to harm" the excluded group, *id.* at 211, Chen has shown it here: in a zero-sum admissions system, the City's deliberate effort to increase admissions for some racial groups necessarily meant an intent to reduce admissions for others, and its own modeling showed that Asian-American students would lose seats. *See SFFA*, 600 U.S. at 218–19.

Finally, the district court relied on the First Circuit's decision in *Boston Parent Coalition*. But that case applied a framework that this Court expressly rejected in *CACAGNY*. The First Circuit concluded that the challenged policy lacked a discriminatory effect because Asian-American students remained overrepresented among admitted students compared to the eligible school-age population. 89 F.4th at 57–59. *CACAGNY*, by contrast, held that a plaintiff need not demonstrate aggregate harm to a racial group and may instead establish discriminatory effect by showing that "any individual has been negatively affected or harmed by that discriminatory law or policy based on race." 116 F.4th at 173. The Third Circuit in *Sargent* expressly recognized this conflict, concluding that this Court adopted a "sounder

23

approach" than the First Circuit. 165 F.4th at 748–50. As *Sargent* explained, courts may not excuse intentional racial discrimination merely because the disadvantaged racial group remains, in the court's view, "sufficiently successful." *Id.* at 749.

***

Taken together, the record and governing precedent show that Chen is likely to prevail on the merits of both her Equal Protection and Title VI claims:[10] the City adopted the Discovery revisions to balance racial outcomes in a zero-sum admissions environment, thereby triggering strict scrutiny which the City concedes the policy cannot satisfy.

## II. M.P. Will Suffer Irreparable Injury Absent an Injunction Pending Appeal

The District Court largely tied its irreparable harm analysis to the likelihood of success on the merits, holding that "[a]bsent that showing, plaintiff has failed to demonstrate irreparable harm." Tr. 55:23–56:1. Should this court conclude Chen is likely to succeed on the merits, it

---

[10] Plaintiff's Title VI claim is likely to succeed for the same reasons as her Equal Protection Clause claims. Tr. 55:4–8.

24

should necessarily find irreparable harm. *See Seventh Regiment Armory Conservancy, Inc. v. Knight*, 811 F. Supp. 3d 467, 478 (S.D.N.Y. 2025).

More fundamentally, the harm faced by M.P. is irreparable in the most concrete sense. If M.P. begins high school elsewhere, no later ruling can restore his freshman year at Stuyvesant, including the coursework, teachers, peer cohort, extracurricular opportunities, and relationships that begin forming on the first day of ninth grade. Because an injunction would preserve that opportunity while its denial would permanently extinguish it, this factor weighs decisively in Plaintiff's favor. This is true even though he has an offer to attend Brooklyn Tech. This Court has already recognized Stuyvesant as the more prestigious school. *CACAGNY*, 116 F.4th at 169. And, regardless, this Court should decline "to judge the comparative merits" of the two schools, recognizing instead that "educational experiences" are inherently "unique," and that the loss of the chance to enroll in one's chosen or preferred school is irreparable harm because final resolution of the case could take "years to come." *Foulke v. Foulke*, 896 F. Supp. 158, 160–61 (S.D.N.Y. 1995).

The district court also erroneously held that M.P.'s injury is "remote or speculative" because there was "insufficient evidence ... to determine

whether or not he, in fact, would have met" the Stuyvesant cutoff absent the admissions changes. Tr. 56:2–10. But the record points decidedly in the opposite direction: M.P. scored only three points below that cutoff, and DOE's own 2019 internal analysis concluded that the Discovery revisions raised the Stuyvesant cutoff by ten points. The City has offered no competing calculation for 2025. It speaks volumes that the City did not dispute in its briefing before the district court that M.P.'s score would have sufficed for admission to Stuyvesant absent the challenged revisions. Although the City's counsel professed at oral argument not to know whether M.P.'s score would have sufficed, the City alone has the ability to perform that calculation, and this Court rightly places the burden on "the party with easier access to relevant information" to avoid requiring the other party to prove a negative. *Nat'l Commc'ns Ass'n v. AT&T Corp.*, 238 F.3d 124, 130–31 (2d Cir. 2001).

## III. An Injunction Would Not Harm the Public Interest

"The government does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quotation omitted). Thus, if Chen is likely to

26

succeed on the merits of her claims, the public interest is served by a grant of this motion.

The district court acknowledged that admitting M.P. would not create a significant administrative burden for the City. Tr. 56:19–20. Stuyvesant admits more than 800 students each year, and Chen seeks only the admission of one additional student, without displacing anyone else. The district court nevertheless relied on the possibility that granting relief could lead to additional lawsuits. Tr. 56:19–24. But the possibility that others may seek to enforce their constitutional rights does not harm the public interest, as that argument would foreclose an injunction in almost any constitutional challenge to a generally applicable policy. And given the imminent start of the school year, it would be nearly impossible for hypothetical plaintiffs to successfully seek admission to the SHSs for 2026–27. Thus, the possibility of future litigation does not justify denying narrow relief to M.P., and granting the injunction would not harm the public interest.

27

## CONCLUSION

This Court should grant an injunction ordering that M.P. be admitted to Stuyvesant High School for the 2026–27 school year pending resolution of Plaintiff's appeal.

DATED: August 3, 2026.

Respectfully submitted,

/s/ Dean McGee

Glenn E. Roper
PACIFIC LEGAL FOUNDATION
1745 Shea Center Dr., Ste. 400
Highlands Ranch, CO 80129
Telephone: (916) 419-7111
GERoper@pacificlegal.org

Dean McGee
Caitlyn Fellner
PACIFIC LEGAL FOUNDATION
3100 Clarendon Boulevard
Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
DMcGee@pacificlegal.org
CFellner@pacificlegal.org

*Counsel for Plaintiff Yi Fang Chen, individually
and on behalf of her minor children M.P., Ma.P., and P.P.*

28

## CERTIFICATE OF COMPLIANCE

Type-Volume Limit, Typeface Requirements,
and Type-Style Requirements

This document complies with the type-volume limitation of Local Rule 32.1(a)(4),(5)/Fed. R. App. P. 27(d)(2)(A),(C), excluding the parts of the document exempted by Fed. R. App. P. 32(f), because this document contains 5,200 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in font style Century Schoolbook and font size 14.

DATED: August 3, 2026.

s/ Dean McGee
Dean McGee
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Dean McGee
Dean McGee
*Counsel for Plaintiff-Appellant*