# 26-847

## United States Court of Appeals
### for the Second Circuit

YI FANG CHEN, individually and on behalf of her minor children M.P., MA.P., AND P.P.,

*Plaintiff-Appellant,*

against

ZOHRAN MAMDANI, in his official capacity as Mayor of the City of New York; KAMAR H. SAMUELS, in his official capacity as Chancellor of the New York City Department of Education; and NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendants-Appellees,*

*(caption continued on next page)*

On Appeal from the United States District Court
for the Southern District of New York

## MEMORANDUM OF LAW IN OPPOSITION TO EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

|  | STEVEN BANKS |
|  | *Corporation Counsel* |
|  | *of the City of New York* |
| RICHARD DEARING | Attorney for Defendants- |
| CLAUDE S. PLATTON | Appellees |
| STEPHANIE TEPLIN | 100 Church Street |
| *of Counsel* | New York, New York 10007 |
|  | 212-356-3255 |
| August 13, 2026 | steplin@law.nyc.gov |

————————————

*(caption continued from previous page)*

TEENS TAKE CHARGE, DESIS RISING UP AND MOVING;
COALITION FOR ASIAN AMERICAN CHILDREN AND
FAMILIES; VERONICA CARRASQUILLO, on behalf of her minor
child, A.C.; WANG JIN HUA, on behalf of her minor child, A.Z.;
HALIMATOU DIALLO, on behalf of her minor child, K.D.;
JENNIFER VELEZ, on behalf of her minor child, G.R.,

*Intervenor-Defendants-Appellees.*

————————————

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................ii

PRELIMINARY STATEMENT..........................................................1

OVERVIEW OF THE CASE..............................................................3

    A. 2018 changes to the Discovery Program ..........................3

    B. The ongoing *CACAGNY* litigation ....................................6

    C. This lawsuit and the motion for a preliminary
       injunction to admit M.P. to Stuyvesant ............................8

ARGUMENT...................................................................................10

    THE MOTION FOR AN INJUNCTION PENDING
    APPEAL SHOULD BE DENIED .........................................10

    A. Chen has not made a strong showing of irreparable
       harm. ................................................................................11

    B. Chen has not shown a clear likelihood of success on
       the merits.........................................................................13

        1. Chen is not likely to prove discriminatory intent. ......14

        2. Chen cannot show a clear likelihood that an
           unconstitutional policy was the but-for cause of an
           injury to M.P. .............................................................21

    C. The equities and public interest do not favor an
       injunction. .......................................................................23

CONCLUSION...............................................................................25

CERTIFICATE OF COMPLIANCE ..............................................26

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudath Isr. of Am. v. Cuomo,*
  979 F.3d 177 (2d Cir. 2020) ........................................................ 10

*Am. Council of Learned Societies v. NEH,*
  ___ F. Supp. 3d ___, 2026 WL 1256545
  (S.D.N.Y. May 7, 2026) ................................................................ 16

*Bos. Parents Coal. v. Sch. Comm. for City of Bos.,*
  996 F.3d 46 (1st Cir. 2023) ..................................................... 17, 20

*Brewer v. W. Irondequoit Cent. Sch. Dist.,*
  212 F.3d 738 (2d Cir. 2000) ........................................................ 13

*Care One, LLC v. NLRB,*
  166 F.4th 335 (2d Cir. 2026) ...................................................... 13

*Chinese Am. Citizens Alliance of Greater N.Y. v. Adams,*
  116 F.4th 161 (2d Cir. 2024) ................................................*passim*

*Christa McAuliffe Intermediate Sch. PTO, Inc. v.
  De Blasio,*
  364 F. Supp. 3d 253 (S.D.N.Y. 2019) ........................................6, 7, 9

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.,*
  68 F.4th 864 (4th Cir. 2023) ....................................................... 20

*Foulke v. Foulke,*
  896 F. Supp. 158 (S.D.N.Y. 1995) ............................................... 12

*Hayden v. Cnty. of Nassau,*
  180 F.3d 42 (2d Cir. 1999) .......................................................... 14

*Herrera v. N.Y.C. Dep't of Educ.,*
  2024 WL 245960 (S.D.N.Y. Jan. 23, 2024) .................................. 16

*JTH Tax, LLC v. Agnant,*
  62 F.4th 658 (2d Cir. 2023) .................................................... 10, 11

*Louisiana v. Callais,*
  ___ U.S. ___, 146 S. Ct. 1131 (2026) ........................................... 16

*Mullin v. Doe,*
  609 U.S. ___, 146 S. Ct. 2121 (2026) ........................................... 16

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Nat'l Ass'n for Gun Rts. v. Lamont,*
    153 F.4th 213 (2d Cir. 2025) ............................................. 11, 12, 13

*Nat'l Commc'ns Ass'n v. AT&T Corp.,*
    238 F.3d 124 (2d Cir. 2001) ....................................................... 12

*Naumovski v. Norris,*
    934 F.3d 200 (2d Cir. 2019) ....................................................... 21

*New York v. U.S. Dep't of Homeland Sec.,*
    969 F.3d 42 (2d Cir. 2020) ......................................................... 23

*Personnel Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979)............................................................. 14, 20

*Pride v. Cmty. Sch. Bd. of Brooklyn, N.Y. Sch. Dist. No. 18,*
    488 F.2d 321 (2d Cir. 1973) ........................................................ 11

*Sargent v. Sch. Dist. of Phila.,*
    165 F.4th 727 (3d Cir. 2026) ...................................................... 17

*Students for Fair Admissions, Inc. v.*
    *President & Fellows of Harvard College,*
    600 U.S. 181 (2023)............................................................. 15, 18

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.,*
    60 F.3d 27 (2d Cir. 1995) ........................................................... 10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977)............................................................. 14, 19

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008)................................................................. 10, 23

**Statutes**

N.Y. Educ. Law § 2590-g(12) (1996)........................................... 3, 4, 22

N.Y. Educ. Law § 2590-h(1) ......................................................... 3

## PRELIMINARY STATEMENT

Plaintiff Yi Fang Chen brings this motion to have her child M.P. admitted to New York City's Stuyvesant High School even though he did not score high enough on the admissions test and does not qualify for the Discovery Program, an alternate admission path for high-scoring socioeconomically disadvantaged students who missed the admission cutoff for a Specialized High School (SHS). Chen sued the City's Department of Education (DOE), Mayor, and Schools Chancellor (together, "the City"), alleging that 2018 changes to the SHS admission process discriminated against Asian-American students. She makes that claim even though Asian-American participation in the SHSs and the Discovery Program increased since the changes took effect.

The U.S. District Court for the Southern District of New York (Ramos, J.) denied Chen's extraordinary request for a preliminary injunction, and this Court should do the same. First, Chen cannot show irreparable harm to M.P., who was admitted to Brooklyn Tech, one of the most prestigious high schools in the country and his second-choice pick.

Second, Chen cannot show a clear likelihood of success on the merits. She admits that the Discovery Program is facially race-neutral: it depends only on students' socioeconomic needs and the economic circumstances of their middle school. Under well-settled law, the changes

to the Program would be subject to strict scrutiny only if they were adopted *because* they would disadvantage a racial group. But Chen can only show, at most, that the City was aware that the changes at issue here—which aimed to increase racial, socioeconomic, and geographic diversity at the SHSs—might cause a small decrease in Asian American enrollment (which, as it turned out, did not occur).

The claim suffers from another defect: M.P. would not be eligible for the Discovery Program in its pre-2018 form because he was admitted to Brooklyn Tech based on his test score. Thus, Chen cannot prove her claim by showing that the school-level socioeconomic *eligibility* criteria for the Discovery program are discriminatory. Only the expansion of the *size* of the Program could have affected his admission. So Chen must prove that the decision to expand the Program was motivated by invidious racial animus, and on that point she has no evidence at all.

Chen's strategy is not hard to grasp. Rather than pursue her claim in a companion lawsuit, where full fact and expert discovery is nearing completion, she prefers to go for a quick win based on limited briefing and a smattering of evidence presented to this Court without context. Admitting M.P. to Stuyvesant on this record is inconsistent with the high burden for emergency relief and is fundamentally unfair to all the other students who, like M.P., did not get into their first-choice high school.

## OVERVIEW OF THE CASE

### A. 2018 changes to the Discovery Program

New York City has long operated prestigious "specialized" high schools, including Stuyvesant High School and Brooklyn Technical High School (Ex.[1] A ¶ 21; Ex. B ¶ 6). Under state law, students can be admitted to an SHS via two routes. N.Y. Educ. Law §§ 2590-h(1)(b), 2590-g(12) (1996). The first is based solely on a student's score on the Specialized High School Admissions Test (SHSAT) (Ex. C ¶ 4–6). Students are ranked by SHSAT score and assigned in that order to the highest-ranked school on their application that has an available seat (*id.* ¶ 6). If a student's first-choice is full, she is considered for her second choice, and so on, until no seats remain (*id.*). The SHSAT score of the last student offered admission to an SHS is known as the cutoff score (*id.*).

The second route is through the Discovery Program, which by law is designed "to give disadvantaged students of demonstrated high potential an opportunity to try the special high school program." N.Y. Educ. Law § 2590-g(12)(d) (1996). The state statute does not define the

---

[1] Exhibits A–F are attached to the Declaration of Stephanie Teplin. Exhibits to the Declaration of Glen Roper (ECF 17.3) are cited by exhibit number and Bates number.

term "disadvantaged" or fix the size of the Discovery Program, leaving those decisions to DOE's discretion. *Id.*

In June 2018, DOE announced two changes to the Discovery Program. First, each SHS would reserve 20% of seats for students admitted through the program, up from approximately 5% (Ex. C ¶ 18; Ex. 4 at '918). Second, DOE revised the eligibility criteria for the program. Eligibility for students at public middle schools would be limited to those attending schools with an Economic Need Index (ENI)[2] of 0.60 or greater (Ex. B ¶¶ 20, 22). Discovery Program students must also be individually socioeconomically disadvantaged (for example, receiving free or reduced-price lunch or SNAP benefits) and receive a recommendation from their middle school (*id.* ¶ 20). Students with a SHSAT score above the cutoff are statutorily ineligible for admission through the Discovery Program (*id.*).

The 2018 changes reflect a recognition—by DOE and the public—that the SHSs had become less diverse racially, geographically, and socioeconomically (Ex. B ¶¶ 4, 9–10). In 2017, only 30 middle schools (out of approximately 650) accounted for 50% of SHS admissions (Ex. B

---

[2] ENI measures a school's economic disadvantage taking into account the number of students that individually have economic need (eligibility for public assistance, recent residence in temporary housing, or a home language other than English) and the proportion of families below the poverty line in the census tract (Ex. B ¶ 23).

¶ 17; Ex. C ¶¶ 24–29). And at the three oldest SHSs (Stuyvesant, Brooklyn Tech, and Bronx Science), fewer than 2.5% of students were African American and fewer than 7% were Latino (Ex. B ¶ 17). In considering the changes, DOE conducted studies and modeling to "more precisely target schools where the majority of students are facing economic hardship and the disadvantages that accompany it" (*id.* ¶ 25).

DOE also modeled, to the extent possible, how changes to Discovery Program eligibility would affect the racial demographics of the SHSs and Discovery participants. DOE did not make predictions about future years, which would have required numerous uncertain assumptions (*see* Ex. B ¶¶ 26–29; Ex. C ¶ 15–16). However, it looked at how the then-current class would have differed if the new policies were in effect (Ex. Ex. C ¶ 20). DOE felt it was important to have this information, not least because it had been subject to a civil-rights complaint alleging that the SHS admission policies discriminated against Black and Latino students (Ex. B ¶ 13]). DOE also considered how the changes could affect the gender, racial, and geographic diversity at the SHSs, as well as their effect on the proficiency of incoming students (*see* Ex. 3 at '812, Ex. 6).

DOE's 2018 modeling showed that if the changes to the Discovery Program had been in effect for the 2018–19 class, the combined percentage of African-American and Latino students might increase from

approximately 9% to approximately 16%; Asian-American enrollment would decrease from 53% to 50.9%; enrollment of white students would decrease from 27.2% to 24.7%; and enrollment of students whose race or ethnicity was unknown would decline from 9% to 7.8% (Ex. B ¶¶ 31–32).

In reality, the change to ENI resulted in increased Asian-American participation in the Discovery Program and at the SHSs. In 2017, before the changes took effect, Asian-American students made up 41% of Discovery invitations (Ex. E ¶ 3). In each year after the changes, they received between 43% and 53% of invitations (*id.* ¶ 4). Admissions through the SHSAT route have also remained consistent: in 2017, 52% of students receiving an offer based on test score were Asian American; in 2026, the figure was 56% (*id.* ¶ 5).

## B. The ongoing *CACAGNY* litigation

In 2018 a group of plaintiffs filed an equal protection suit challenging the changes to the Discovery Program. *See Chinese Am. Citizens Alliance of Greater N.Y. v. Adams (CACAGNY)*, 116 F.4th 161, 167–68 (2d Cir. 2024). In district court, the *CACAGNY* plaintiffs sought and were denied a preliminary injunction. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 364 F. Supp. 3d 253 (S.D.N.Y.), *aff'd on standing grounds*, 788 F. App'x 85 (2d Cir. 2019). Chen was dismissed

6

from *CACAGNY* for lack of standing because her oldest child was then in first grade. *Id.* at 272.

The parties agreed to bifurcate discovery, with the first phase addressing the impact of changes to the Discovery Program and the second addressing the City's motivations for adopting them. *CACAGNY*, 116 F.4th at 168. After phase-one discovery established that Asian-American participation in the Discovery Program had increased, the City moved for summary judgment on the basis that the plaintiffs could not show a discriminatory effect. The district court (Ramos, J.) granted summary judgment, but this Court reversed. *Id.* at 164–65, 169.

In the unusual posture of the case, the Court was required to take all inferences in plaintiffs' favor and assume they could "prove that the policy changes to the Discovery Program were made with the discriminatory intent to reduce the number of Asian-American students at the SHSs." *Id.* at 165, 171. Under that assumption, the Court held that the district court erred by insisting on evidence of "an aggregate disparate impact on Asian-American students"—which did not exist—"in order to establish the requisite discriminatory effect for an equal protection claim." *Id.* at 165. Rather, "if discriminatory intent is proven, a negative effect or harm from that discriminatory policy on individual Asian-

7

American students applying to the SHSs would be sufficient to trigger strict scrutiny review." *Id.*

Following remand, the parties began phase-two discovery into the City's motivation for the 2018 changes (*see* No. 18-cv-11657, ECF 203). Fact and expert discovery have not yet concluded, and motions addressed to standing are being briefed (*id.*; Ex. D at 33).

## C. This lawsuit and the motion for a preliminary injunction to admit M.P. to Stuyvesant

While the *CACAGNY* litigation was ongoing, Chen, individually and on behalf of her child M.P., filed a new complaint, represented by the same counsel as the *CACAGNY* plaintiffs (Ex. A). M.P. received a SHSAT score of 558, which was three points below the cutoff for admission to Stuyvesant, his first choice (*id.* ¶ 11). M.P. was admitted to Brooklyn Tech, his second choice (Ex. E ¶ 6).

Chen asserted two causes of action, under the Equal Protection Clause and Title VI (Ex. A ¶¶ 71–96). She then moved for a preliminary injunction directing DOE to admit M.P. to Stuyvesant for the 2026–27 school year, relying on the same evidence and arguments she presents on this motion (S.D.N.Y. ECF 14–17).

Judge Ramos, assigned the new case as related to *CACAGNY,* denied the motion for a preliminary injunction (Ex. D at 48–58), applying

8

the heightened standard for a mandatory injunction (*id*. 48–49). First, as to both claims (*id*. 55), Chen had not demonstrated that the facially race-neutral changes to the Discovery Program were enacted "at least in part because of and not merely in spite of [their] adverse effects upon an identifiable group" (*id*. 50). None of her evidence demonstrated a strong likelihood of showing that the changes were motivated by a goal of disadvantaging Asian Americans (*id*. 51–53). *See Christa McAuliffe*, 364 F. Supp. 3d at 277–79 (evaluating similar evidence). Thus, the changes should be reviewed for a rational basis, and under that standard they were likely to be upheld (Ex. D at 53–54).

As to the remaining preliminary injunction factors, the court held that Chen could not rely on a constitutional violation to establish irreparable harm because she was unlikely to succeed on the merits (*id*. 55–56). Moreover, there was "insufficient evidence" to conclude that M.P. would have been admitted to Stuyvesant but for the Discovery Program changes, making any harm too remote and speculative to support injunctive relief (*id*. 56). Finally, the court found that the balance of equities and the public interest favored maintaining the status quo, observing that "[w]hile the admission of M.P. alone may not be a large administrative burden for the city, … such admission could open opportunities

for widespread similar litigation and endanger the orderly administration of decisions to specialized high schools" (*id.*).

## ARGUMENT

### THE MOTION FOR AN INJUNCTION PENDING APPEAL SHOULD BE DENIED

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). An injunction pending appeal after the district court denied relief is more extraordinary still. *Agudath Isr. of Am. v. Cuomo*, 979 F.3d 177, 180 (2d Cir. 2020). And here, contrary to Chen's contention (Motion for Injunction Pending Appeal ("Mot.") 16), she seeks a mandatory injunction that would "alter[] the status quo" by requiring M.P.'s admission to Stuyvesant. *See JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023); *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). Chen therefore must make "a strong showing of irreparable harm" and show "a clear or substantial likelihood of success on the merits," in addition to demonstrating that the equities and public interest favor an injunction. *JTH Tax*, 62 F.4th at 667, 669. She cannot meet that burden.

**A. Chen has not made a strong showing of irreparable harm.**

"[I]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction," *JTH Tax*, 62 F.4th at 672 (quotation omitted), and Chen does not come close to making the strong showing required.

No matter the result of this motion—or this lawsuit—M.P. will attend one of the best public high schools in New York City and, indeed, the country. Chen does not attempt to establish that Brooklyn Tech is objectively inferior to Stuyvesant and does not explain the basis for M.P.'s preference (*see* Ex. D at 17) (confirming that the alleged injury was not based on "measur[ing] the difference between Stuyvesant and Brooklyn Tech")). Showing that M.P. will attend a different, but also excellent, school is not enough to establish irreparable harm. *See Pride v. Cmty. Sch. Bd. of Brooklyn, N.Y. Sch. Dist. No. 18*, 488 F.2d 321, 327–28 (2d Cir. 1973); *see also Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 248 (2d Cir. 2025), *cert. granted sub nom. Grant v. Higgins*, 2026 WL 1871312 (U.S. June 30, 2026) (purpose of a preliminary injunction not to "guarantee the parties suffer no harm during the pendency of

11

litigation but merely to preserve the relative positions of the parties until a trial on the merits can be held" (quotation omitted)).[3]

The harm that Chen claims, is, at best "remote" and "speculative," which would not suffice even for a prohibitory injunction. *See Lamont*, 153 F.4th at 248. For one thing, year-to-year variability means there is no fixed cutoff; in fact, M.P.'s score would have been above the cutoff for Stuyvesant if he'd been in last year's applicant pool. (Ex. A ¶ 11). And there are dozens of other students who scored the same or higher than M.P. on the SHSAT but were not admitted to Stuyvesant (Ex. F; Ex. D at 19), yet Chen's argument assumes that if her challenge were successful the automatic remedy would be to admit M.P. She offers no proof on this front and instead tries to improperly shift her burden on a preliminary injunction to the City (Mot. 26).[4] What's more, before 2018, DOE allowed each SHS to choose the number of seats set aside for Discovery participants. Chen gives no reason to believe that if the changes were undone, the Discovery Program would shrink back to its pre-2018 size.

---

[3] *Foulke v. Foulke*, 896 F. Supp. 158 (S.D.N.Y. 1995), does not say anything different. There a student would lose her admission to one school if she did not immediately accept. *Id*. at 160. M.P.'s admission to Brooklyn Tech is assured.

[4] The case Chen cites is about statutory burdens of proof at trial. *Nat'l Commc'ns Ass'n v. AT&T Corp.*, 238 F.3d 124, 130–31 (2d Cir. 2001). It does not excuse Chen from supporting her preliminary injunction application, particularly where she chose to move without discovery.

12

Rather than marshal evidence of irreparable injury, Chen asserts that a violation of equal protection is *per se* irreparable harm (Mot. 24–25). This assumes likelihood of success on the merits, which, as discussed below, Chen cannot show. And if such presumed harm might support an injunction against an allegedly unconstitutional policy, it would not support a mandatory injunction admitting M.P. to Stuyvesant, which requires Chen to prove that M.P. would have been admitted but for the policy. In any event, the *per se* injury rule "does not obtain universally," *Care One, LLC v. NLRB*, 166 F.4th 335, 348 (2d Cir. 2026), and this Court has recently declined to extend it, *Lamont*, 153 F.4th at 248. Although in one instance the Court found that likelihood of success on an equal protection claim established irreparable harm, that was not based on a *per se* rule but on the "unique and somewhat outrageous facts." *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744–45 (2d Cir. 2000) (elementary-school student's school offer withdrawn after twice being extended).

### B. Chen has not shown a clear likelihood of success on the merits.

The parties agree that DOE's implementation of the Discovery Program is facially race-neutral (Mot. 18–19; Ex. D at 6). It is therefore subject to rational-basis review unless Chen can show that the changes

were motivated by discriminatory intent and had a discriminatory effect on M.P. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977). Chen does not argue that the changes lack a rational basis, and she has failed to make a strong showing that they should be subject to strict scrutiny.

### 1. Chen is not likely to prove discriminatory intent.

*a.* Under *Arlington Heights*, Chen must show that the intent to discriminate against Asian Americans because of their race was a motivating factor for the City's decisions to increase the size of the Discovery Program and introduce the ENI threshold. 429 U.S. at 265–66. Discriminatory intent requires more than "intent as awareness of consequences." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). A plaintiff must show that the decisionmaker acted "at least in part 'because of,' not merely 'in spite of,' [the] adverse effects upon an identifiable group." *Id.* This "typically" means the "government actor seeks to disadvantage or negatively impact a group of persons." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 50 (2d Cir. 1999). Although she now argues otherwise, Chen acknowledged these principles to the district court, explaining that the claim was based "not [on] mere incidental awareness of race, but making decisions because of race" (Ex. D at 22, 46).

14

That standard was not changed—or even addressed—by *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* (*SFFA*), 600 U.S. 181 (2023). There, the Supreme Court reviewed university admissions policies that indisputably were not race-neutral. *Id.* at 195–96 (race was a "determinative tip" or "plus" for non-white applicants); *id.* at 220 (admissions criteria established "an inherent benefit in race *qua* race"). Applying strict scrutiny, the Court held that the generalized goal of a diverse student body was insufficient to justify race-based admissions. *Id.* at 214–15.

*SFFA* did not consider when a race-neutral policy should be subject to strict scrutiny or how to evaluate the intent factor under *Arlington Heights*, let alone overrule *Arlington Heights*, *Feeney*, or any of this Court's cases that followed. Chen glibly quotes a phrase from an introductory paragraph of *SFFA* about policies that are "well intentioned" (Mot. 19 (quoting *SFFA*, 600 U.S. at 213)). But the decision did not (and did not need to) evaluate the universities' motivation because their admission policies were not race-neutral. It noted the universities' good

15

intentions only to express that even good-faith use of race-based policies can violate strict scrutiny.[5]

Both the Supreme Court and this Court have recently reaffirmed the viability of *Arlington Heights*. In *Mullin v. Doe*, the Supreme Court assumed that *Arlington Heights*—or perhaps an even more deferential standard—applied to the termination of temporary protected status for Haitians. 609 U.S. ___, 146 S. Ct. 2121, 2138 (2026). It described its task as "determin[ing] whether a 'discriminatory purpose [was] a motivating factor in the decision.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 265–66). And in *CACAGNY*—decided after *SFFA*—this Court emphasized that its "holding in no way undermines, or even implicates, the Supreme Court's guidance in *Feeney*, applied by this Court and other circuits under the *Arlington Heights* standard, namely, that 'discriminatory purpose implies that the decisionmaker selected or reaffirmed a particular course of action at least in part *because of*, not merely *in spite of*, its adverse effects upon an identifiable group.'" 116 F.4th at 175 n.7

---

[5] None of the other cases Chen cites dispensed with the requirement to establish discriminatory intent for race-neutral policies (Mot. 17–18). *See Louisiana v. Callais*, ___ U.S. ___, 146 S. Ct. 1131, 1152 (2026) ("intentional use of race" in redistricting); *Am. Council of Learned Societies v. NEH*, ___ F. Supp. 3d ___, 2026 WL 1256545, at *55 (S.D.N.Y. May 7, 2026) (grant awards "expressly employ[ing]" classifications based on race); *Herrera v. N.Y.C. Dep't of Educ.*, 2024 WL 245960, at *7–8 (S.D.N.Y. Jan. 23, 2024) (material questions of fact about whether DOE used "race-based" hiring policies).

(quoting *Feeney*, 442 U.S. at 279, alterations omitted). The Court quoted approvingly the First Circuit's reasoning that "'aware[ness] that race-neutral selection criteria … are correlated with race'" is insufficient to show discriminatory intent. *Id.* (quoting *Bos. Parents Coal. v. Sch. Comm. for City of Bos.*, 996 F.3d 46, 48 (1st Cir. 2023)).[6]

Chen relies repeatedly on the line that SHS admissions are "zero sum" (*e.g.*, Mot. 11, 19, 20, 23). But she never connects the dots to show why, under these facts, a zero-sum admissions process amounts to "racial balancing" when the policy at issue is race-neutral (*id.* 17). Her position seems to be that any system with a fixed number of seats can never be changed unless racial proportions stay static against some (arbitrary) baseline. But that rule would tie the hands of policymakers and "freeze the status quo of prior discriminatory practices," "turn[ing] the previous status quo into an immutable quota." *Bos. Parent Coal.*, 89 F.4th at 57–58 (quotations and alteration omitted). DOE should not be prevented from exercising its discretion under state law and locked into the pre-

---

[6] The Third Circuit applied this same intent analysis, and, after a close review of the evidence, found material fact issues about a different city's motivation. *Sargent v. Sch. Dist. of Phila.*, 165 F.4th 727, 742–43 (3d Cir. 2026). The decision does not help Chen, who has not presented a full record and who must meet the higher standard of a clear likelihood of success.

2018 admissions process for all time just because one plaintiff would prefer the result.

**b.** Chen cannot make the requisite showing of intent. As an initial matter, in most equal protection cases "circumstantial evidence of disparate impact may be 'an important starting point' in determining whether a facially race-neutral policy or decision was motivated by a discriminatory purpose." *CACAGNY*, 116 F.4th at 172 (quoting *Arlington Heights*, 429 U.S. at 266)). Because there is no evidence of a discriminatory effect on Asian-American students in the aggregate from the Discovery Program changes, *see id*. at 168, Chen does not get an evidentiary boost from that starting point.

Chen agrees that there is no constitutional problem with DOE's efforts to expand educational opportunities for economically disadvantaged students (Ex. D at 10). *See SFFA*, 600 U.S. at 299–300 (Gorsuch, J., concurring) (observing that institutions "could obtain significant racial diversity without resorting to race-based admissions practices," such as by favoring "socioeconomically disadvantaged applicants"). Chen's musing (Mot. 6) that it is "odd" to consider schoolwide economic factors does not undercut DOE's policy judgment that "[s]tudents who are both from low-income families and attending schools that have students with higher economic hardship face more disadvantages than

18

students who are from low-income families but attend schools with higher-income students" (Ex. B ¶ 24). And no matter what middle school they attend, only students who are individually disadvantaged qualify for Discovery (*id.* ¶ 20).

The scattered evidence Chen attaches to her motion (at 7–9) is no substitute for the "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" that *Arlington Heights* requires. 429 U.S. at 266. She quotes a handful of emails and documents, devoid of context and without any effort to show their role in the decision-making process. And it's telling that she selected just seven documents from the thousands exchanged in the *CACAGNY* litigation and ignores statements from DOE decisionmakers about their motivation (*see* Ex. B ¶ 4). Rather than prove her case on a full record, Chen would prefer to highlight snippets in isolation.

In any event, the documents do not show an intent to harm Asian Americans. For example, the DOE slide deck discusses increased diversity at SHSs across multiple characteristics—race, but also geography, middle schools, gender, and socioeconomic status (Ex. 3 at '812). And it describes several options for SHS admissions that DOE did *not* pursue, noting that expanding and changing eligibility for the Discovery Program was projected to do the least to alter the racial makeup of SHSs

19

(*id.* at '811). Chen cites a statement that Asian-American leadership would "vociferously oppose" the changes, but—as it says in the same bullet point—that's because they, as well as "[a]lum communities" and "other stakeholders," might "allege diminishing of quality/standards" at the SHSs, not claim racial discrimination (Ex. 7).

The chart showing the possible demographics of future Discovery participants was not prepared for decision making, but to respond to a reporter's question to City Hall (Ex. 5 at '255). In any event, the document shows, at most, that in evaluating race-neutral criteria for SHS admissions, DOE chose the one that increased racial and other measures of diversity. *See Bos. Parent Coal.*, 89 F.4th at 61–62. DOE anticipated that Asian-American participation could decrease, but this "awareness of consequences" is not evidence of discriminatory intent. *Feeney*, 442 U.S. at 279; *see Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023). And as to the implications of expanding the size of the Discovery Program (as opposed to adjusting eligibility criteria), the documents Chen cites show that, while increasing socioeconomic and geographic diversity, it would have no material effect on racial demographics (Ex. 4 at '916).

In short, the scattered evidence cited by Chen does not present a full picture of the decision-making process and shows, at most, that

DOE was aware that the changes designed to increase access for the most disadvantaged students could affect the racial demographics of the Discovery Program. That is insufficient to show a clear likelihood of success on her claim.

### 2. Chen cannot show a clear likelihood that an unconstitutional policy was the but-for cause of an injury to M.P.

Chen assumes away her burden to prove that an unconstitutional policy had a harmful effect on M.P., but her lack of evidence on that point is another reason to deny a preliminary injunction. In *CACAGNY*, the Court reaffirmed that "an equal protection claim challenging a facially neutral policy … require[s] a showing of discriminatory effect." 116 F.4th at 173. Chen therefore must show that "the harm [to M.P.] would not have occurred in the absence of—that is, but for—the defendant's conduct." *Naumovski v. Norris*, 934 F.3d 200, 213–14 (2d Cir. 2019) (causation standard under § 1983 claim for equal protection violation).

Chen cannot meet that standard. To begin, she cannot rely on changes to *eligibility* for the Discovery Program or the use of the ENI threshold because it is undisputed that M.P. was ineligible for Discovery even under the pre-2018 system. M.P.'s SHSAT score gained him

admission to Brooklyn Tech (Ex. E ¶ 6). By law, students who score above the cutoff for any SHS are not eligible for the Discovery Program (Ex. B ¶ 20; Ex. C ¶ 8). N.Y. Educ. Law § 2590-g(12) (1996).

Chen's entire claim must therefore rest on the allegation that the *percentage of seats* allocated to Discovery Program participants was an unconstitutional race-based decision that caused M.P. to be admitted to his second-choice school (*see* Ex. A ¶ 1). *See CACAGNY*, 116 F.4th at 171, 174 (equal protection plaintiffs must "demonstrate that they suffered some harm from the law or policy" that was motivated by discriminatory intent). But Chen confirmed to the district court that she has no qualm about the size of the Discovery Program: "the pure expansion[,] if not part of a … broader racial balancing goal, would not trigger an equal protection claim" (Ex. D at 10). And as noted, the evidence she presents does not suggest a racial motivation for increasing the size of a program designed to give more seats to socioeconomically disadvantaged students. She doesn't even present evidence that DOE was *aware* of how the 20% set-aside, in isolation, would change the racial makeup of SHS classes.

## C. The equities and public interest do not favor an injunction.

Finally, the equities and public interest, which merge in this case, do not favor an injunction. *See New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020). First, fairness is ill-served by permitting M.P. to leapfrog over the 50-plus students with the same or higher SHSAT scores who similarly picked Stuyvesant as their first choice and did not get in (Ex. F). Admitting M.P. would be contrary to longstanding DOE policy to treat all students with the same SHSAT score as a group (*see* Ex. 4 at '910), upsetting students' reasonable expectations about how admissions would be administered. *See Winter*, 555 U.S. at 24 (considering the "public consequences" of an injunction).

Second, while admitting one additional student to Stuyvesant may not in and of itself be an administrative disaster, the prospect of piecemeal SHS admissions through litigation would be. When asked at oral argument if this injunction would open the floodgates, Chen's counsel responded that no one else had sued—with the "yet" left unspoken (Ex. D at 21). Indeed, the *CACAGNY* plaintiffs claim to have identified multiple middle-school students who intend to apply to an SHS in the coming years (*see* No. 18-cv-11657, ECF 227, at 13, 15). The impact on

23

DOE's ability to run SHS admissions in an orderly fashion could snowball quickly.

Third, admitting M.P. via injunction would violate the unchallenged state law requiring that admission to SHSs be based only on SHSAT score or participation in the Discovery Program (*see supra* 3).

Weighed against all this is Chen's conclusory statement of M.P.'s desire to attend Stuyvesant, with no real harm identified if he attends his second-choice school. That personal preference, however sincerely felt, is not enough to tip the equities in his favor.

## CONCLUSION

The Court should deny the motion for an injunction pending appeal.

Dated:  New York, New York
August 13, 2026

Respectfully submitted,

STEVEN BANKS
*Corporation Counsel*
*of the City of New York*
Attorney for Defendants-Appellees

By:  */s/ Stephanie Teplin*
STEPHANIE TEPLIN
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
212-356-3255
steplin@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
STEPHANIE TEPLIN
*of Counsel*

25

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 5,197 words, not including the table of contents, table of authorities, this certificate, and the cover.

_/s/ Stephanie Teplin_
STEPHANIE TEPLIN

26

# 26-847

## United States Court of Appeals
## for the Second Circuit

YI FANG CHEN, individually and on behalf of her minor children M.P., MA.P., AND P.P.,

*Plaintiff-Appellant,*

against

ZOHRAN MAMDANI, in his official capacity as Mayor of the City of New York; KAMAR H. SAMUELS, in his official capacity as Chancellor of the New York City Department of Education; and NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendants-Appellees,*

*(caption continued on next page)*

On Appeal from the United States District Court for the Southern District of New York

## DECLARATION OF STEPHANIE TEPLIN IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

*(caption continued from previous page)*

TEENS TAKE CHARGE, DESIS RISING UP AND MOVING; COALITION FOR ASIAN AMERICAN CHILDREN AND FAMILIES; VERONICA CARRASQUILLO, on behalf of her minor child, A.C.; WANG JIN HUA, on behalf of her minor child, A.Z.; HALIMATOU DIALLO, on behalf of her minor child, K.D.; JENNIFER VELEZ, on behalf of her minor child, G.R.,

*Intervenor-Defendants-Appellees.*

STEPHANIE TEPLIN declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a Senior Counsel in the office of Steven Banks, Corporation Counsel of the City of New York, attorney for defendants-appellees in this appeal. I submit this declaration in opposition to plaintiff-appellant's Emergency Motion for Injunction Pending Appeal.

2. Attached as **Exhibit A** is a true and correct copy of the Complaint in this action, filed in the district court as ECF 1.

3. Attached as **Exhibit B** is a true and correct copy of the Declaration of Joshua Wallack dated January 17, 2019, filed in the district court as ECF 31-2.

4. Attached as **Exhibit C** is a true and correct copy of the Declaration of Nadiya Chadha dated January 17, 2019, filed in the district court as ECF 31-3.

5. Attached as **Exhibit D** is a true and correct copy of the complete transcript of proceedings before the district court on July 21, 2026.

6. Attached as **Exhibit E** is a true and correct copy of the Declaration of Lianna Wright dated June 17, 2026, filed in the district court as ECF 31-1.

7.     Attached as **Exhibit F** is a true and correct copy of the

Declaration of Lianna Wright dated August 13, 2026.

Dated:   New York, New York
         August 13, 2026


                                        /s/ Stephanie Teplin

                                        STEPHANIE TEPLIN
                                        Assistant Corporation Counsel

                                        100 Church Street
                                        New York, New York 10007
                                        212-356-3255
                                        steplin@law.nyc.gov

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YI FANG CHEN, individually and on behalf of her minor children M.P., Ma.P., and P.P.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ZOHRAN MAMDANI, in his official capacity as Mayor of the City of New York; KAMAR H. SAMUELS, in his official capacity as Chancellor of the New York City Department of Education; and the NEW YORK CITY DEPARTMENT OF EDUCATION,<br><br>　　　　　Defendants. | Case No. 1:26-cv-03355 |

**COMPLAINT**

**INTRODUCTION**

1.　M.P. is the son of Chinese immigrants. He is also a high-achieving New York City public school student who seeks admission to Stuyvesant High School, one of the most selective public schools in the nation. He recently took the Specialized High School Admissions Test (SHSAT) and ranked Stuyvesant as his first choice. He missed admission by three points. But for the City's racially motivated set-aside of 20 percent of Stuyvesant's seats for students who scored more than 60 points below M.P., he would have been admitted.

2.　New York City's specialized high schools (SHSs) are among the most academically rigorous public high schools in the nation. Starting in 2020, the City began reserving 20 percent of its SHS seats for a separate admissions pathway—the Discovery program—that excludes students based on criteria the City purposefully selected to change the racial composition of those schools. The City adopted and continues to enforce that policy in an

effort to reduce the number of Asian-American students and increase the number of black and Hispanic students admitted to the SHSs.

3.    Because of that racially discriminatory policy, M.P., a Chinese American, lost the opportunity to compete for all available seats and was not admitted to his preferred school. Unless the policy changes, his siblings Ma.P. and P.P. will face the same discrimination.

4.    Plaintiff Yi Fang Chen—the mother of M.P., Ma.P., and P.P.—came to the United States to build a better life for herself and her children. She has lived and worked in New York City for decades and raised her family with the expectation that merit—not race—would determine their opportunities in public education.

5.    Chen brings this action to vindicate her and her children's rights under the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, which forbid the government from structuring admissions policies to disadvantage students because of their race.

6.    In *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), the Supreme Court held that government officials may not manipulate admissions systems—whether through explicit classifications or facially neutral proxies—to produce race-based outcomes. Defendants have done exactly that here. Chen requests declaratory and injunctive relief to remedy that constitutional violation and to restore a race-neutral admissions process in which students like M.P. can compete on equal terms.

**JURISDICTION AND VENUE**

7.    This action arises under the Fourteenth Amendment to the United States Constitution; 42 U.S.C. § 1983; and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. The Court has jurisdiction over these federal claims under 28 U.S.C. §§ 1331 (federal

2

question) and 1343(a) (redress for deprivation of civil rights). Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

8.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1)–(2). Defendants reside within this district and a substantial part of the events giving rise to the claim have occurred or will occur in the Southern District of New York.

## PLAINTIFF

9.      Plaintiff Yi Fang Chen was born in China; she moved to the United States in 1996 as a teenager. Although she came to this country speaking little English, she worked hard and eventually earned a Ph.D. in statistics from Stanford University. She has been naturalized as a U.S. citizen and now works as a data scientist in Manhattan.

10.     Chen and her husband, a naturalized immigrant from Hong Kong, have three children and live in Brooklyn. Their oldest son, M.P., is an eighth grader at I.S. 239, Mark Twain Intermediate School for the Gifted and Talented. Chen and her family have long had the goal that M.P. would attend an SHS. For years they have planned for him to seek admission to Stuyvesant High School, the most selective of the schools and the one at which they think M.P. will receive the best education and have the best opportunities. Accordingly, when he registered for the SHSAT, M.P. listed Stuyvesant as his top choice.

11.     M.P. took the SHSAT in the fall of 2025. He was notified in March 2026 that his score was 558. Although a score of 558 would have been sufficient to gain admission to Stuyvesant for the 2025–26 school year, when the cutoff was 556, it was three points below this year's Stuyvesant cutoff of 561.

12.     Stuyvesant's incoming class is at least 800 students, meaning Defendants' 20 percent Discovery set-aside reserves more than 160 seats each year for students with scores

3

below the overall SHSAT cutoff. Absent the expansion of the Discovery program, those seats would have been available to students admitted through the standard SHSAT process. Restoring those seats would have lowered Stuyvesant's cutoff score by at least three points, to a level at or below M.P.'s score of 558. M.P. therefore would have been offered admission to Stuyvesant were it not for the Discovery program changes.

13.    A Department of Education analysis using 2019 SHSAT data concluded that setting aside 20 percent of seats for the Discovery program increased the cutoff score for Stuyvesant by ten points, from 552 to 562. The set-aside had a similar effect for the 2025 SHSAT.

14.    Because of the increased cutoff score, M.P. was denied admission to Stuyvesant, his preferred school, and offered admission to his second choice. If he is unable to attend Stuyvesant starting this fall, M.P. plans to retake the SHSAT and reapply to Stuyvesant as a ninth grader.

15.    Chen has two other children. Ma.P. is a fourth grader at P.S. 185 in Brooklyn who has begun active SHSAT preparation, including regularly working through practice exam questions from prior tests. He plans to take the SHSAT in 2029 as an eighth grader and list Stuyvesant as his top choice. P.P. is currently a first grader at P.S. 185.

16.    Because of the Discovery program changes, Chen's children are excluded from competing for 20 percent of the seats at each SHS. The restructuring of Discovery has made it more difficult for them to gain admission to any SHS, and to their preferred schools.

**DEFENDANTS**

17.    Defendant Zohran Mamdani is the Mayor of New York City. In his capacity as Mayor, Mamdani exercises ultimate authority over the New York City Department of Education

(DOE) and the admissions process at the SHSs, subject to state law. He is sued in his official capacity.

18.     Defendant Kamar H. Samuels is the Chancellor of the DOE. Defendant Samuels serves at the pleasure of the Mayor, and the DOE operates under the Mayor's authority. Samuels is charged with overseeing New York City's public schools, including the SHSs. He is sued in his official capacity.

19.     Defendant Mamdani took office as Mayor in January 2026, and Defendant Samuels serves as his Chancellor. Although the admissions changes challenged here were initially adopted in 2018 under former Mayor Bill de Blasio and former Chancellor Richard Carranza, Defendants Mamdani and Samuels continue to apply and enforce those changes, including in the 2026 admissions cycle.

20.     Defendant New York City Department of Education (DOE) is a municipal agency of the City of New York responsible for administration and operation of the City's public school system, including the SHSs. The DOE receives federal financial assistance within the meaning of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and is therefore subject to Title VI's prohibition on discrimination based on race, color, or national origin. DOE is responsible for implementing, administering, and enforcing the admissions policies challenged in this action.

## GENERAL ALLEGATIONS

### I.     NEW YORK CITY'S SPECIALIZED HIGH SCHOOLS

21.     The DOE operates the City's SHSs, including some of the most rigorous and prestigious public secondary schools in the United States. Most prominent among them are the oldest: Stuyvesant High School (Stuyvesant), Bronx High School of Science (Bronx Science),

5

and Brooklyn Technical High School (Brooklyn Tech), collectively referred to as the "Big Three." These schools offer students access to a world-class education and a pathway to the nation's elite universities.

22.    Stuyvesant is widely regarded as the most selective and prestigious of the SHSs. It enrolls approximately 3,200 students, including a substantial number from economically disadvantaged backgrounds. Its students achieve extraordinary academic success: recent data show average SAT scores around 1500 and a four-year graduation rate of approximately 99 percent. Stuyvesant has produced four Nobel Laureates and numerous leaders in science, law, and public life.

23.    The remaining SHSs are Brooklyn Latin School (Brooklyn Latin); High School for Mathematics, Science and Engineering at City College (HSMSE); High School of American Studies at Lehman College (HSAS); Staten Island Technical High School (Staten Island Tech); and Queens High School for the Sciences at York College (Queens Science).

24.    The Fiorello H. LaGuardia High School of Music and Art and Performing Arts is a specialized high school, but because it is arts-focused and uses an audition process for admissions, it is not relevant to this lawsuit.

## II.    RACIAL DEMOGRAPHICS OF THE SPECIALIZED HIGH SCHOOLS

25.    According to public data maintained by the City, as of the 2024–25 school year, the racial demographics of the New York City public school system were 42.3 percent Hispanic, 19.3 percent black, 18.7 percent Asian (listed as "Asian and Pacific Islander"), and 16.1 percent white.[1]

---

[1] *Demographic Snapshot 2024-25: Visual Guide*, NYC Public Schools, https://infohub.nyced.org /docs/default-source/default-document-library/2024-25-demographic-snapshot-summary.pdf, at 5.

26.     According to the City's "Demographic Snapshot" spreadsheets, the SHSs have a predominantly Asian student population, comprising about 60 percent of students. Each of the SHSs has a higher percentage of Asian students than New York City public schools as a whole.[2]

27.     The Big Three, which have much larger enrollments than the other SHSs, are majority Asian. According to the Demographic Snapshot, in 2024–25, Stuyvesant was 71.8 percent Asian, Bronx Science was 60.8 percent Asian, and Brooklyn Tech was 58.5 percent Asian.

## III.     THE SHSAT

28.     Under a New York law enacted in 1971, known as the Hecht-Calandra Act, admission to the SHSs must be based "solely and exclusively by taking a competitive, objective and scholastic achievement examination, which shall be open to each and every child in the city of New York." N.Y. Educ. Law § 2590-g(12)(b) (1997). The current version of the statute incorporates that requirement by reference. N.Y. Educ. Law § 2590-h(1)(b).

29.     The SHSs use the Specialized High School Admissions Test (SHSAT) as the sole factor in admissions decisions. To be eligible for the SHSAT, a student must be a City resident and currently in eighth grade or a first-time (i.e., not repeating the grade) ninth grader.

30.     Students seeking admission to an SHS must take the SHSAT and rank their preferred schools in order (they need not rank all eight). Students are then ordered from highest to lowest SHSAT score and assigned, in that order, to the highest-ranked school on their list that has an available seat. If a student's first-choice school is full, the student is considered for his or her second choice, and so on. After all available seats across the SHSs are filled, no additional students are admitted based solely on SHSAT score.

---

[2]     *See*     https://infohub.nyced.org/docs/default-source/default-document-library/demographic-snapshot-2020-21-to-2024-25-public.xlsx.

31.     Once all SHSAT seats are filled at a school, the lowest SHSAT score among admitted students is referred to as that school's "cutoff" score.

32.     Cutoff scores can vary from year to year. For the 2026–27 school year, Stuyvesant's cutoff was 561—the highest of any SHS.[3] The overall cutoff, set by Brooklyn Latin at 495, was the lowest score at which any student was admitted through the SHSAT process.

## IV.     THE DISCOVERY PROGRAM

33.     The Hecht-Calandra Act permits establishment of a "Discovery program" to help some low-income students gain admission into the SHSs. N.Y. Educ. Law § 2590-h(1)(b). State law expressly requires that the Discovery program must not "in any manner interfer[e] with the academic level of those schools." N.Y. Educ. Law § 2590-g(12)(d) (1997).

34.     Prior to the changes challenged here, the Discovery program was open to all New York City students who were economically disadvantaged.

35.     Hecht-Calandra establishes requirements for participation in Discovery. To be eligible, a student must (1) take the SHSAT and score just below the overall cutoff; (2) be certified as disadvantaged; (3) be recommended as having "high potential for the special high school program"; and (4) successfully complete a summer preparatory program. N.Y. Educ. Law § 2590-g(12)(d) (1997).

36.     New York state law does not prescribe the size of the Discovery program, and historically each SHS set its own Discovery numbers. Between 2006 and 2015, only one to three percent of SHS admissions came through Discovery. Stuyvesant did not participate in Discovery at all for many years, and in 2018 admitted only 23 students through the program out of a freshman class of more than 800.

---

[3] *Specialized High Schools*, NYC Public Schools, https://www.schools.nyc.gov/enrollment/enroll-grade-by-grade/specialized-high-schools.

37.    In 2018, the year before the Discovery program changes were announced, a total of 270 students participated in the program across all SHSs, representing less than five percent of the total number of students admitted.

38.    Because students in the Discovery program score below the overall cutoff, this year all Discovery students admitted to Stuyvesant will have scored below 495—at least 66 points lower than students admitted based solely on the SHSAT.

39.    Prior to the challenged changes, approximately two-thirds of the students participating in the Discovery program were Asian American. These students were, by definition, economically disadvantaged.

## V.    DEFENDANTS' CHANGES TO DISCOVERY

40.    On June 3, 2018, then-Mayor de Blasio and then-Chancellor Carranza announced a plan to expand and reorganize the Discovery program. All SHSs were directed to increase the share of students admitted through Discovery to 20 percent of their incoming classes by 2020.

41.    The plan also imposed a new eligibility restriction for Discovery. Specifically, eligibility was limited to students attending middle schools with an "Economic Need Index" (ENI) of 0.6 (60 percent) or higher.

42.    A school's ENI is a metric used to estimate the average level of economic need among its student population. It is the average of the "Economic Need Values" (ENV) of all students attending that school, which are based on factors such as eligibility for public assistance, living in temporary housing, and census-tract poverty data. Each student's ENV, and thus each school's ENI, falls between 0.0 and 1.0 (0% and 100%).

43.    The ENI restriction imposed in 2018 limited eligibility for Discovery not simply to poor students, but to poor students who attend particular middle schools. As a result, an eighth

9

grader attending a school with an ENI below the 0.6 threshold is ineligible for Discovery, even if that student meets the highest indicators of economic need—such as qualifying for public assistance or living in temporary housing.

44.     M.P.'s middle school, I.S. 239, has an ENI below the 0.6 threshold. As a result, M.P. and his classmates are ineligible for the Discovery program regardless of their economic circumstances.

45.     The SHS admissions changes were fully implemented starting in the 2020–21 school year. They have remained in place, and Defendants continue to implement and enforce those changes.

### A.  The Changes Were Designed To Disadvantage Asian Students

46.     Defendants designed the Discovery changes in an effort to increase black and Hispanic enrollment at the SHSs at the expense of Asian students. Defendants' estimate, based on internal modeling, was that offers to black and Hispanic students would increase from 9 percent to 16 percent under the new plan.

47.     Because SHS admission is a zero-sum process, increasing admissions for a particular demographic group reduces the number of seats available to others.

48.     Defendants designed and selected an ENI restriction of 0.6 to exclude students attending middle schools with substantial Asian-American populations that had historically sent many students to the SHSs. Based on ENI data considered when designing the policy, a disproportionate number of majority Asian-American schools were rendered ineligible for Discovery compared to majority black and majority Hispanic schools.

49.     When Defendants designed the plan, they relied on 2016–17 ENI calculations in deciding what ENI restriction to impose. Under those calculations, students at about 75% of the

10

majority Asian-American schools with eighth grade enrollment would be excluded from the Discovery program by a 0.6 ENI restriction.[4] Although the 2017–18 school year ENI calculations were not as stark, students attending 11 of the 24 majority Asian-American schools were rendered ineligible for Discovery under the 0.6 ENI restriction. That compares to just 15 of the 185 majority black schools and just seven of the 232 majority Hispanic schools with eighth grade enrollment.

50.     A simple expansion of the Discovery program without an ENI restriction would have increased offers to economically disadvantaged students regardless of race. But because Asian Americans already constituted roughly two-thirds of Discovery participants, expansion alone would not have served Defendants' goal of altering the racial composition of students at the SHSs.

51.     Use of a 0.6 ENI restriction transformed the expansion of Discovery into a racial proxy. If Defendants' objective had been solely to increase the number of low-income students in the program, there would have been no need to restrict eligibility based on school-level ENI thresholds.

### B.  Contemporaneous Public Comments Show Racial Intent

52.     In reference to the demographics of the SHSs, the day before announcing the Discovery changes, Mayor de Blasio wrote in an op-ed: "Can anyone defend this? Can anyone look the parent of a Latino or black child in the eye and tell them their precious daughter or son

---

[4]    *See*   https://infohub.nyced.org/docs/default-source/default-document-library/demographic-snapshot-2016-17-to-2020-21-public.xlsx.

11

has an equal chance to get into one of their city's best high schools?"[5] He referred to the racial demographics of the SHSs as a "monumental injustice."

53.    The day that the changes were announced, de Blasio tweeted: "Stuyvesant High School just admitted almost a thousand students, but only ten of those students were African American and less than thirty were Latino. In a city that is majority African American and Latino."[6]

54.    Referring to the large proportion of Asian-American students at the SHSs, Chancellor Carranza stated in an interview with New York's Fox affiliate WNYW that "I just don't buy into the narrative that any one ethnic group owns admission to these schools."[7]

55.    The City's press release announcing the Discovery program changes noted that they were intended to "support greater . . . racial . . . diversity" at the SHSs.[8] It presented the revised Discovery program as an important step in making the admission process "fairer." It also stated that the SHS student population "is not representative of the New York City high school population" because "Black and Latino students comprise 9 percent of SHS offers, but 68 percent of all New York City high school students" and because "[t]he incoming freshman class at Stuyvesant High School only has 10 African-American students in a class of more than 900."[9]

---

[5] Bill de Blasio, *Our Specialized Schools Have a Diversity Problem. Let's Fix It.*, Chalkbeat (June 2, 2018), https://chalkbeat.org/posts/ny/2018/06/02/mayor-bill-de-blasio-new-york-city-will-push-for-admissions-changes-at-elite-and-segregated-specialized-high-schools/.

[6] Then-Mayor Bill de Blasio, tweeting from the @NYCMayor account (June 3, 2018), https://twitter.com/nycmayor/status/1003414958464487425.

[7] Elizabeth A. Harris & Winnie Hu, *Asian Groups See Bias in Plan to Diversify New York's Elite Schools*, N.Y. Times (June 5, 2018), https://www.nytimes.com/2018/06/05/nyregion/carranza-specialized-schools-admission-asians.html.

[8] Office of the Mayor, *Mayor de Blasio and Chancellor Carranza Announce Plan to Improve Diversity at Specialized High Schools* (June 3, 2018), https://a860-gpp.nyc.gov/concern/nyc_government_publications /nc580q26h.

[9] *Id.*

12

The press release emphasized that City modeling suggested that the revised Discovery program would result in 16 percent of offers going to black and Latino students—up from a rate of 9 percent.

56.     Quotes in the press release from supportive public officials emphasized the racial focus of the proposed plan. Mayor de Blasio is quoted as saying, "[f]or far too long our specialized high schools have failed to reflect the diversity of our city" and that "[w]e cannot let this injustice continue." Board of Regents Chancellor Betty A. Rosa called the proposal a "bold plan to . . . support greater equity at New York City's specialized high schools." City Council member Ydanis Rodriguez stated that changing the SHS admissions policy "is an important step in ensuring the student population reflects the city's population." Other quotes likewise focused on "equity," "diversity," and "students of color," and repeatedly connected the racial makeup of the SHSs to the proposed admissions changes.[10]

57.     In announcing the changes, de Blasio and Carranza also declared their intention to eventually eliminate the SHSAT requirement. They predicted that this part of their plan, which would require the New York legislature to repeal the Hecht-Calandra Act, would increase black and Hispanic enrollment at the SHSs to 45 percent. Like their change to the Discovery program, de Blasio and Carranza sought elimination of the SHSAT on the ground it would change the racial balance of the SHSs, again at the expense of Asian students.

### C.  Internal Documents Show Racial Intent

58.     Internal documents from DOE and the Mayor's office show that one of the primary goals in changing the SHS admissions policy was to increase the percentage of black and Hispanic students accepted into the schools, at the expense of Asian students.

---

[10] *Id.*

59.    An internal DOE slide deck dated April 2018 states that the SHSs "are much less racially diverse than NYC high schools overall" and includes a chart showing that 62% of students at the SHSs were Asian, as compared to 16% of all City high schools. It states that one of DOE's "guiding principles" in changing the admissions process is to "[i]ncrease the diversity" of the SHSs. It further notes that researchers had modeled the effect of alternative admissions processes, but that "without incorporating geography there was no substantial change to the percent of Black and Hispanic students offered seats at Specialized High Schools." Indeed, "in many of the models the percentage of Black students decreased."

60.    The slide deck dismisses alternative admissions approaches—such as using recommendation letters, interviews, or writing assessments—because they are "unlikely to increase diversity." Instead, it proposes options with a greater racial effect, such as reserving seats for top students at each middle school. It also discusses the plan that Defendants ultimately implemented—to "[a]djust and expand the Discovery program to achieve more racial diversity." According to the slides, modeling showed that expanding the Discovery program and including an ENI restriction would mean "[m]ore Black and Hispanic students would become eligible for Discovery."

61.    An April 2018 DOE email chain discussed proposals to change the SHS admissions process. Deputy Chancellor Josh Wallack asked: "given the low percentage of black students in Discovery, how much bigger would the Discovery program need to be at Bronx Science (as an example) to increase the percentage of black students by 1%?" Director of Research and Policy Nadiya Chadha responded that it was "an imperfect calculation" but that "to increase the population of Black ninth graders" by about 1%, "the program would need to expand to ~60 students (6x larger than their summer 2017 program)." However, she noted that if

Discovery expansion included an ENI restriction, that "would not require as large a program, since it would be easier to target Black students directly for that program."

62.     Later in the same email chain, Chadha provided modeling showing how different ENI restrictions would affect the racial composition of the SHSs. She evaluated ENI levels of 40%, 60%, and 80% and stated: "in the 60% model, the minimum discovery cut score does drop, but the pool is more diverse and the average proficiency of students barely changes." Chadha noted, however, that just changing the Discovery program and adding an ENI restriction would not have as great a racial effect as other proposals and called Asian students "overrepresented" at the SHSs: "Even if we expand Discovery and adjust the definition, the percentages of students by race do not change drastically (compared to our other proposals). Asian and White students are similarly overrepresented; the total Black and Hispanic percentage increases from 10% to 18% at most."

63.     A May 30, 2018, email from Chadha was particularly blunt, stating that "we currently want to use the Discovery program as a lever to admit more Black and Hispanic students."

64.     Defendants' racial focus is also evident in an internal DOE document titled "Making admissions to the Specialized High Schools more equitable for all students." It claims that the student population at the SHSs "does not represent the full breadth and excellence of New York City students," including because "Black and Hispanic students make up 68% of the NYC high school population, but only 9% of those offered a seat in a Specialized High School." It discusses the plan to expand Discovery and add an ENI restriction, stating that "[a]s a result, offers to Black and Hispanic students across the Specialized High Schools would nearly double, going from ~9 percent currently to ~16%."

15

65.     Other internal emails confirm that DOE ran modeling to determine the racial effect of its proposed plan. In August 2018—two months after the plan was announced—DOE Press Secretary Will Mantell emailed DOE officials to state that "CH" (City Hall) was "asking what we expect the racial breakdown to be once we're at scale under the new eligibility criteria." Chadha responded with a chart showing "rough estimates" of the effect of expanding Discovery to 20 percent with a 0.6 ENI restriction. According to Chadha, the racial composition of students in Discovery would change significantly: Asian students would drop from 64% to 38%, whereas black students would increase from 10% to 22% and Hispanic students from 12% to 31%:

| Ethnicity | Percent of students who received SHS offers through Discovery, for fall 2018 admissions [preliminary] | Model for expanded Discovery [20% of seats, 60% ENI minimum]* |
|---|---|---|
| Asian | 64% | 38% |
| Black | 10% | 22% |
| Hispanic | 12% | 31% |
| White | 11% | 7% |
| Other | 2% | 2% |
| Unknown | 2% | N/A |

*Data for students who would have been eligible to apply for Discovery in summer 2017. Does not reflect income eligibility or student interest in participating.

## VI.    PRIOR LAWSUIT

66.     In December 2018, a coalition of plaintiffs—which then included Chen—filed a lawsuit against Mayor de Blasio and Chancellor Carranza, alleging that the plan to revise the Discovery program violated the Equal Protection Clause.

67.     The plaintiffs sought a preliminary injunction to prevent implementation of the Discovery changes, but the district court denied the request. *Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253 (S.D.N.Y. 2019). As part of that ruling, the court concluded Chen lacked standing because her son was then in first grade and too young for his injury to be imminent. *Id.* at 272.

16

68.    Chen's dismissal was jurisdictional, not on the merits. Her son M.P. has now taken the SHSAT, received his score, and been denied admission to Stuyvesant as a direct result of the Discovery program changes.

69.    The other lawsuit continued without Chen. After limited discovery, the City sought summary judgment, arguing that aggregate disparate impact is a necessary element of an equal protection claim and that the overall percentage of Asians at the SHSs had increased slightly following the Discovery program changes. The district court agreed and granted summary judgment. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 627 F. Supp. 3d 253 (S.D.N.Y. 2022).

70.    On appeal, the Second Circuit reversed, holding that an aggregate disparate impact is not a required element of an equal protection claim. *Chinese American Citizens Alliance of Greater New York v. Adams*, 116 F.4th 161 (2d. Cir. 2024). It held that proof of discriminatory intent combined with a negative effect on individual Asian-American applicants is sufficient to trigger strict scrutiny. *Id.* at 165. The court also noted that expert analysis showed that "under the revised Discovery Program, the number of Asian Americans receiving offers to the two most selective SHSs, Stuyvesant and Bronx Science, declined," which supported the claim of an equal protection violation. *Id.* at 169, 178.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**(Violation of the Equal Protection Clause of the Fourteenth Amendment, through 42 U.S.C. § 1983)**

71.    Plaintiff hereby realleges and incorporates each of the preceding paragraphs as though fully set forth herein.

17

72.    The Fourteenth Amendment to the United States Constitution provides in relevant part: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

73.    Defendants were and are acting "under color of state law" within the meaning of 42 U.S.C. § 1983.

74.    Facially neutral state action violates the Equal Protection Clause when it is motivated by a racially discriminatory purpose and has a discriminatory effect. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977).

75.    The plan to expand and reorganize the Discovery program was intended to racially balance the schools by increasing the number of black and Hispanic students and limiting the number of Asian students who are admitted.

76.    The Discovery program changes were made "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

77.    Defendants expected and intended the changes to reduce the number of Asian Americans who are admitted to the SHSs and to exclude some Asian Americans from being accepted into their preferred SHSs.

78.    Facially neutral policies enacted with discriminatory intent are subject to strict scrutiny and are invalid unless the government can prove that they are narrowly tailored to further a compelling government interest. *Students for Fair Admissions*, 600 U.S. at 206–07.

79.    The same equal protection principles apply whether race is used explicitly or as a proxy through facially neutral criteria designed to produce race-based outcomes.

80.     There are limited circumstances in which race-based governmental action may be permissible, including remedying specific instances of past discrimination that violated the Constitution or a statute, or avoiding imminent and serious risks to human safety in prisons. No such circumstances are present here, and there is no compelling government interest supporting Defendants' changes to the SHS admissions policy.

81.     Even if a compelling government interest existed, Defendants' changes to the Discovery program are not narrowly tailored, including because they rely on overbroad and arbitrary classifications, are not necessary to achieve a compelling interest, and do not have a logical endpoint.

82.     To survive constitutional scrutiny, a public school admissions policy must comply with "the twin commands of the Equal Protection Clause." *Id.* at 218. First, "an individual's race may never be used against him in the admissions process." *Id.* And second, race "may not operate as a stereotype." *Id.*

83.     Defendants' changes to the Discovery program violate the "twin commands" because they use facially neutral criteria as a proxy for race and operate to disadvantage Asian-American applicants. By selecting an ENI threshold specifically because DOE modeling showed it would reduce Asian-American admissions, Defendants used race as a negative in the admissions process. Defendants also relied on the stereotype that there are too many Asians at the SHSs.

84.     Chen, individually and on behalf of her minor children, is entitled to injunctive relief to prevent Defendants from continuing to enforce the Discovery changes and a declaration that the changes are unconstitutional.

19

85.     Because the Discovery program changes resulted in M.P. being denied admission to his preferred SHS, Plaintiff is entitled to appropriate injunctive relief, including an order requiring M.P.'s admission to Stuyvesant starting in the 2026–27 school year.

## SECOND CAUSE OF ACTION

**(Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, against the DOE only)**

86.     Plaintiff hereby realleges and incorporates each of the preceding paragraphs as though fully set forth herein.

87.     Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

88.     Title VI creates a private right of action for individuals harmed by intentional discrimination on the basis of race by recipients of federal financial assistance. *See Alexander v. Sandoval*, 532 U.S. 275, 279–80 (2001).

89.     Defendant DOE receives substantial federal funds each year, including under Title I of the Elementary and Secondary Education Act, and the SHS admissions process constitutes a "program or activity" within the meaning of 42 U.S.C. § 2000d-4a.

90.     The DOE adopted and continues to enforce the Discovery program changes for the purpose of reducing the number of Asian-American students admitted to the specialized high schools.

91.     Title VI prohibits discrimination "on the ground of" race. Under the governing standard, a Title VI plaintiff need only show that discrimination was a substantial or motivating factor.

20

92.    DOE's changes to the Discovery program and to SHS admissions were intentional and discrimination was a substantial or motivating factor in the changes.

93.    But for the race of Asian-American students, the DOE would not have expanded and restructured the Discovery program as it did. The purpose of the changes was to increase the share of black and Hispanic students and reduce the share of Asian-American students at the SHSs, and DOE's own modeling confirmed that the ENI threshold was designed to target middle schools with substantial Asian-American populations.

94.    The ENI restriction was a but-for cause of the exclusion of Asian-American applicants from 20 percent of SHS seats.

95.    M.P. was harmed by the DOE's intentional discrimination on the basis of race. But for the race-based manipulation of the Discovery program, M.P. would have been admitted to Stuyvesant.

96.    DOE's continued enforcement of the Discovery program changes constitutes ongoing intentional racial discrimination in violation of Title VI. Chen, individually and on behalf of her minor children, is entitled to appropriate declaratory and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

1. An entry of judgment declaring that Defendants' expansion and reorganization of the Discovery program for admission to New York City's specialized high schools violates the Equal Protection Clause and Title VI of the Civil Rights Act of 1964.

2. Entry of a preliminary and permanent injunction against Defendants prohibiting them from continuing to enforce the changes to the Discovery program.

21

3.  Entry of a preliminary and permanent injunction against Defendants requiring that Plaintiff's child M.P. be admitted to Stuyvesant High School starting in the 2026-27 school year.

4.  Nominal damages in the amount of $1.00.

5.  An award of attorneys' fees and costs in this action pursuant to 42 U.S.C. § 1988.

6.  An award of any further legal or equitable relief this Court may deem just and proper.

DATED: April 23, 2026.

Respectfully submitted,

 /s/ Dean McGee
Dean McGee, N.Y. Bar No. 5135884
Christopher D. Barnewolt, D.C. Bar No. 90020413*
Caitlyn Kinard, D.C. Bar No. 90029259*
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Ste. 1000
Arlington, VA 22201
Telephone: (202) 888-6881
DMcGee@pacificlegal.org
CKinard@pacificlegal.org
CBarnewolt@pacificlegal.org

Glenn E. Roper, Colo. Bar No. 38723*
PACIFIC LEGAL FOUNDATION
1745 Shea Center Dr., Ste. 400
Highlands Ranch, CO 80129
Telephone: (916) 419-7111
GERoper@pacificlegal.org

*Counsel for Plaintiff Yi Fang Chen, individually and on behalf of her minor children M.P., Ma.P., and P.P.*

*pro hac vice motions forthcoming

22

# Exhibit B

Case 1:18-cv-11657-ER Document 50 Filed 01/17/19 Page 1 of 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

CHRISTA McAULIFFE INTERMEDIATE SCHOOL
PTO, Inc. et al,

                                                    Plaintiffs,

                        -against-

BILL DE BLASIO, in his official capacity as Mayor of
New York, et ano.,

                                                    Defendants.

------------------------------------------------------------------------x

**DECLARATION OF
JOSHUA WALLACK**


18 CV 11657 (ER)(OTW)

 

**JOSHUA WALLACK** declares, pursuant to 28 U.S.C. §1746, under penalty of perjury, that the following is true and correct:

1.      I am Deputy Chancellor for Early Childhood Education and Student Enrollment in the New York City Department of Education ("DOE"). As such, the DOE Office of Student Enrollment, which among other things is responsible for enrollment in the Specialized High Schools, reports to me. I have overseen the Office of Student Enrollment since 2015, and I have been employed at the DOE since 2014. This declaration is based on my personal knowledge, discussions with DOE employees, and the books and records of DOE.

2.      I make this declaration in opposition to the Plaintiffs' motion for a preliminary injunction in the above-captioned case and to apprise the Court of the history of DOE's efforts to foster diversity in the eight Specialized High Schools, and the reasons for the changes to the Discovery Program that are being challenged by Plaintiffs. Those changes, namely, the expansion of the program and the adoption of different selection criteria, were announced by the Mayor and the Chancellor on June 3, 2018.

3. I led the decision-making group that decided to expand the Discovery Program and adopt the criteria for eligibility to participate in the Discovery Program that are currently in effect and are being challenged (the "current criteria"). After reviewing data and options developed by the Office of Student Enrollment concerning the expansion of the Discovery Program and the revision of such criteria, the decision-making group recommended to the Chancellor that the Discovery Program be gradually expanded during the 2019-2020 and 2020-2021 school years and that the Chancellor adopt the current criteria. Specifically, the current criteria define how to determine whether a student is "disadvantaged" for the purposes of eligibility for the Discovery Program. The Chancellor adopted these recommendations, and I believe that the decision-making group's recommendation was decisive in the Chancellor's decision to expand the Discovery Program and to adopt the revised criteria.

4. The Chancellor, the decision-making group, and I were in no way motivated by a desire to harm Asian-American students or to limit the enrollment of Asian-American students in the eight Specialized High Schools. Instead, the Chancellor, the decision-making group, and I were trying to increase the ethnic, racial, geographic, and socio-economic diversity of the student bodies of those high schools, which we believe will be beneficial to all students enrolled in those schools. The expansion of the Discovery Program and the current Discovery Program criteria, which are race-neutral, should better identify disadvantaged students, account for the impact of attending a school with a high percentage of economically disadvantaged students, and also expand the number of intermediate schools that send students to the eight Specialized High Schools, and thereby motivate other students and their families, as well as teachers and administrators in these intermediate schools, to pursue the entry of more students from these schools to the Specialized High Schools.

Case 1:18-cv-11657-ER Document 50 Filed 01/17/19 Page 3 of 16

<u>History of Efforts to Maintain Diversity in the Specialized High Schools</u>

5. I have learned the facts set forth in the following history from discussions with DOE employees and the books and records of DOE, and I believe them to be true.

6. Specialized High Schools have existed in New York City for more than 100 years. The Specialized High Schools have consistently provided rigorous instruction to academically gifted students in a challenging environment. The three original Specialized High Schools were Stuyvesant High School, Brooklyn Technical High School, and Bronx High School of Science. Stuyvesant opened in 1904, Brooklyn Tech in 1922, and Bronx Science in 1938. In 1934, Stuyvesant began using an entrance exam developed in conjunction with Columbia University. The use of an entrance exam then expanded to Bronx Science and Brooklyn Tech.

7. It is my understanding that in the late 1960s, the Specialized High Schools were offering admission based upon the scores of an entrance examination and a Discovery Program that extended offers of admission to disadvantaged students who showed potential for success at the Specialized High Schools. In 1971, New York enacted legislation, the Hecht-Calandra Act, to codify the requirement that a competitive achievement examination be the main criterion for admission to the Specialized High Schools but expressly provided for a Discovery Program that was unlimited in size to admit disadvantaged students with great potential to the Specialized High Schools. <u>See</u> Laws of 1971, chap. 1212, Roberts Dec. at Ex. 1 (Dkt. no. 48-1)

8. Enactment of the Hecht-Calandra Act did not end debate about the fairness of the use of a single test for admission to the Specialized High Schools. In 1977, the federal Office of Civil Rights opened an investigation into whether the single test as an admission standard constituted a form of discrimination against members of minority groups and females. <u>See</u> Marcia Chambers, *U.S. Inquiry Into Bias Is Opposed At Prestigious New York*

*Schools*, N.Y. TIMES, November 7, 1977, available at https://www.nytimes.com/1977/11/07/archives/us-inquiry-into-bias-is-opposed-at-prestigious-new-york-schools-us.html (last visited January 12, 2019). According to that news article, Board of Education data from the 1975-1976 school year showed that 23 percent of the students then enrolled at the Specialized High Schools were African-American, 9 percent Latino, 12 percent Asian-American, and 56 percent White. The Board of Education and the Office of Civil Rights reached an agreement that did not change the admissions criteria. See Ari Goldman, *On The Right Track*, N.Y. TIMES, June 17, 1978, available at www.nytimes.com/1978/06/17/archives/on-the-right-track.html (last visited January 12, 2019).

9. It appears, however, from newspaper articles that the percentage of African-American and Latino students at Stuyvesant declined significantly from the 1970s. See, Pam Belluck "More Minority Students Enter Elite Schools," New York Times, May 8, 1997 (percentage of African-American students at Stuyvesant was 12.9% in 1979 but 4.3 % in 1995; and 5.5% in 1997); and Maria Newman, "For Poor but Talented, A Shot at Opportunity; Helping Pupils Qualify for Top Exams," New York Times, August 4, 1995 (4.8% of students at Stuyvesant are African-American and 4.3% are Latino).

10. There has been concern for decades about the declining and/or low percentages of African-American and Latino students in the Specialized High Schools. This concern was shared by previous DOE Chancellors. In 2002, former Chancellor Joel Klein created additional Specialized High Schools in, I believe, an effort to expand opportunities for admission to the Specialized High Schools and to increase diversity in the student body of those schools. Between the 2002-2003 and 2007-2008 school years, DOE added a new specialized high school in each borough. The High School for Mathematics, Science and Engineering at

City College ("Math, Science and Engineering") in Manhattan, the High School of American Studies at Lehman College ("American Studies") in the Bronx, and the Queens High School for the Sciences at York College ("Sciences at York") opened for the 2002-03 school year. Staten Island Technical High School ("Staten Island Tech") became a testing Specialized High School in the 2006-2007 school year, and Brooklyn Latin became the eighth testing Specialized High School in the 2007-2008 school year.

11. In addition, in an effort to have greater numbers of disadvantaged students score well on the SHSAT, for more than two decades, DOE has instituted citywide extra-curricular programs to help prepare disadvantaged students for the test. The Citywide programs include the Specialized High School Institute ("SHSI"), which began in the mid-1990s and ended in 2012, and its replacement, Dream-SHSI ("DREAM"), which began during the 2011-12 school year. The purpose of both of these programs was to prepare disadvantaged students for the SHSAT, which among other things would increase diversity at the Specialized High Schools. SHSI was an intensive 15-month program that provided students with a range of supports, including coursework in literature, writing, mathematics, and science, as well as group guidance activities and test preparation skills. SHSI began in June of the sixth-grade year and continued until October of eighth grade, when students took the SHSAT. The structure of DREAM is similar to that of SHSI, except that students begin participating in DREAM in the spring semester of sixth grade. DREAM requires that a student be economically disadvantaged as defined by Title I Free Lunch status. Both SHSI and DREAM were conducted at multiple sites throughout the City. In 2016, DOE added the DREAM Intensive program, which runs during the summer and fall immediately preceding administration of the SHSAT in the fall of eighth grade.

12. Notwithstanding these efforts, the combined percentage of African-American and Latino students enrolled at the Specialized High Schools continued to decline. See Specialized High Schools Demographics from NYC Department of Education, 1995-2015, attached hereto as Exhibit 1.

13. In 2012, the NAACP Legal Defense and Education Fund, Inc., Latino Justice PRLDEF, and the Center for Law and Social Justice at Medgar Evers College filed a complaint with the Office for Civil Rights of the United States Department of Education (OCR) against DOE, alleging that the use of the SHSAT for admission to the Specialized High Schools violated Title VI of the Civil Rights Act of 1964, because the test had a large disparate impact on African-American and Latino students. See *Complaint re The admissions process for New York City's elite public high schools violates Title VI of the Civil Rights Act of 1964 and its implementing regulations*, September 27, 2012, attached to the Declaration of Thomas B. Roberts as Exhibit 4. (Dkt. no. 48-4) Four Asian-American advocacy groups filed letters supporting the NAACP LDF's complaint, which stated that those groups supported the NAACP LDF's efforts to force DOE to further diversify the student bodies at the Specialized High Schools. See, statements attached to the Declaration of Thomas B. Roberts as Exhibits 5-8. (Dkt. no. 48-5, -6, -7, -8) In that complaint, the NAACP LDF asserted that DOE's failure to employ the Discovery Program as a means to increase diversity was evidence of intentional discrimination against minority students. *Complaint* at p. 28, n. 23. (Dkt. no. 48-4) OCR opened an investigation of the complaint, and DOE produced documents and witnesses for interviews in response to OCR's requests. This investigation is ongoing.

14. In 2016, DOE initiated additional efforts to build awareness of the Specialized High Schools, ease the burden of weekend testing, and increase middle school

teachers' capacity to prepare their students for the SHSAT. DOE engaged in targeted outreach to students from underrepresented groups to increase awareness of the Specialized High Schools and the steps that must be taken to prepare and take the SHSAT. See, https://www.schools.nyc.gov/about-us/news/announcements/contentdetails/2016/06/09/city-announces-new-initiatives-to-increase-diversity-at-specialized-high-schools. In the fall of 2017, DOE commenced SHSAT testing during the school day in 15 schools serving students from underrepresented groups in an effort to facilitate test-taking for students for whom testing on the weekend might be a burden. DOE expanded this program to 50 schools in 2018. DOE also launched a Capacity Building Initiative in the spring of 2018 to train middle school teachers on the best practices to prepare their students for the SHSAT. In addition to expanding the DREAM program by adding DREAM Intensive as noted above, DOE offered other test preparation opportunities through partnerships with after-school programs and test prep agencies.

15. In addition, DOE took steps to invigorate the Discovery Program, which, by the early years of this decade, was not operating in all of the Specialized High Schools. By the 2011-2012 school year, for example, only four of the eight Specialized High Schools had a Discovery Program, and each Program was small. The schools that then had Discovery Programs were Brooklyn Tech, Brooklyn Latin, Sciences at York, and Math Science and Engineering. In recent years, American Studies, Staten Island Tech, Bronx Science, and Stuyvesant have all launched Discovery Programs. As of the summer of 2018, all eight testing Specialized High Schools participated in the Discovery Program.

16. Consistent with the Hecht-Calandra Act, the Discovery Program, as implemented in recent years up through and including the class admitted in September 2018, required that, in addition to scoring below the cut-off score for admission based solely on the

SHSAT, a student be disadvantaged. The criteria DOE established for this requirement provided that a student either: qualify for free lunch; attend a Title I school and qualify for reduced price lunch; receive assistance from the New York City Human Resources Administration; be a foster child, ward of the state or in temporary housing; or have entered the United States within the last four years and live in a home where the primary language is not English. For the 2017-2018 school year, approximately 70% of DOE students qualified for free lunch under the National School Lunch Program.

17. Despite all these efforts to increase diversity, only 30 of the approximately 650 intermediate schools provided 50% of the students admitted to the Specialized High Schools, and the combined percentage of African-American and Latino students enrolled in the Specialized High Schools continued to decline. The lack of racial and ethnic diversity has become so pronounced that at Stuyvesant High School in the 2017-2018 school year, only 0.7% of the students were African American and 2.8% of the students Latino. Similarly, at the Bronx High School of Science in the 2017-2018 school year, only 2.5 % of the students were African-American and 6.2% of the students Latino. The same is true at Staten Island Technical High School, where in the 2017-2018 school year, 0.8 % of the students were African-American and 2.7 % Latino. See, New York City Demographic Snapshot at http://infohub.nyced.org/docs/default-source/default-document-library/demographicsnapshot201314to201718public_final.xlsx.

18. Increasing equity and excellence for all is a cornerstone of DOE's approach to education and the Chancellor's priorities. Efforts to increase diversity, inclusion, and access have taken many forms, including in admissions. DOE believes that diversity comes in many forms, and that all students benefit from diverse and inclusive schools and classrooms.

In June 2017, DOE released "Equity and Excellence for All: Diversity in New York City Public Schools," a comprehensive plan for increasing school diversity in the school system across a variety of measures. See, https://www.schools.nyc.gov/about-us/news/announcements/contentdetails/2017/06/06/chancellor-fari%C3%B1a-releases-equity-and-excellence-for-all-diversity-in-new-york-city-public-schools. Analyzing and expanding the Specialized High Schools diversity initiatives was one of the proposals in the plan and remains a priority under this Chancellor. See Press Release at: https://www.schools.nyc.gov/docs/default-source/default-document-library/diversity-in-new-york-city-public-schools-english.

19. Against this historical backdrop, and with the goal of taking steps to promote racial, ethnic, geographic, and socio-economic diversity in the Specialized High Schools, the above mentioned decision-making group recommended in the spring of 2018 that the Chancellor exercise his discretion to expand the Discovery Program and modify the Discovery Program eligibility criteria. That recommendation was designed to advance the purpose the State Legislature intended when authorizing the Discovery Program – i.e., to ensure that disadvantaged students residing in the City of New York have an opportunity to enroll in, and benefit from, the Specialized High Schools. The Chancellor adopted the recommendation and announced the changes on June 3, 2018.

The Current Criteria for Admission through the Discovery Program

20. The current criteria for admission to a Specialized High School through the Discovery Program are (i) that the student take the SHSAT, score below the cut-off score for admission based only on the SHSAT, and have a score within the range of scores that will be required to fill the available Discovery Program seats, (ii) that the student receive a recommendation from her current school stating that she will benefit from a Specialized High

Case 1:18-cv-11657-ER  Document 50  Filed 01/07/19  Page 10 of 16

School education; (iii) that the student currently attend a school with a 2017-18 Economic Need Index ("ENI") of 60% or more, and (iv) one of the following:

> 1) The student's family income qualifies the student for free lunch or reduced price lunch based on the student's meal form (https://www.myschoolapps.com/);
>
> 2) The student's family receives assistance from the NYC Human Resources Administration (welfare or SNAP benefits);
>
> 3) The student is in foster care, a ward of the state, or is a Student in Temporary Housing as defined by McKinney-Vento (http://www.nysteachs.org/info-topic/eligibility.html); or
>
> 4) The student is an English Language Learner or a former English Language Learner within the previous 2 school years, and enrolled in a DOE school for the first time within the last four years.

21.    A student who receives an offer of admission through the Discovery Program must also successfully complete a summer school program before being admitted to a Specialized High School.

22.    The ENI is a measure of economic need that DOE has created and which it utilizes in many contexts to measure economic disadvantage.  DOE has found the ENI to be a more effective measure of economic disadvantage in many contexts than other measures of poverty.  A school's ENI estimates the percentage of students facing economic hardship and is based upon the average of the Economic Need Values ("ENV") of the students attending the school.

23.    A student's ENV is calculated as follows: the ENV is 1.0 if: (i) the student lives in a household that is eligible for public assistance from the NYC Human Resources Administration; (ii) the student lived in temporary housing in the past four years; or (iii) the student has a home language other than English and enrolled in a DOE school for the first time within the last four years.  Otherwise, a student's ENV is based on the percentage of families

10

with school-age children in the student's census tract whose income is below the poverty level, as estimated by the American Community Survey Five-Year estimate. The student's Economic Need Value equals the decimal value of this percentage (for example, if 62% of families in the census tract have income below the poverty line, the student's Economic Need Value is 0.62). See, New York City Demographic Snapshot at http://infohub.nyced.org/docs/default-source/default-document-library/demographicsnapshot201314to201718public_final.xlsx; see also Equity and Excellence for All: Diversity in New York City Public Schools, p. 4 FN 1, available at https://www.schools.nyc.gov/docs/default-source/default-document-library/diversity-in-new-york-city-public-schools-english.

24. The gradual expansion of the Discovery Program and the use of the current criteria are race-neutral policies that make no school assignments based upon race and are designed to more effectively identify disadvantaged students than the old criteria, because the current criteria place an emphasis upon schools with high ENI scores, while also seeking to advance geographic, socio-economic, racial and ethnic diversity. Students who are both from low-income families and attending schools that have students with higher economic hardship face more disadvantages than students who are from low-income families but attend schools with higher-income students. See, https://www.nytimes.com/roomfordebate/2012/05/20/is-segregation-back-in-us-public-schools/integrating-rich-and-poor-matters-most.

25. In addition, the ENI factor, more than the previously used Title I measure, allows for a more specific assessment of the level of economic hardship at a school, because the ENI factor is on a scale and because the chosen threshold is 0.60 or greater, which includes approximately 50% of the intermediate schools. (A Title I school is defined by the federal Title I statutory scheme, which provides that at least 40% of families must be low-income for the school

Case 1:18-cv-11657-ER Document 50 Filed 01/17/19 Page 12 of 16

to be eligible for remedial education assistance through Title I. In New York City, more than 50% of the intermediate schools meet the Title I standard.) In other words, using the ENI factor and a 0.60 threshold allows DOE to more precisely target schools where the majority of students are facing economic hardship and the disadvantages that accompany it. The fact that many of the schools with an ENI of 0.60 or above have recently not sent students to the eight Specialized High Schools further speaks to the level of disadvantage these students face. The gradual expansion of the Discovery Program is designed to increase the diversity of the Specialized High School across these dimensions - racial, ethnic, geographic and socio-economic - in an orderly fashion, while ensuring that the scholastic achievement of the student bodies at the Specialized High Schools will remain excellent.

26. I want to emphasize to the Court the lack of certainty as to what the precise effects of the current criteria for eligibility in the Discovery Program will be concerning racial and ethnic diversity. The decision-making group and I believed that the current criteria will expand the geographic and socio-economic diversity of the students attending the Specialized High Schools, because only students attending an intermediate school with an ENI of 0.60 or greater will be considered for the Discovery Program, and many of those schools have sent few or no students to the Specialized High Schools in recent years.

27. However, with regard to race and ethnicity, there are several factors beyond DOE's control that will affect the racial and ethnic composition of the students admitted through the challenged Discovery Program criteria. Based on past experience, many students who may qualify for the Discovery Program will indicate that they are not interested in receiving an offer, because the Discovery Program requires them to attend and successfully complete an intensive summer school program. These students may choose, for example, to instead attend

12

one of DOE's many excellent, selective screened high schools, which screen applicants based on multiple factors. These screened schools attract academically gifted students and provide a rigorous education, without necessarily requiring summer school preparation. At this time, DOE simply does not know which students are qualified for the Discovery Program or how many of them will be interested in participating in the Discovery Program.

28.    Moreover, I note that there are many Asian-American students in the intermediate schools with ENIs of 0.60 or greater. I understand that for the class admitted in September 2018, of the students offered admission to a Specialized High School from an intermediate school with an ENI of 0.60 or greater, 70% were Asian-American, and that this constituted 1,060 Asian-American students. In addition, approximately thirty percent of the students who take the SHSAT and attend an intermediate school with an ENI of 0.60 or greater are Asia-American. Accordingly, I believe there is no basis for the Plaintiffs' assertion that the expansion of the Discovery Program and the use of the current criteria will limit or reduce the enrollment of Asian-American students in the Specialized High Schools. We simply do not know, and the existing data do not suggest that.

Modeling the Challenged Discovery Program

29.    With regard to the modeling the Office of Student Enrollment showed me and the other decision-makers in the spring of 2018, I want to emphasize that we knew then that the modeling was a rough prediction and could not precisely predict the future ethnic and racial composition of the students enrolling in the Specialized High Schools through the Discovery Program. Indeed, there was - and is - significant uncertainty about the predictive accuracy of the modeling because it necessarily employed assumptions that may not reflect reality. Specifically, the modeling made the assumption that the students who are potentially eligible to participate in

the Discovery Program would respond to offers of admission to the Discovery Program the same way as students offered admission to a Specialized High School based solely upon their SHSAT score.  The model did not account for the higher percentage of students eligible for the Discovery Program who would likely turn it down because of the summer school requirement.  Nor did the model attempt to predict which groups of students might be more or less inclined to participate in the Discovery Program and attend summer school.  Accordingly, we did not – and do not – believe the modeling can exactly predict the racial composition of the students who will be admitted through the Discovery Program.

30.    At any rate, even though there is uncertainty surrounding the predictive validity of the modeling, it did influence our decision to recommend that the current criteria be adopted, and therefore warrants discussion.  The Office of Enrollment sent the decision-making group and me statistics predicting the ethnic composition of the combined student bodies of the eight Specialized High Schools if the current criteria had been used to fill 20% of the seats that were filled in the fall of 2017 and comparing those numbers to the demographics of the students actually admitted.  A copy of those statistics is attached to the Declaration of Nadiya Chadha as Exhibit 1.

31.    The model indicates the possibility of increasing racial and ethnic diversity at the Specialized High Schools.  But, the modeling rebuts the Plaintiffs' contention that DOE sought to limit Asian-American enrollment.  DOE's April 2018 modeling indicated that in the 2020-2021 school year, when 20% of the enrollment in the eight Specialized High Schools will be reserved for students participating in the Discovery Program, the racial and ethnic diversity of students enrolled in the Specialized High Schools might be somewhat

14

Case 1:18-cv-11657-ER Document 50 Filed 01/17/19 Page 15 of 16

increased, in that the combined percentage of African-American and Latino students in the eight schools might increase from approximately 9% to approximately 16%.

32. The model further showed that if this occurred it would have limited impact upon students of other ethnicities. Indeed, it was projected that the total enrollment of Asian-American students in the eight Specialized High Schools would decline by approximately 2.1%, from 53% to 50.9%. The total enrollment of students whose race or ethnicity was unknown to DOE would decline by approximately 1.2%, from 9% to 7.8%. And the total enrollment of White students would decline by approximately 2.5%, from 27.2% to 24.7%.

33. Far from seeking to limit the enrollment of Asian-American students, the modeling predicted that the current criteria would result in limited impact upon the enrollment of other groups, including Asian-Americans, while increasing diversity and providing all the students in the Specialized High Schools the advantages of learning and socializing in a more diverse student body.

34. What the impact of the current criteria and expansion of the Discovery Program will be for the class to be enrolled in September 2019 is even more uncertain. There was no modeling performed for the 2019-2020 school year (when approximately 13% of the total enrollment in the eight Specialized High Schools will be reserved for students participating in the Discovery Program). The modeling was based upon 20% of the class receiving admission through the Discovery Program. However, given that the Discovery Program will be smaller in the 2019-2020 school year than in the following year, if any assumption are made, it would be reasonable to assume that the impacts will be smaller in 2019-2020 than in the following year.

Case 1:18-cv-11657-ER Document 50 Filed 01/17/19 Page 16 of 16

35.    As stated in paragraph 4 above, in recommending that the current criteria be adopted, one of my goals was to increase the ethnic, racial, geographic, and socio-economic diversity of the student bodies of the Specialized High Schools, which I believe will be beneficial to all students enrolled in those schools. The expanded and revised Discovery Program criteria, which are race-neutral, should expand the number of intermediate schools that send students to the eight Specialized High Schools. I believe that this can have a ripple effect, inspiring and incentivizing other students, families, teachers and administrators from intermediate schools that historically have not sent students to a Specialized High School to apply to the Specialized High Schools. This in turn helps attract a broader range of talented, high performing students from throughout New York City to the Specialized High Schools. This is consistent with DOE's overall goal to expand access and opportunity for all of our students, and promote equity and excellence for all.

Dated: New York, New York
       January 17, 2019

JOSHUA WALLACK

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

CHRISTA McAULIFFE INTERMEDIATE SCHOOL
PTO, Inc. et al,

                                        Plaintiffs,

             -against-

BILL DE BLASIO, in his official capacity as Mayor of
New York, et ano.,

                                Defendants.

--------------------------------------------------------------------- x

**DECLARATION**

18 CV 11657 (ER)(OTW)

NADIYA CHADHA, declares under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am the Director of Research and Policy in the Office of Student Enrollment ("OSE") of the New York City Department of Education (the "DOE"). My responsibilities include conducting research and data analysis to support and inform the policymaking process as it relates to enrollment and admissions in DOE schools and supporting the overall admissions process for 3K, Pre-K, Kindergarten, middle school and high school through analysis, reporting, and policymaking. I have held this position since July 2015. I have a Bachelor of Arts degree in Economics from Boston College and Master of Public Administration degree from Columbia University.

2.     I submit this Declaration in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction. Its content is based on my personal knowledge, the books and records of DOE and discussions with other DOE employees.

Admission to the Specialized High Schools and the Discovery Program

a.  Offers Based on Score on the Specialized High School Admissions Test ("SHSAT")

3.     An overview of the process of how students apply to take the SHSAT, the procedures at the test sites, the contents of the test, how the test is scored and the Discovery Program are found in the 2018-2019 Specialized High Schools Student Handbook, which is published by DOE and is available at https://www.schools.nyc.gov/docs/default-source/default-document-library/specialized-high-schools-student-handbook.

4.     Before the test, students and their families are advised to carefully consider and decide which of the eight testing Specialized High Schools they want to attend and their order of preference. On the test date, students must complete a grid on the answer sheet in which they list their school choices in order of preference. Every student must provide at least one school choice and may provide as many as eight school choices.

5.     In accordance with State law, after the test scores are compiled, the scores of all students who took the test are rank-ordered from highest to lowest score.

6.     The student with the highest score is placed in her first choice school. The student with the next highest score is then placed in her first choice school. Each student in turn, in order of score, is placed in that student's first choice school as long as there are available seats in that school. If all the seats in a student's first choice school have been filled through this process, then the student is placed in her second choice school, provided there are seats available.

If not, the student is offered a seat in her third choice school if seats are still available, and so on. The process continues until all seats at the eight Specialized High Schools have been filled.

7. Based on prior experience, not all students accept the offers they receive. In September 2019, there will be approximately 4,000 seats available through this process in the eight Specialized High Schools. Accordingly, based on past experience, DOE will make approximately 4,800 offers to fill these seats.

b. Offers for the Discovery Program

8. The process of making offers for the Discovery Program, through which students can also gain admission to the Specialized High Schools, is significantly different, because of legal and practical constraints. Admission to the Discovery Program is also governed by State law. Students must take the SHSAT and score below the cut-off score of those admitted based solely on the SHSAT score. Once the offers based solely on the SHSAT score are determined, the cut-off score is known. The SHSAT score list is then reviewed, and students who are clearly ineligible for the Discovery Program are eliminated. This year, those are the students who do not attend a public school with an Economic Needs Index ("ENI") of 60% or above.

9. An estimated score range is then established, encompassing far more than enough students, taken in rank order, who may be eligible for and interested in taking the Discovery Program. The score range will depend on the number of seats available through the Discovery Program and the other factors discussed below. For the September 2019 entering class, there are currently a total of 528 seats in the Specialized High Schools reserved for

students who enter through the Discovery Program.[1] It is estimated that to fill these seats, 1,000 to 1,500 students and their schools will need to be contacted to determine whether the students are eligible and interested. (The exact number of students has not yet been determined.)

10. Pursuant to State law, to be eligible for the Discovery Program, the student must be disadvantaged, must be recommended by her current school as having high potential for the Specialized High School program and must take an intensive preparatory summer school program. Upon successful completion of the summer school program the student is admitted to a Specialized High School.

11. For the summer 2019 Discovery Program, the new criteria for determining which students are disadvantaged are being used. The student must attend a school with an ENI of .60 or above, and satisfy one of the following criteria: 1) the student's family income qualifies the student for free lunch or reduced price lunch based on the student's meal form; 2) the student's family receives assistance from the NYC Human Resources Administration (welfare or SNAP benefits); 3) the student is in foster care, a ward of the state, or is a Student in Temporary Housing as defined by McKinney-Vento or 4) the student is an English Language Learner or was an English Language Learner within the previous 2 school years, and enrolled in a DOE school for the first time within the last four years.

---

[1] In the 2018-2019 Discovery Program there were 252 participants. The 528 seats allocated for the upcoming 2019-2020 Discovery Program constitutes approximately 13% of the available seats in the Specialized High Schools. It is planned that the 2020-2021 Discovery Program will have approximately 800 seats, which is 20% of the available seats in the Specialized High Schools.

12. For the summer 2019 Discovery Program, the planned procedure is that we are planning to either send a letter or call the potentially eligible students and inform them that they may be eligible for the Discovery Program, through which they can gain entry into a Specialized High School, and that if they meet the other eligibility criteria, they will be required to go to the preparatory summer school program. They will be asked to respond by letter stating whether they are interested in participating in the Discovery Program. If the students' records do not show whether they are disadvantaged, they will also be asked to submit documentation establishing that they meet one of the disadvantaged criteria. The students' current schools will subsequently be asked to provide a letter stating whether the student is recommended as having high potential for the Specialized High School program.

13. Once DOE receives the responses, both as to whether students are interested in participating in the Discovery Program, and if so, whether they meet the other eligibility criteria, DOE can prepare a list of students to whom offers can be made, based on the students' scores on the SHSAT and their school choices. State law also requires offers for the Discovery Program to be made in rank order based on each student's score on the exam.

14. Thus, once a list of eligible and interested students is established, offers for the Discovery Program are made based on the students' rank-ordered scores and their school choices. This works in the same manner as for students who are given offers based solely on their SHSAT score.

15. However, as can be seen from the above, not everyone who is eligible for the Discovery Program receives an offer for the Program. Some students who are not interested in participating do not submit the documentation establishing that they are disadvantaged, even though they may satisfy the criteria. A significant number of students who are eligible respond

that they are not interested in the Discovery Program and accordingly are given no offer to participate in the Program.

16.    Accordingly, it is not possible to know with precision the population of students who are eligible for the Discovery Program in any given year. Nor will it be possible to know who will be made an offer to participate in the Discovery Program until late April or May 2019, after the student expressions of interest and the verification of eligibility requirements have been received.  DOE plans to provide Discovery Program offers in May 2019.

Data Concerning the Changes for the Discovery Program

      a.  Modeling the Effects of the Changes that were Subsequently Adopted

17.    In April 2018, a group of decision makers at DOE were considering whether revisions could be made in the admission procedure for the Specialized High Schools that could result in greater racial/ethnic, geographic and socioeconomic diversity in the student bodies of these schools.

18.    The Hecht Calandra Act does not limit the size of the Discovery Program, and does not define the eligibility requirement that a student be "disadvantaged." Accordingly, I was asked to model the possible results of expanding the Discovery Program to 20% of the seats at the Specialized High Schools, and of revising the criteria for the disadvantaged eligibility requirement.

19.    Estimates that I produced, using the proposed changes that were later adopted, are contained in a chart which is annexed hereto as Exhibit "1." I used the data for students that had taken the SHSAT for admission to the Specialized High Schools in September 2017. The first row of the chart shows the actual number of students who received offers to a

Specialized High School based solely on their SHSAT score. The second row shows the actual total of those students and the number of students who participated in the summer 2017 Discovery Program.

20. These totals are then broken down by race/ethnicity, and provided in percentages. The column headed "Other" refers to students who are multiple race categories not represented.[2] I then modeled how these actual numbers would have changed if the Discovery Program was expanded to 20% of the seats and the criteria for "disadvantaged" included a requirement that the student attend a school with an of ENI of 60% or above. The resulting estimated numbers are in the third row of the chart.

21. These estimates show a decrease of 2.9% points for Asian-American students, as a percentage of the total student population, a decrease of 2.5% points for White students and a decrease of 1.2% points for the group of "Other" students. The estimates show an increase of 2.4% points for Black students and 3.48% points for Hispanic students. It should be emphasized, that as described above, there are many variables that affect who receives an offer to the Discovery Program. Accordingly, these figures are estimates and the actual result may be different.

22. In April 2018 I provided the data in Exhibit "1" to the DOE decision makers who were considering revisions to the Discovery Program. The modeled changes in Chart "1" were incorporated in the new plan announced by the Mayor and the Chancellor on June 3, 2018. However, the 20% expansion of the Discovery Program is being rolled out over two years. For the 2019-2020 school year, the expansion will be approximately 13% and then will rise to 20% in the following year.

---

[2] This category represents students who do not report their race, as well as students reported as Native American or Multi-Racial.

b. Offers by Middle School

23. In addition to the modeling data, I analyzed data about the number of students who received offers based on their SHSAT score, and the number of participants in the Discovery Program, broken down by the middle school attended by the students. This actual data is for the students who entered a Specialized High School in September 2017 and the chart is at Exhibit "2."

24. The data shows that of the 648 public middle schools in New York City (which includes charter schools), there were 338 schools that had zero students who received a SHSAT offer to a Specialized High School and only 11 of these schools had any participants in the Discovery Program.

25. Of the 648 public middle schools, 96 schools had only 1 student receive a SHSAT offer and of these schools, only 5 had a single participant in the Discovery Program.

26. Thus, the students in 50.5% of the schools, over half of the public middle schools in New York City, received no offers to a Specialized High School, and in 15.6% of all public middle schools, only one student received an offer.

27. Looked at another way, this means that 428 out of the 648 middle schools in New York City had zero or one student receive an offer to a Specialized High School for Fall 2017. At all 428 of these middle schools combined – which comprise approximately two-thirds of all NYC middle schools (66%) – just 101 students—received an offer to a Specialized High School.

28.     By comparison, *each* of the 8 middle schools that had the largest number of offers to Specialized High Schools had over 100 students who received offers.  The number of offers to students in each of these schools varied between 268 and 108 students.

29.     The data also shows that 50% of offers to a Specialized High School were made to students at only 30 (or 4.6%) of all public middle schools in New York City, none of which were in the Bronx. Of the 161 public intermediate schools in the Bronx, only 45 – less than 30% - had students that received an admission offer for fall 2017 to the Specialized High Schools based upon individual SHSAT scores. Of the remaining 116 Bronx intermediate schools that had no students receiving offers based on SHSAT scores, only 4 - approximately 3% - had students that received offers through the Discovery Program.

c. <u>Asian-American Students who Attend a School with an ENI of 60% or Above</u>

30.     I also was asked to provide actual data for purposes of this litigation, showing the rate of participation and rate of success in the Specialized High School admission process of Asian-American students who attend schools with an ENI of 60% or above. The charts that show this data are annexed at Exhibit "3" as 3A, 3B and 3C.[3]

---

[3] Since the purpose of the tables in Exhibit "3" is to contrast high ENI and low ENI middle schools, students attending private schools – for which DOE does not calculate an ENI – are treated as a separate category. The data in the Exhibit "3" tables therefore differs in minor ways from the data in Exhibit "1", as Exhibit "1" incorporates information about the race of private school students to the extent that this information is available to DOE.

31.     Chart 3A shows the data for students who were offered admission to a Specialized High School for September 2018, based on their score on the SHSAT. The data shows the number of students who attended a school with an ENI of 60% or above, the number of students who attended a school with an ENI of less than 60%, and the number of students for whom there is no ENI available.[4] These totals are then broken down by race/ethnicity. The row headed "other" refers to students who are students of multiple race categories that are not represented and the row headed "private school attendees" refers to students who attend private schools. Chart 3A shows that offers were made to 1,511 students from schools with an ENI of 60% or greater, and of these, 1,060 students (or 70.2 %) were Asian-American.

32.     Chart 3B shows the same data for the prior year, students who were offered admission to a Specialized High School for September 2017. The data for Asian-Americans is very similar. Offers were made to 1,540 students from schools with an ENI of 60% or greater, and of these, 1,075 students, or 69.8 %, were Asian-American.

33.     Finally, Chart 3C shows the data for test takers -- those who took the SHSAT for admission to the Specialized High Schools in September 2018.  The data shows that of the 16,107 students who took the exam and attend schools with an ENI of 60% or above: 4,974, or 30.9 % were Asian-American; 4,361, or 27.1% were African-American; 5,001 or 31% were Hispanic; 1,475 or 9.2% were White; and 296 or 1.8% were "Other." Chart 3A and Chart 3C, when read together, show that African-American and Hispanic students accounted for approximately 41% of SHSAT test-takers, yet only received approximately 9% of offers to Specialized High Schools.

---

[4] No ENI data is available for students who attend a private school or do not attend a DOE district school or a charter school, due to being homeschooled, hospitalized, etc.

Timeline and Process of Determining Specialized High School Offers

34.     Offers of admission to the Specialized High Schools must be prepared for mailing at the same time as all First Round offers of admission made to the approximately 80,000 students seeking admission to a New York City public high school.

35.     There are 427 high schools operated by DOE that utilize DOE's centralized admissions process, and some high schools offer multiple programs. In total, there are approximately 800 schools and programs to which students can apply. Each student may apply to as many as 12 schools or programs in non-specialized high schools, listing them in order of preference. DOE mails the first round of offers of admission to all high schools, including the Specialized High Schools, at the same time.

36.     In the fall of 2018, more than 29,000 students took the SHSAT for admission in September 2019. DOE's test vendor, Pearson, the company that develops the SHSAT, scanned the completed tests and delivered a file with each student's score and list of Specialized High School preferences to DOE on January 4, 2019.

37.     It should be noted that in connection with this litigation, I was asked to review the exam score of the child of a Plaintiff in this lawsuit, on whose behalf the Plaintiff is suing. Given the child's score on the exam, she is very likely not affected by the Discovery Program.

38.     DOE is still in the process of determining the cut-off scores for each Specialized High School. According to the original schedule, DOE would provide cut-off score information to Pearson this week together with the student identification numbers. Pearson would then run the data to match students and schools and perform spot checks to verify accuracy, a process that takes approximately 8 business days.

39.     Pearson next gives DOE the offer information for the students who took the SHSAT.  DOE will then analyze the data for those students who scored just below the cut-off score, to identify which students may be eligible for the Discovery Program. As explained above, students who scored below the cut-off on the SHSAT but who may be eligible for the Discovery Program will be so informed and asked to provide information about (i) their interest in the Discovery Program and (ii) in some cases, their economic or linguistic need.

40.     As for admission to all other high schools, DOE applies algorithms to the application choices of all 80,000 students; these algorithms are designed to provide each student with his or her highest possible preferred school.  Each student is offered admission to one non-specialized high school. Students whose score on the SHSAT exceeds the cut-off for one of their chosen Specialized High Schools will receive offers for two schools: one Specialized High School and one non-specialized high school.[5]

41.     DOE was scheduled to finalize and transmit the content of the approximately 80,000 high school offer letters to outside vendors for printing and mailing by February 11, 2019.   Pursuant to contract, these vendors have three weeks to complete the printing and mailing process for all offer letters.  These offer letters were originally scheduled to be mailed to all 80,000 high school student applicants on March 4, 2019.

42.     If the Court were to grant a preliminary injunction, however, the cut-off score DOE developed for each Specialized High School would need to be recalibrated—and those cut-off scores directly impact which students will receive an offer (if any) to a particular Specialized High School.  DOE would have to consult again with the eight Specialized High

---

[5] There is one exception to these rules.  If a student has applied  and been accepted for one or more studios at the Fiorello H. LaGuardia High School of Music and Art & the Performing Arts, those offers will be listed on the offer letter in addition to any other offer(s).

School principals to set new seat targets for the Discovery Program at each Specialized High School and then recalibrate the cut-off score for each school based on those targets. The revised data would then have to be sent back to Pearson for verification, re-run through DOE's computer systems to generate new offer letters, and finally sent to the outside vendors to print and mail the letters within the contracted three weeks.

43. A decision was made by officials at DOE, that considering the compressed period in which primarily OSE must complete this complicated Specialized High School offer process; complete the Discovery Program eligibility review; complete the general high school offer process for all 80,000 applications; prepare responses in this litigation; and attempt to provide the Court with sufficient time to rule on the instant motion, it was necessary for DOE to push back the admissions timeline just described to allow for the latest feasible date to mail offer letters: March 18, 2019. To meet that deadline, DOE must provide finalized information to the outside vendors for printing and mailing by February 25, 2019.

44. The New York City high school application process is stressful for students and their families. DOE is mindful that a delay in the mailing of high school offers will increase anxiety for students and families, cause complications for those students considering private school offers, and require Specialized High Schools to reschedule and re-staff Open Houses that have already been planned for the second week in March 2019. Additionally, the School Fair has already been planned for the weekend of March 23 and 24, 2019, where representatives of high schools that still have open seats are available to speak with students and their families who are considering applying in Round 2 of the high school application process. Applications for Round 2 are due by March 29, 2019.

Service of Papers Just Before Winter Recess

45. Finally, I have been advised by counsel that the papers in this lawsuit were served on Thursday, December 20, 208. The DOE's winter recess began on Monday, December 24, 2018 and continued through January 1, 2019. During this period all schools are closed.

46. While the DOE's main office where I work was not officially closed that entire period (the office was open between December 26 and December 28), I, like most staff in QSE and at the main office, had a preplanned vacation arranged for the winter recess period. I returned to work, as did most of my colleagues, on January 2, 2019.

Dated:          New York, New York
                January 17, 2019

                                        NADIYA CHADHA

# Exhibit D

Q7LVCHEO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

YI FANG CHEN, et ano,

                Plaintiffs,

            v.                          26 Civ. 3355 (ER)

ZOHRAN MAMDANI, et al,

                Defendants.             Argument

------------------------------x
                                        New York, N.Y.
                                        July 21, 2026
                                        2:35 p.m.

Before:

                    HON. EDGARDO RAMOS,

                                        District Judge

                        APPEARANCES

PACIFIC LEGAL FOUNDATION
      Attorneys for Plaintiffs
BY:   DEAN McGEE
      GLENN E. ROPER
      CAITLYN A. FELLNER

CORPORATION COUNSEL
SPECIAL FEDERAL LITIGATION DIVISION
      Attorneys for Defendants
BY:   TONYA JENERETTE
      ABIGAIL STRANGE

NAACP LEGAL DEFENSE & EDUCATIONAL FUND INC.
      Attorneys for Intervenor Defendants
BY:   DONYA KHADEM
      ASJA TOWNS
      -and-
LATINOJUSTICE PRIDEF
BY:   MARIANA LOPEZ

Q7LVCHEO

(Case called)

THE DEPUTY CLERK:  Counsel, please state your name for the record.

MR. McGEE:  Dean McGee, on behalf of plaintiff, with my colleagues Glenn Roper and Caitlin Fellner.

And I'd like to acknowledge the presence of my client, Yi Fang Chen, and her son, here today.

MS. STRANGE:  Abigail Strange, for the city.

MS. JENERETTE:  Good afternoon, your Honor.

Tonya Jenerette, for the city and the Department of Education.

MS. KHADEM:  Good afternoon, your Honor.

Donya Khadem on behalf of defendant intervenors.  And I also have my colleagues here, who I'll let introduce.

MS. TOWNS:  Asja Towns, for defendant intervenors.

MS. LOPEZ:  Hi, your Honor.  Mariana Lopez, for defendant intervenors.

THE COURT:  Good afternoon to you all.

This matter is on for a preliminary injunction hearing.  And it is the plaintiffs that are seeking an injunction.  So, Mr. McGee or Mr. Roper, I'm happy to hear you.  And you can remain seated; just bring the microphone close to you.

MR. McGEE:  Sounds good.  Thank you, your Honor.

It was around seven years ago that Yi Fang Chen was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q7LVCHEO

among a group of plaintiffs who filed an action seeking to enjoin racially motivated changes to the Discovery Program. Her concerns recently came to fruition, with her son earning a score that would have admitted him to Stuyvesant but for those revisions.

Of course, the Court denied the preliminary injunction in 2019. And the natural question for the Court to ask is what's changed?

Our answer is: Quite a lot, both in the development of equal protection clause jurisprudence, and in the development of the factual record through the related case and the discovery that's now been presented here.

So starting with the developments in the law and focusing on the preliminary injunction factor of likelihood of success on the merits, I think the best place to start is *Students for Fair Admission*, and specifically what that decision meant for the issue of discriminatory intent. Because discriminatory intent is certainly an area where I think the parties are kind of talking past each other. And as I read defendants' papers, both intervenors and the city, they take the perspective that it's our burden to show actual animus towards the Asian-American students. That is not the law, certainly not after *SFFA*.

So the Court in *SFFA* acknowledged — as it really had to — that the race-focused admissions processes they struck

Q7LVCHEO

down were likely "well-intentioned and implemented in good faith by the school administrators."  For purposes of this motion, it's fair to presume the same about the defendants here.  They were addressing something they viewed as a problem, which was the racial demographics of the specialized high schools.

But *SFFA* nevertheless struck down that program.  It held that the use of race in the admissions process was unlawful and operated with discriminatory intent, in violation of the equal protection clause.

How did they reach that conclusion?  I think it really comes down to the issue of zero sum admissions and the nature of zero sum admissions in schools.

From the decision:  "Admissions are zero sum, a benefit provided to some applicants, but not to others, necessarily disadvantages the former group at the expense of the latter."

So in the documents here, when defendants are talking about using the Discovery Program as a "lever" to admit certain demographics, but not others, and when they are projecting different ENI cutoffs, modeling different ways to essentially racially balance the schools or, as they said publicly, to make them look like New York City, that is discriminatory intent, despite its benevolent framing.  And *SFFA* said that efforts at racial balancing are "patently unconstitutional" and that

Q7LVCHEO

racial manipulations within a zero sum system violate one of the twin commands of equal protection, which is that someone's race should never be used by the government as a negative against them.

THE COURT:  But wasn't the Supreme Court's focus, at least in large part, that the policies at issue in *SFFA* were openly racial; they were policies that were meant to highlight or benefit individual applicants because of their race.

Correct?

MR. McGEE:  Yes.  It's true that the admissions processes specifically struck down in *SFFA*, you know, explicitly, sort of on the back end, as they're reviewing applications, would give points based on race.  But *SFFA* also said, sort of, you know, poetically, the Constitution deals with shadows, not substance, right, as something that can't be done explicitly.  You can't give it a different name and try to get around that to reach the same result.  That's sort of the point of the *Arlington Heights* analysis, is it allows the Court to kind of look beyond the veil of facial racial neutrality and examine the record.

So our perspective on that is when you look at the internal record, the ENI -- the defendants openly talked about racial goals.  And then when you look at the documents that were from the related action, discovery documents, you see them essentially using ENI as a racial proxy, right, trying to

Q7LVCHEO

racially balance using ENI as a proxy.

THE COURT:  But you don't dispute that the policy itself or the program, the Discovery Program, and the changes that were sought to be implemented by the prior mayoral administration were racially neutral.

MR. McGEE:  No, I don't dispute facial racial neutrality; I just ask the Court to consider *Arlington Heights*, the quote I gave from *SFFA*, and the obligation to kind of look beyond the facial racial neutrality to the purpose and the design of the program.

THE COURT:  And, by the way, the Supreme Court has never held that diversity can never be a legitimate governmental goal; correct?

MR. McGEE:  *SFFA* is pretty clear that it certainly does not satisfy strict scrutiny.  And our argument is, of course --

THE COURT:  The diversity or the matter at which one would want to arrive at?

MR. McGEE:  I'm paraphrasing, but *SFFA*, my read of it certainly is that, sort of, general goals of diversity are quite clearly, after *SFFA*, not considered a compelling governmental interest.

I would also draw the Court's attention to Judge McMahon's decision in the *National Endowment for the Humanities* case, where she essentially said that often those types of

Q7LVCHEO

racial decisions don't even satisfy rational basis scrutiny.

THE COURT:  Okay.

MR. McGEE:  On the issue of intent, I just also wanted to briefly reference Judge Vyskocil's decision in *Herrera*, because I think it is instructive; very similar statements from the same city decision-makers:  Former Chancellor Carranza, former Mayor de Blasio, talked about in hiring at the DOE, that they wanted to make the demographics "look like New York City." And Judge Vyskocil took that as evidence, among other things, of racial discriminatory intent as part of a broader package of evidence showing essentially an effort at racial balancing in hiring.

THE COURT:  I'm sorry.  So did Judge Vyskocil refer to Richard Carranza's and Mayor de Blasio's statements?

MR. McGEE:  She did.  And it was in denial of summary judgment by the city I believe was the context of that decision, so not the same context.  But she took that as evidence, among other things, of unlawful race-based decision-making.

THE COURT:  And those statements were statements that were brought to my attention in connection with the original or the preliminary injunction motion in *Christa McAuliffe*; correct?

MR. McGEE:  That's correct, your Honor.

THE COURT:  That preliminary injunction was upheld by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q7LVCHEO

the Second Circuit.

MR. McGEE:  Yes, it was.

And so, of course, we're asking the Court two things. And I mentioned in the beginning that there have been significant shifts.

One is through the equal -- the shift in jurisprudence governing the equal protection clause after *SFFA*.  And the second significant development is in the factual record that your Honor did not have before this Court through the discovery documents in the *CACAGNY* action.

THE COURT:  But you still relied to a great extent — at least my reading of your papers — on those prior statements.

MR. McGEE:  That is part — but no longer all — of the evidence we are submitting.

And I appreciate my colleague pointing out that the upholding of the PI denial really only addressed standing, but not the merits of the decision --

THE COURT:  Okay.

MR. McGEE:  -- as it related to discriminatory intent.

And then briefly on the issue of intent, we do think it's worth emphasizing the simplicity with which the Supreme Court more recently, after the filing of this case, summarized *SFFA* and *Arlington Heights* in the *Callais v. Louisiana* decision, saying very bluntly:  If race played a role, strict scrutiny applies.  Judge McMahon, citing *Callais*, said

Q7LVCHEO

similarly:  When the government uses race to create a classification for purpose of official action, the government must satisfy strict scrutiny.

That brings us to the other big shift in equal protection clause jurisprudence, which is the Second Circuit's *CACAGNY* decision, again, in the related case.  Now, we know that the Second Circuit declined to make any finding as to discriminatory intent.

I still think it's worth noting that, like the Supreme Court, the Second Circuit zeroed in on the idea of a zero sum admissions world and how to view equal protection clause cases within that world.

From the decision:  "Specialized high school admission is a zero sum game, in that admitting more students from a particular demographic means admitting fewer from other demographics.  Thus, the city's modeling also projected that the changes to the Discovery Program would decrease the number of Asian-Americans at the specialized high schools."

This only buttresses our point that the evidence of discriminatory intent or purpose in a case like this does not require overt animus, simply the intent by government actors to categorize young people by their race and make decisions that will ultimately negatively impact some of them based on their race, even if they are framed positively or in a benign manner. In other words, in a zero sum system, those aren't independent

Q7LVCHEO

consequences; it's part of the patently unconstitutional.

That's the quote from the Supreme Court, racial balancing.

THE COURT:  In this particular case, there isn't just the test, right, there is the Discovery Program.  And you have no qualms with that program, do you?

MR. McGEE:  No, the program is permitted to exist under the law.  The big limitation, statutory — not constitutional — limitation on it is just that it ultimately can't hinder the academic performance of the school.

I'm paraphrasing.

THE COURT:  And you have no qualm, I take it, with the fact that part of what the city wanted to do was to expand the Discovery Program.

MR. McGEE:  No.  And certainly not for purposes of an equal protection clause analysis.  That's the pure expansion, if not part of a, sort of, broader racial balancing goal, would not trigger an equal protection clause.

THE COURT:  And I take it you have no dispute with the notion that a legitimate goal of the Discovery Program is to expand educational opportunities for individuals from economically disadvantaged backgrounds.

MR. McGEE:  Yes, I agree, that's the purpose of the Discovery Program within Hecht-Calandra.

THE COURT:  Okay.  I guess we're just sort of distilling this down to your case rises or falls on whether or

Q7LVCHEO

not you are able to establish at this juncture, by whichever standard we apply, that the defendant was intentionally discriminating against Asian students.

MR. McGEE:  Yes, through that lens that I just discussed of the zero sum admissions, right, which would not require a showing of a conscious decision to hurt Asian-American students; it's the acknowledgment that when you start to racially balance -- when you make efforts to racially balance — in this case through the ENI cutoffs, not just expansion of the Discovery Program, but the specific ENI targeting — that was used as a racial proxy.

THE COURT:  And so long as it's done however appropriately under your theory, I take it -- I used the word "diversity" before, let me now change it up just a little bit. Would you quarrel with the fact that it's appropriate for the government in any appropriate way to attempt to address the impact of prior discrimination?

MR. McGEE:  I'll answer that through the way the Supreme Court answered it in *SFFA*, where any efforts to use race to remedy prior discrimination has to be — and I'm paraphrasing a bit here, but it's specific racial discrimination relevant to the program, it violated the Constitution or a statute.  That's a weak paraphrase.  But in the decision you'll see the Supreme Court actually did very -- only very narrowly allow that consideration to come into play

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

if the government is using race as a factor.

THE COURT: But if the government is not using race as a factor, then it is allowable.

MR. McGEE: It always depends on the circumstances, right, to look to see, of course, whether race was the motivating reason to do it. But, sure, with that caveat, if -- you know, yeah.

So I talked about how *CACAGNY* is relevant to the issue of discriminatory intent, though it didn't address it explicitly. It's most important for its discussion of discriminatory impact. It clarified that a student like M.P. unambiguously has a valid equal protection clause claim, even though the projected decrease in overall Asian-American representation at the specialized high schools failed to materialize. And the Court pointed out as an example of an Asian-American student who had had a viable claim through the *CACAGNY* decision as an Asian-American student who is denied entry to one of the more -- who got into the specialized high schools, but was denied entry to the elite schools. Stuyvesant specifically was called out by the Second Circuit as there being evidence that Asian-American students -- fewer Asian-American students were admitted to Stuyvesant as a result of the changes.

THE COURT: I'm sorry. Did the Second Circuit say that someone in the young students' situation here, someone who

Q7LVCHEO

got into Bronx Science or Brooklyn Tech, but not Stuyvesant, stated a claim?

MR. McGEE: Essentially, yes. Because it acknowledged that there was not an overall reduction on the specialized high schools as an aggregate, but "the number of Asian-Americans receiving offers to the two most selected specialized high schools, Stuyvesant and Bronx Science, declined."

So they did, I believe.

So essentially it was a reminder from the Second Circuit that while we talk about these group protections in the context of the equal protection clause, it is ultimately an individual right and creates a valid equal protection clause claim for a student in precisely M.P.'s position. That's Ms. Chen's son.

Before turning to the other PI factors, I want to get back to what I said about how not only has the law changed, but the facts too.

We know that this Court already reviewed the public documents available in 2019 and found that those alone were not sufficient to establish discriminatory purpose. Again, we ask you to revisit that decision in light of *SFFA* and *Callais*. But, regardless, the discriminatory intent, when viewed through those lenses, is beyond evident in the internal deliberations now available to the Court.

So just some highlights.

Q7LVCHEO

Exhibit 2 of the Roper declaration talks about the city using Discovery as a lever to admit more black and Hispanic --

THE COURT:  I'm sorry.  You'll need to slow down.

MR. McGEE:  Apologies.

Exhibit 2 of the Roper declaration, it uses this phrase -- the city said, We want to use Discovery as a "lever to admit more black and Hispanic students."

Exhibit 3, the city is then talking about how to do that.  And they are talking about which ENI cutoffs specifically --

THE COURT:  By the way, that first part is -- you have no qualm with, I assume.

MR. McGEE:  So the big picture, right, as I walk through these exhibits, the qualm, the concern, again, is with the zero sum — what that means in the context of zero sum admissions, right, where in the context of what the Supreme Court described as patently unconstitutional racial balancing. It's when you start making those manipulations to achieve racial goals in a zero sum system, as you make decisions that increase one, you're necessarily making decisions that decrease others.

So through that lens, if we do have a concern about it, only within that context of what that means for our clients, right, it ultimately is sending the message that the

Q7LVCHEO

intent — though not stated explicitly — was to reduce, because that is the mathematical consequence of trying to racially balance.

Just briefly then on the exhibits.

In Exhibit 3, the city discusses using the ENI cutoff specifically for that purpose, rejecting alternatives that "did not change the racial makeup."

Exhibit 4 talks about ENI to target certain demographics and includes the specific racial projections.

Exhibit 5 shows that once they decided on that 60 percent ENI cutoff, there are charts showing the projection to decrease Asian participation in the Discovery Program from 64 percent to 38 percent.

And then Exhibit 7 is an internal summary that specifically notes as a con "vociferous" opposition from Asian-American leadership and resistance generally from those who would have received seats in the absence of change.

So this takes it from a case where we're talking about maybe just awareness of race to an explicit purposeful attempt at racial balancing.

Unless your Honor has any more questions on discriminatory intent, I'm happy to discuss the other PI factors.

THE COURT:  You can go on.

MR. McGEE:  Okay.

Q7LVCHEO

So with respect to irreparable harm, we don't think there's any reason for this Court to revisit its decision that equal protection clause violations are, in and of themselves, irreparable harm. That would put the equal protection clause right on par with the First, Fourth, and Eighth Amendments, which the Second Circuit has recognized are entitled to that presumption and which this Court recognized. Defendants rely on Second Amendment cases. We view them as distinguishable for that reason alone.

But, in any event, the irreparable harm here is clear. It's the loss of a once-in-a-lifetime opportunity to attend what is arguably the best high school in the country that he earned but for this program.

THE COURT: Why should I conclude that, that he earned it?

MR. McGEE: I don't think it's contested on the papers in any meaningful way, that that three-point gap between his score and the cutoff, he would have been in the range to be admitted into Stuyvesant but for the 20 percent reservation of students to the Discovery Program as part of the racial balancing. I don't think that's contested. The city's own projections — I believe it's Exhibit 8 — at the time projected a ten percent difference. So that three points is well within what the city itself projected.

THE COURT: Do I need to make a qualitative analysis

Q7LVCHEO

as between Stuyvesant and Brooklyn Tech?  Because, as I understand it, he has a seat at Brooklyn Tech.  By everyone's account here, they are -- Brooklyn Tech, Bronx Science, and Stuyvesant are the top three.  Do I have to make a determination that Brooklyn Tech is so much the lesser school that it would be a constitutional violation to prevent or to require that the young man to attend Brooklyn Tech?

MR. McGEE:  The Court need not measure the differences between Stuyvesant and Brooklyn Tech.  I think the *Foulke* decision which we cite is apt for its analysis.  There, in a different factual context — divorce — you had a student who had the opportunity to go to Rye Day School, an excellent private school in Westchester, or Mamaroneck, an excellent public school.  The Court said, I'm not going to weigh the comparative merits of those schools.

The chance to miss a year that you can't get back at a school that you want to go to as a child — in this case it was a parent, in that case, wanted the kid to go to — is, in and of itself, irreparable harm.  I think that's true just from a common sense perspective.  You can't get your freshman year of high school back, the friends you would make, the courses you would take in a specific school.  So I don't think the Court needs to get into various merits.

I do think the record is clear, and even in the *CACAGNY* decision, that Stuyvesant, among great schools -- and

Q7LVCHEO

three of my best friends went to Bronx Science.  But, you know,
Stuyvesant is considered the most elite of the specialized high
schools.

THE COURT:  By the way, as I understand it from the
papers, you can apply to Stuyvesant for your sophomore year.

MR. McGEE:  You can apply to Stuyvesant for your
sophomore year.

THE COURT:  Do you know how many people do that?

MR. McGEE:  I don't.  But, again, we don't think that
changes the calculus of irreparable harm.  Because the harm is
losing that freshman year at a school that he earned admission
to but for the unconstitutional program.

THE COURT:  Okay.

MR. McGEE:  As to balance of equities, hardships, and
the public interest, your Honor's denial in the related action
emphasized that unwinding the whole program, which was the
relief sought, that it had been planned for nearly a year, on
the eve of its implementation, weighed in the city's favor.
That's, of course, not at issue here.

We're talking about admitting one student who, again,
we argue, earned his place but for an unlawful attempt at
racial balancing.  Your Honor's decision also emphasized that
the plaintiffs' hardships in that case were largely
speculative.  That was, of course, understandable at the time
in that case, but is no longer true here.  We have concrete

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q7LVCHEO

harm:  A student who was denied admission to his dream school.

And, as a general matter, the public interest is always served when constitutional rights are upheld.

THE COURT:  Let me ask you about that.

I understand that the student came in several points below the cutoff.

MR. McGEE:  Three points below the cutoff; correct.

THE COURT:  Was he the first student below the cutoff line?

MR. McGEE:  I don't have access to the list, so that's not a question I can answer in the abstract.

THE COURT:  Presumably he was not.

MR. McGEE:  Happy to presume hypothetically he was not.  I just don't know.

THE COURT:  Okay.  So if he was not the very first student below the list, aren't you, in essence, asking me to have him jump the line ahead of someone else who ranked even higher?  And defense makes the point — I don't know whether you would agree — that that would actually be a violation of the law establishing these schools.

MR. McGEE:  So we don't agree.

First, I guess I'll start with the second point of your question.  We don't agree that this would violate Hecht-Calandra.  Hecht-Calandra establishes the necessity of the SHSAT with the Discovery -- making allowance for Discovery

Q7LVCHEO

Program.  And our client took the SHSAT.  He went through the process that Hecht-Calandra requires.  And what the Court has to look for with the plaintiff before it is what is the -- if the Court finds it was unlawful, what is the but-for world that you should return him to for purposes of injunctive relief; and, in this case, it's admission to the school.  It's what the Supreme Court did in the *Bakke v. Regents of California* case; admission for one student who established would have been admitted in that world but for a racial balancing program.

THE COURT:  I happen to be old enough to remember *Bakke*, and I don't recall that the admissions process was as regimented there as it is here.  So if it's regimented -- and by that I mean there is a list of people who qualify or not.

And if the young plaintiff here is not first or second or third or fourth on that list — and I don't like to engage in parades of horribles, but if I place him in the school, and the first and second and third and fourth students who ranked ahead of him came in tomorrow and said, What about me? wouldn't I be required under what you're asking me to do to place them at Stuyvesant?

MR. McGEE:  No, your Honor.  And let me just first address the issue --

THE COURT:  By the way, they could be Asian students, they could be black, they could be white students.  And if they would have qualified but for this program, aren't you

Q7LVCHEO

essentially requiring me to place them in the school?

MR. McGEE:  No, your Honor.  I'll answer that question first and then I want to go back to the violation of Hecht-Calandra.

We're not, in part because, frankly, as far as we know, none of those students have filed suit.  And as your Honor recognized in the --

THE COURT:  Well, not yet.

MR. McGEE:  But as your Honor recognized in the *Christa McAuliffe* action, it is well within the Court's discretion on a preliminary injunction to consider the timing of a lawsuit when considering the balance -- you know, when making those balancing decisions.  So there's, frankly, a big difference between a plaintiff who filed back in April, as our client did, and someone waiting, you know, until the month before admissions are finalized.  So, no, your Honor would be able to say, Frankly, for this school year, you're too late.

The other kind of core point is we don't agree this would be a violation of Hecht-Calandra.  But the Supreme Court's *Milliken* decision, which was a racial desegregation case, made very clear that state rules governing school admissions are not sacrosanct.  Ultimately, it is protecting an individual's constitutional rights, as we're asking the Court to do here, would come above those considerations anyway.

So I'm happy to conclude here.

Q7LVCHEO

Again, just to reemphasize, this motion concerns one student who would have been attending his dream school but for a policy designed to reallocate educational opportunities by race. We think it's clear from the public statements, but certainly clear from the internal documents in the Roper declaration, that the purpose was an effort at racial balancing. So not mere incidental awareness of race, but making decisions because of race. And so on this motion, Ms. Chen is not asking the Court to dismantle the admissions systems or displace other students, just that her son would be placed where he would have been absent the constitutional violation.

THE COURT: Let me ask you briefly — the intervenors make the point that two of the other plaintiffs don't have standing because of their relative age. And previously I did not grant standing, for example, to the young gentleman here because he was too far removed from being either hurt or not by this policy.

MR. McGEE: I believe both of those students are at least a year older than M.P. was at the time your Honor made the decision. One of them I'm almost certain is in middle school, right, so more of the exact type of student who could be granted prospective relief. And as to the younger student, I think under the *CACAGNY* decision, it would be worth revisiting your Honor's prior decision, frankly, just through

Q7LVCHEO

the lens of how long that case has taken.  It shows that these things can, in fact, take longer than anyone anticipated.  And so it's not necessarily prudent to deny that relief on standing and have them refile years later.

THE COURT:  Thank you.

Ms. Jenerette.

MS. JENERETTE:  Yes, your Honor.

So I guess two points:  One, there has not been a change in equal protection jurisprudence.

THE COURT:  There's been some change in equal protection jurisprudence.

MS. JENERETTE:  Not that applies here or that should affect the outcome here.

*Students for Fair Admission* is inapplicable to this case because, in that case, the Supreme Court considered the admissions policies at Harvard and UNC that were explicitly race-based.  And both of those cases, the admissions policies considered race as an explicit factor in admissions decisions. And the Court considered whether or not using race as a classification to advantaged or disadvantaged students in the admissions process could survive strict scrutiny.  And the Court found that on the facts presented there, it did not.

The Court also held that Harvard and UNC could have and should have considered race-neutral options to achieve racial diversity.  And the Court did not strike down — did not

Q7LVCHEO

hold — that race-neutral policies could not be used to achieve racial diversity. And that is what we have here.

The Discovery Program, by their own admissions, the 2018 changes to the Discovery Program challenged here are race-neutral, is a race-neutral policy to try to achieve racial diversity in the specialized high schools.

It's worth noting too that in the Second Circuit -- the Second Circuit's decision in *CACAGNY* is a narrow procedural holding that merely remanded the case, the *CACAGNY* case, to this Court for discovery on the question of discriminatory intent. The Court did not find that the changes to the Discovery Program violated the equal protection clause, nor did the Court find that the defendants acted with discriminatory intent to exclude Asian-American students from the Discovery Program.

The Second Circuit remanded the case for discovery on the issue of discriminatory intent. And, in so doing, it is worth noting that in footnote 7, the Court particularly emphasized that because there was no discovery on the issue of discriminatory intent, that they would have to presume intent in their reasoning, the reasoning that plaintiffs cite around zero sum admissions.

But the Court emphasized that their holding in no way undermines or even implicates the Supreme Court's guidance in *Feeney*, as applied by the Second Circuit and other under

Q7LVCHEO

*Arlington Heights*, namely, that discriminatory purpose implies that this decision-maker selected or reaffirmed a particular course of action because of — not in spite of — its adverse effects on an identifiable group.

And the Court held that the simple fact that the board -- that a decision-maker may have been able to discern that expanding — quoting *Coalition for T.J.* — the fact that the board may have been able to discern that expanding the school's black and Hispanic student population might, as a natural and foreseeable consequence, impact enrollment figures for Asian-American students or students of another racial group is, under *Feeney*, wholly insufficient from which to infer a constitutionally impermissible intent. And that is exactly what we have here. And this is the point that plaintiffs fail to grapple with; they refuse to grapple with it. Because they cannot establish and have not established discriminatory intent under that standard.

THE COURT: Let me ask a couple of questions, Ms. Jenerette.

First of all, let me ask, with respect to discovery, is discovery complete in *Christa McAuliffe*?

MS. JENERETTE: Yes.

THE COURT: And the plaintiffs highlight a particular chart and particular discussions about a chart and how the Board of Education modeled the Discovery Program, and how,

Q7LVCHEO

pursuant to one model, the percentage of Asian students dropped — I forget exactly what the numbers were — from like 64 to 38, am I right about that, something along those lines?

And they emphasized that the explicit discussions around that modeling shows that this was a race-based determination.

MS. JENERETTE:  Yeah.  So the plaintiffs -- their description of that chart is misleading and it is false based on the face of the document itself, right.  So the modeling that they refer to, it's referenced in Roper declaration Exhibit 4, the chart.  And it says that the percentage of Asian students would drop from 47 percent to 38 percent.

But in that chart, your Honor, it says that the pool -- that refers to the pool of diverse students who would be eligible for the program, for the Discovery Program, the applicant pool under different models.  And under that model, the pool of Asian students would drop from 47 percent to 38 percent.  And the percentage of black students in the applicant pool would increase from 11 percent to 24 percent.

But what plaintiffs ignore is that the demographics of the students in that same model of Asian students who would receive actual offers to the Discovery Program under the model with the 20 percent expansion of the Discovery Program, with the 60 percent ENI floor, the percentage of Asian students who would receive offers to the Discovery Program would be 51

Q7LVCHEO

percent.  And that is also Roper Exhibit 4, the page is CHMCE-065911.

And that is exactly what happened once the changes implemented; that the percentage of Asian students continued to receive more than 50 percent and, in some years, over 60 percent of the -- well, 50 percent of the offers, and they were over 60 percent of the students who actually enrolled in the Discovery Program.

THE COURT:  How long has the Discovery Program been in place now?

MS. JENERETTE:  So the Discovery Program has been in place since 1971.  But the changes that they are challenging here have been in place since 2018.

As the defendants establish in the declaration that we submitted in support of our papers, the percentage of Asian students admitted through the Discovery Program over that eight-year period has steadily increased.  And so certainly if the goal of defendants was to discriminate against Asian-American students and to reduce the percentage of Asian-American students admitted to the Discovery Program, we had eight years to reverse the changes that have resulted, and more than 60 percent of Discovery enrollees being Asian-American students, which has been the case every year.

In 2018, Asian students received — and that was the year the program was adopted.  Asian students received 43

Q7LVCHEO

percent of Discovery Program invitations, and they comprised 62 percent of students ultimately approved to participate.

In 2019, Asian-American students received 54 percent of Discovery Program invitations, and comprised 65 percent of students ultimately approved to participate.

In 2020, they received 50 percent of Discovery Program invitations, and comprised 59 percent of students ultimately approved to participate.

And I could go on.

Last year, in 2025, Asian-American students received 52 percent of Discovery Program invitations, and comprised 63 percent of students ultimately approved to participate.

Every single year since these programs -- since these changes were adopted, from 2018 to the present, Asian students have comprised no less than 56 percent of Discovery Program participants. And that the goal then of the city of New York and the Department of Education was to reduce the percentage of Asian students participating in the program. We certainly would not have continued with these changes.

THE COURT: Okay.

MS. JENERETTE: I think that was the last point that I wanted to make.

Basically, that the plaintiff cannot prevail on the extraordinary remedy of a preliminary injunction because she is not likely to succeed on the merits, because she cannot

Q7LVCHEO

establish on the facts here — even the facts that she's

presented from the *Christa McAuliffe* case — that there was any

intention to discriminate against any Asian-American students.

SFFA does not stand for the proposition that the

government may not implement race-neutral methods to achieve

racial diversity.  The Supreme Court has had every opportunity

to consider that issue and in each case it has upheld the

constitutionality of it.

*Callais* is completely distinguishable here because

that is a voting rights actions case; it has nothing to do with

K through 12 or college admissions.

So the standard that plaintiffs have asked the Court

to apply, which is that any effort to achieve racial diversity

or to remedy the historical race discrimination is necessarily

discriminatory against any other ethnic group that may be

impacted by that as a Fourteenth Amendment violation.  They can

cite no constitutional support for that argument.  They can

cite no case law for that argument.  Because the Supreme Court

has not held that, and the Second Circuit did not so hold.

THE COURT:  What about the point that was made that

the fact that this program prevented him from attending his

first-choice school and what is arguably the most prestigious

of even the top three of the specialized high schools, isn't

that a constitutional damage that can be addressed?

MS. JENERETTE:  It's not, your Honor.  Because the

Q7LVCHEO

plaintiff speculates that he would have been admitted to

Stuyvesant but for the 2018 changes to the Discovery Program.

THE COURT: Well, I mean, I think Mr. McGee

indicated -- and let me just ask straight out, do you agree

with the math that but for the changes to the Discovery

Program, the cutoff would have been lower and he would have

been accepted?

MS. JENERETTE: There's no way to know that, your

Honor. I mean, it's entirely speculative. The cutoff scores

change every year.

THE COURT: By the way, do you know whether or not he

was the first person below the cutoff line?

MS. JENERETTE: My understanding is that he was not.

I cannot state that with certainty, but my understanding is

that we can't say for sure that he would be admitted to

Stuyvesant. Based on that score, we don't know who's ahead of

him in the queue; we can't say with certainty that he's the

first person on the list so that he would get into Stuyvesant.

THE COURT: But I believe you made the point in your

papers that if I were to grant the relief sought, he would be

leapfrogging over other students.

MS. JENERETTE: He would be. We believe that he would

be. We can't say with certainty that he would not be, that he

would not leapfrog over other students.

THE COURT: Okay. Thank you.

Q7LVCHEO

MS. JENERETTE:  If I can just say one more thing on the issue of his admission to Stuyvesant.

The courts in this jurisdiction have consistently held that a student not getting their first choice or their preferred choice of school is not the deprivation of an education such that it's a violation of a constitutional right. He cites *Foulke v. Foulke*, which is completely distinguishable from this case.  It's divorce.  It's not binding, in any event.

THE COURT:  That's the Mamaroneck case?

MS. JENERETTE:  Sorry?

THE COURT:  That's the Mamaroneck case?

MS. JENERETTE:  Yeah.  I mean, it's a case where the child was -- you know, he had an offer to, or she — I don't know what the child's gender was — had an offer to attend a private school that he would lose if they did not accept it, and then would be foreclosed from attending that school.

And so based on those facts, the Court found that there was, you know, some harm that may have sufficed for a preliminary injunction.

That is not the case here.  I mean, if this student can walk into Brooklyn Tech and take his seat in September, on September 10th, irrespective of what happens here, he will attend one of the most prestigious specialized high school in New York City.  He has a seat at Brooklyn Tech.  Nobody is going to take that away from him.

Q7LVCHEO

The question just becomes, is he entitled to a seat at Stuyvesant based on his speculation — unproven, entirely unproven — and to give him a seat in violation of state law, which requires that a student be admitted based solely on the cutoff score, which he did not make. And he can speculate that the only reason his cutoff score didn't qualify him for Stuy was because of the Discovery Program.

But admitting him to Stuyvesant would be a violation of state law and based totally on speculative harms. And absent that, this student can still go to Brooklyn Tech, and he can still do exactly what his mother said he's going to do, which is, sit for the SHSAT again next year and start his sophomore year at Stuyvesant if he makes the cutoff score.

THE COURT: I believe I read in your papers that there is no Discovery Program for sophomore hires or admittees.

MS. JENERETTE: That is correct.

THE COURT: Can you give me an idea of how many students are able to get into Stuyvesant in their sophomore year?

MS. JENERETTE: I am not sure. But if he takes the test and he makes a cutoff score, he will be admitted to Stuyvesant. It's not like the DOE will say, Sorry, all the seats are filled. You can't go to Stuyvesant. There are no more sophomore seats available for you.

If he takes the test and makes the cutoff score, he'll

Q7LVCHEO

get a seat.

THE COURT:  Thank you.

Ms. Khadem, is there anything that you wanted to add?

MS. KHADEM:  Yes, your Honor.  And really quickly, I just want to correct something for the record.

Our understanding is that in *McAuliffe*, discovery is not yet completed, not on every issue in the case.

MS. JENERETTE:  That is fair to say.  The fact discovery is completed.  Expert witness discovery is not completed, because we moved to challenge their standing.  And so if the Court finds that they have standing, then expert witness depositions will go forward.

THE COURT:  Okay.

Mr. McGee.

MR. McGEE:  Thank you, your Honor.  Just briefly.

My understanding is fact discovery is completed but for our right to take depositions on the issue of discriminatory intent.

THE COURT:  That hasn't happened yet?

MR. McGEE:  No.

THE COURT:  How could discovery be complete?

MR. McGEE:  So there's depositions and then there's expert discovery.

THE COURT:  Okay.  Very well.

Ms. Khadem, anything else?

Q7LVCHEO

MS. KHADEM:  Yes, your Honor.

I would like to address a few of plaintiffs' primary points.

First, the Court should deny plaintiffs' motion for a mandatory preliminary injunction, which is extraordinary relief, solely because not only do they not meet any of the factors for a mandatory preliminary injunction, but, most importantly, they don't meet the requirement that they can show a clear and substantial likelihood of success on the merits. Because nothing in the record at this time and nothing in the papers that plaintiffs point to as evidence of intent are actually evidence that the defendants intended to discriminate against Asian-American students in the creation of the 2018 Discovery Program.

So I'll just address a few of the plaintiffs' points directly.

So, first, there is nothing impermissible — there's nothing constitutionally impermissible about a school district taking race-neutral steps or adopting a race-neutral policy with the goal of ensuring that all students, regardless of the neighborhoods they grew up in, the middle schools they attended, the income of their families, their access to resources, or their race, can equally compete for admission to specialized high schools.  *SFFA* did not change that, and neither did *Callais*.

Q7LVCHEO

Second, your Honor, the Economic Need Index is a factor in invitation to the Discovery Program or in eligibility for the Discovery Program is not a proxy for race. Proxy discrimination occurs when the challenged policy treats individuals differently based on seemingly neutral criteria that is so closely associated that it can't be disentangled.

THE COURT: What happens, as I believe the plaintiffs are urging, when facially neutral factors are going to affect racial groups differently, and you're aware of it before you implement the policy?

MS. KHADEM: Your Honor, the law has made very clear both at the Supreme Court and in this circuit that mere awareness of race or on impacts along racial lines when adopting a racially neutral policy does not rise to the level of discriminatory intent.

So it was completely okay, for example, for the school district to be aware of the years of gross inequities in the admissions rates of certain groups to the specialized high schools, and to know that that needed to be addressed. But the issue was really whether or not they intended in making those changes to discriminate against Asian-American students. And the record makes clear they didn't. A lot of the charts that plaintiffs point to actually support the argument that there was not any intent, so I can turn to some of those.

So just, first of all, the context really matters for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q7LVCHEO

a lot of the internal documents that plaintiffs cite to, so that's the new evidence as they describe them.  Both Wallack and Chadha were part of the working group of staff members that modeled potential Economic Need Index options, but neither of them have ultimate decision-making authority under *Arlington Heights*.

In the Roper declaration, it's very clear that Josh Wallack could not adopt an ENI by himself, and that the decision-makers would need to be the higher-ups, such as then-Mayor de Blasio or then-Chancellor Carranza.

And so when you read the statements that your Honor already considered in *McAuliffe*, where you decided that their statements made clear that they did not have an intent to discriminate, as part of understanding these ENI emails which you'll see is that defendants actually used a multitude of factors, including race-neutral factors, when they were modeling the process.

So, for example, the ENI was really not chosen out of thin air, as plaintiffs suggest.  The ENI of 60 percent was chosen after really thoughtful modeling and consideration of alternatives, which were really focused on targeting high-poverty schools, a race-neutral factor, and a desire to increase middle school diversity.  This is completely aligned with then-Mayor de Blasio's statement that the specialized high schools really had a geographic issue, as he says in one of his

Q7LVCHEO

contemporaneous statements.

This is also reflected in the Power Point in Exhibit 3, which notes that four percent of the middle schools at the time comprised 50 percent of the offers to the specialized high schools.  This is on page 31 of the Roper declaration document.

This is also aligned with the emails in Exhibit 4, where Chadha writes that the 60 percent Economic Need Index is grounded in the citywide average, not in anything related to race.  And she actually rejected using an 80 percent Economic Need Index, because it would exclude too many resource-challenged students.  Nothing about race, just about access to resources.

Plaintiffs say that the Department of Education rejected alternative models in the Power Point in Exhibit 3 because they didn't increase diversity enough.  But what plaintiffs neglect to mention when they make that argument is that the very next slide in the exhibits they provide says that these alternative measures invited bias, which is why they didn't go with that.

THE COURT:  Invited?

MS. KHADEM:  Biases.

THE COURT:  Biases.

MS. KHADEM:  Yes.

What plaintiffs' papers actually show is that they are assuming, without support, that simply because the Department

Q7LVCHEO

of Education ultimately chose a threshold that was projected to increase the number of black and Latinx students admitted, that the policy was necessarily chosen to discriminate against Asian-American students.

But in this circuit, in the Second Circuit, the *Jana-Rock* case makes very clear that awareness of an increase in the number of individuals admitted through a certain policy from certain racial groups should not be conflated with the desire to decrease numbers from other groups.

I also think it's really important, your Honor, to just point out a few of the discrepancies or misrepresentations made in plaintiffs' arguments around the middle schools. So plaintiffs point to the fact that 11 out of the 24 majority Asian-American middle schools were excluded in the ENI threshold that was selected; but they neglect to mention that in the 2017 to 2018 school year. 106 schools were ineligible for Discovery meaning that the 11 schools that were a majority Asian-American and were no longer eligible were really only 10.4 percent of the schools that were no longer eligible. And it's relevant that 15 majority black schools were also excluded.

(Alarm sounded)

THE COURT:  That generally means we'll get a message in just a moment.

MS. KHADEM:  Should I continue, your Honor?

Q7LVCHEO

THE COURT:  Wait.

MS. KHADEM:  Okay.

(Pause)

THE COURT:  Why don't you go ahead.

MS. KHADEM:  Okay.  Thank you, your Honor.

So I bring up these statistics and this understanding of the data just to show that these are all facially neutral and independently valid criteria that were used to adopt the ENI, and nothing related to race.

Additionally, your Honor, I wanted to address directly plaintiffs' reliance on *Herrera* and also on the *American Council* case which are misplaced.

So *Herrera* involved a motion for summary judgment, where plaintiffs needed only to demonstrate a genuine dispute of material fact.  Here, of course, we're in a preliminary injunction posture, and the issue is whether or not there's a substantial likelihood of success on the merits, and here there isn't.

Second, *Herrera* arose in the context of Title VII in a Section 1983 employment discrimination claim.  And although the Court did consider statements by Mayor de Blasio and Chancellor Carranza expressing a desire for leadership to reflect diversity of the city or look like New York City, it did not hold that those statements alone constituted unlawful race-based decision-making.  And when you look at the whole

Q7LVCHEO

record here, it is clear that the intent was to eliminate barriers to access to the specialized high schools and not to discriminate against Asian-American students.

Additionally, *American Council of Learned Societies* is readily distinguishable from this case.  It involved evidence that the government expressly classified grants based on protected characteristics, and used those classifications as the operative criteria for terminating federal grants.  And here, there is no race used in the decision-making process for who is invited to or eligible to the Discovery programs.

Additionally, your Honor, I wanted to make sure that I spent a second talking about the other factors.

So not only do plaintiffs fail to meet their burden of showing that they are likely to succeed on the merits of their equal protection or Title VI claim — because intent would be required for both — but they also fail to meet the other requirements for a mandatory preliminary injunction.

I will start with the harm prong, the irreparable harm prong, your Honor.

Their injury is entirely rooted in an alleged constitutional violation.  And this circuit and this district has held that where the harm is the loss of a constitutional right, as plaintiffs allege here, it's impossible to disentangle whether or not there is a likelihood of success on the equal protection claim here and the irreparable harm.  And

Q7LVCHEO

because they cannot establish an equal protection claim here because of a lack of intent, they also cannot establish irreparable harm.

Next, your Honor, it is speculative whether or not the plaintiff M.P. would be admitted to Stuy but for the adoption of the challenged policy here.  And that's primarily because prior to the adoption of the 2018 version of the Discovery Program at issue here today, schools each had their own independent discretion with respect to how many seats they would leave open to Discovery Program students.  So it's actually the case that nobody knows how many seats Stuy would have had.  They might have had more than 20 percent of their seats going to Discovery.

THE COURT:  Is it still the case that Stuyvesant can determine how many seats are open to Discovery?

MS. KHADEM:  It's the case that they have to have 20 percent of seats open to Discovery.

THE COURT:  So now they are required to have 20 percent.

MS. KHADEM:  That's correct.  And every one of the specialized high schools is.

And so there is a world in which maybe Stuy decided they wanted more students who were Discovery participants to be at their schools, and so it would be possible that that three-point difference still would not have allowed plaintiff

Q7LVCHEO

M.P. to attend Stuy.

So there's speculation there. And given that this is extraordinary relief, and particularly because the balance of equities are not in favor, that's concerning.

And finally, your Honor, for all the reasons that my colleague already addressed, admitting the plaintiff to Stuy for the fall would mean that there's potential he would be skipping students. But more than that, your Honor, it would suggest to the public and to current Discovery Program students and to those interested in participating in the Discovery Program that it's tainted by a constitutional violation. It would suggest that current Discovery Program students, including several of our clients as defendant intervenors, got in through a program that discriminated against others, and that is a serious harm.

THE COURT: Serious harm to whom?

MS. KHADEM: It's a serious harm to the public. It's a serious harm to students who are interested in attending the specialized high schools. It's a kind of dignitary harm. And that's why it's really important that a mandatory preliminary injunction is not granted unless there is clear and substantial likelihood of success on the merits. Because the merits really inform what the Discovery Program appears to the public.

And then finally, your Honor, can I just say that the younger students do not have standing to bring these claims.

Q7LVCHEO

As you spoke with plaintiffs earlier, you've already held in *McAuliffe* that students that are many years away from sitting for the specialized high schools admissions test and who just have these future goals of applying do not have standing to bring claims challenging the policy.

THE COURT:  Thank you.

Mr. McGee, I'll give you a couple minutes to respond.

MR. McGEE:  Thank you, your Honor.

I first want to be clear that I don't think it's fair to say we're admitting race neutrality.  I want to just be clear about our allegations.  The ENI cutoffs were used as a racial proxy to advance racial balancing goals.

And *SFFA* said, acknowledging that this type of thing could happen, said that which cannot be done directly cannot be done indirectly.

I also want to be clear that there is no finding in *SFFA* that the administrators intended to harm Asian-American students.  To the contrary, the Court acknowledged and even sort of presumed benevolent intent conceptually, but focused on that kind of mathematical ledger in a zero sum world, where you temper racial balancing.  You're necessarily using race as a negative for those that you want fewer of.

It's important to note *Coalition for T.J.* is a case from the Fourth Circuit relied upon by the defendants.  That is a pre-*SFFA* case.

Q7LVCHEO

There was some discussions of the charts. And I believe the city's counsel was focused on Exhibit 5.

There are charts in Exhibit 4 that are important to understanding the internal deliberations of the city. But it is the first page of Exhibit 5 that most explicitly projects that if they make these changes, there will be a decrease of Asian-American participation in Discovery from 64 percent to 38 percent.

Again, so the entire discussion about overall attendance of Asian-American students at the specialized high schools is effectively irrelevant after the *CACAGNY* decision, particularly because *CACAGNY* recognized harm to a student like this who gets into a specialized high school, but not the one that he wanted to get into as a result of a constitutional program, which the Second Circuit had to presume for purposes of that decision was implemented with discriminatory intent.

As to the allegation that we are speculating that he would have -- that Ms. Chen's son would have gotten in, I don't think it's fair for the city defendants to say that we are speculating. They are uniquely positioned to know how many students are in between and what the numbers would have been in a but-for world. And on the papers themselves, they don't contest our general proposition that that three-point delta would have gotten him in but for the 20 percent reserved for Discovery students. In fact, Stuyvesant, my understanding,

Q7LVCHEO

some years prior to these changes had zero Discovery students; generally had very few.

The precedent about -- it was referenced by the city's counsel, about denial of first choice not being a constitutional harm, my understanding of all those cases is that was in the context of alleging the deprivation of the right to an education. We're not saying he's being denied his right to an education. We're saying he has equal protection harm that has denied him his entrance into his dream school. That's an important distinction.

THE COURT: Does that exist as a constitutional principle?

MR. McGEE: Yes. Right.

In *Bakke*, for example, right, it's an equal protection case. The Court admitted the proper -- the Court decided that the proper injunctive relief was to admit the plaintiff in that case to the school he wanted to --

THE COURT: Was Mr. Bakke -- had he been admitted to another medical school?

MR. McGEE: I don't know off the top of my head. It certainly wouldn't surprise me if he was, in fact, admitted to another medical school, in the same way another hypothetical would be an employment discrimination case, right. Someone applies to the job they really want, they are denied for discriminatory reasons. Well, they have a job that's second

Q7LVCHEO

best.  That doesn't undermine the fact that they were harmed by discrimination in their denial of a job opportunity at their first choice.

The phrase "aware of race" was used by the defendants a few times.  We just want to be clear, we're not alleging this is a case where the defendants were merely aware of race.  Awareness is different.  It's making decisions because of race, specifically for the purpose of racial balancing, specifically for the purpose of racial balancing in a zero sum admissions context, which is *SFFA*.

THE COURT:  So that's what you're asking me to find on this record, that they did this because of race.

MR. McGEE:  Because of race, not awareness of race.

And we think that's very clear from the record.  I think the dispute is about, you know, discriminatory intent.  And that's where, again, I refer your Honor to *SFFA*, the fact that the Court acknowledged conceptually benevolent intent; said it's still not good enough in a zero sum admissions context.

I believe it was the intervenor defendants who said that our arguments about harm are entirely rooted in a presumption that a constitutional violation is harm.  That is what your Honor found in the 2019 decision.  But, of course, we've detailed the harm that we view would apply to our client just from denial of his freshman year at Stuyvesant.  There was

Q7LVCHEO

a factual question about the number of students admitted through this sophomore year program. I also don't know the numbers, but I do know that it's very few. It's an extraordinarily narrow path.

And I think that -- if I could just talk to my colleague. I think that sufficiently addresses --

THE COURT: Let me ask you this question, and I struggle with how to raise it.

The defendants provide information essentially showing that, if anything, Asian students' participation in the specialized high schools over the course of the life of the Discovery Program as amended during the de Blasio administration, has, if anything, increased rather than decreased. And, therefore, is this plaintiff being hurt by the fact that those that are being admitted into the program now are Asian students or perhaps relatively economically disadvantaged as to him?

MR. McGEE: When viewed through the lens of the Second Circuit's *CACAGNY* decision, what matters is intent, right, coupled with injury to one student who is of the race, you know, that the intent was to harm. And, again, it always brings us back to that question of what is intent? We have different perspectives on that. We think *SFFA* says, again, you don't have to intend to harm the Asian-American students; it's just that the mathematical consequence of racial balancing is

Q7LVCHEO

the intent.

THE COURT:  Thank you.

MR. McGEE:  Thank you.

THE COURT:  I'm going to take five minutes.  I'll be right back, so don't anyone move.

You can move.  Don't go anywhere.

(Recess)

THE COURT:  A preliminary injunction will not issue.

To obtain a preliminary injunction, a moving party must show, first, that he is likely to succeed on the merits; two, that he is likely to suffer irreparable harm in the absence of preliminary relief; three, that the balance of equities tips in his favor; and four, that an injunction is in the public interest.

Courts refer to preliminary injunctions as prohibitory or mandatory.  Prohibitory injunctions maintain the status quo pending resolution of the case.  Mandatory injunctions alter it because mandatory injunctions disrupt the status quo.  A party seeking one must meet a heightened legal standard by showing clear or substantial likelihood of success on the merits.  And here I am citing to *North American Soccer League v. U.S. Soccer Federation,* 883 F.3d 32 (2d Cir. 2018).

I find that plaintiff is seeking a mandatory injunction, as she request that the Court alter the status quo by admitting her son, M.P., to Stuyvesant for the 2026-2027

Q7LVCHEO

school year, despite the fact that he was not admitted this year.  Therefore, in order for the Court to grant her preliminary injunction, plaintiff will need to show a clear or substantial likelihood of success on the merits, that they are likely to suffer irreparable harm absent preliminary relief, and that the balance of equities tips in their favor, and that an injunction is in the public interest.

With respect to the first factor, clear or substantial likelihood of success on the merits, plaintiff brings claims under the equal protection clause of the U.S. Constitution and Title VI.  I find that she has not met her burden with respect to either claim at this juncture.

With respect to the equal protection standard, government action can discriminate on the basis of race in various ways:

First, a law or policy discriminates on its face if it expressly classifies persons on the basis of race.

Second, a law or policy that is facially neutral discriminates on the basis of race if it is enforced in a discriminatory way.

And third, a law or policy that is facially neutral discriminates on the basis of race if it is motivated by a discriminatory purpose, and its application results in a discriminatory effect.  And here I am quoting *Village of Arlington Heights*, 429 U.S. 252 (1977).

Q7LVCHEO

If the policy is racially discriminatory, it is evaluated with strict scrutiny; otherwise, it is evaluated with rational basis.

Here, the Discovery Program changes are facially race-neutral, is a facially race-neutral policy that is enforced in a nondiscriminatory manner. And so to demonstrate that the policy is discriminatory, plaintiff must demonstrate that the policy is motivated by a discriminatory purpose and results in a discriminatory effect.

The Supreme Court in *Arlington Heights* recognized that discriminatory intent is rarely susceptible to direct proof, and so it broadened the scope of what may serve as evidence of intent, including whether the impact of the official action bears more heavily on one race than another, the historical background of the decision, the specific sequence of events leading up to the challenged decision, departures from the normal procedural sequence, or substantive departures and contemporaneous statements from the legislative or administrative record, here quoting *United States v. Suquilanda*, 116 F.4th 129 (2d Cir. 2024).

Under the *Arlington Heights* framework, to meet a burden of establishing discriminatory intent, a plaintiff must demonstrate that the city selected or reaffirmed a particular course of action at least in part because of and not merely in spite of its adverse effects upon an identifiable group.

Q7LVCHEO

Here, fundamentally the plaintiff has not met the burden to demonstrate that the Discovery Program changes were enacted because of their effects on Asian-American students.

The Court has previously evaluated the statements of then-Mayor de Blasio and Chancellor Carranza concerning the Discovery Program changes and found that they don't constitute evidence of intent to discriminate against Asian-Americans specifically. Those statements do show that the city lauded the fact that the program could increase enrollment for blacks and Latino students at specialized high schools which have historically been very underrepresented when compared to the demographics of the city of New York.

At this juncture, internal Department of Education documents that plaintiff cites similarly do not demonstrate that the city enacted the Discovery Program changes because of their effects on Asian-American students. They highlight that diversity was a guiding principle of the changes to the Discovery Program, that an aim was to admit black and Hispanic students, and that the Department of Education modeled several potential changes to the Economic Need Index to understand the impact on racial demographics.

Further, plaintiff argues that because the Economic Need Index resulted in almost 75 percent of Asian-American majority middle schools being ineligible for the Discovery Program, whereas majority black and Hispanic middle schools

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q7LVCHEO

were impacted only in the single digits.  However, again, this does not demonstrate that the threshold was determined because of the impacts on Asian-American students.

Just as the Court said in its February 2019 order in *McAuliffe v. De Blasio*, plaintiffs' conclusion requires one to accept the proposition that a facially neutral policy seeking to improve racial diversity necessarily carries with it a discriminatory intent.  That is not the law.

In *Hayden v. County of Nassau,* 180 F.3d 42 (2d Cir. 1999), the Second Circuit affirmed the use of racial preferences to remedy past racial discrimination, and added that even in the absence of specific and identified discrimination, nothing in our jurisprudence precludes the use of race-neutral means to improve racial and gender representation.

As the Second Circuit explained in *Jana-Rock Construction v. New York State Department of Economic Development,* 438 F.3d 195 (2d Cir. 2006) to equate a desire to eliminate the discriminatory impact on some disadvantaged groups with an intent to discriminate against other groups could seriously stifle attempts to remedy discrimination.

Plaintiff argues that this reasoning is no longer applicable because of the Supreme Court's recent equal protection case law, specifically, *Students for Fair Admissions Inc. v. President & Fellows of Harvard College,* 600 U.S. 181

Q7LVCHEO

(2023), and *Louisiana v. Callais*, 146 S. Ct. 1131 (2026), in which that Court affirmed that the use of race by a decision-maker necessitates evaluation under strict scrutiny. However, both of these cases concern policies and decisions that facially took race into account rather than the facially race-neutral and evenly applied policy we have here.

Though the Second Circuit has not squarely addressed the issue, in *Boston Parent Coalition for Academic Excellence Corp. v. School Committee for the City of Boston,* 89 F.4th 46 (1st Cir. 2023), the First Circuit found no reason to conclude that *Students for Fair Admissions* changed the law governing the constitutionality of facially neutral valid secondary education admissions policies under equal protection principles.

For such policies to merit strict scrutiny, the challenger must still demonstrate, one, that the policy exacts a disparate impact on a particular racial group; and two, that such impact is traceable to an invidious discriminatory intent. The Court finds the First Circuit's reasoning persuasive to support its conclusion.

Accordingly, the plaintiff has not met her burden to demonstrate that Discovery Program changes were enacted with discriminatory intent and, therefore, the Court evaluates the program under rational basis.

In *Chinese American Citizens Alliance of Greater New York v. Adams,* 116 F.4th 161 (2d Cir. 2024), the Second Circuit

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q7LVCHEO

confirmed that if the government enacts a law or policy with a proven discriminatory motive against a certain race, a valid equal protection claim can be based on a showing that any individual has been negatively affected or harmed by that discriminatory law or policy based on race, even if there is no disparate impact to members of that racial class in the aggregate.

However, as previously discussed, plaintiff has failed to demonstrate that the changes were enacted with discriminatory intent against Asian-Americans, at least at this juncture, and, therefore, has failed to demonstrate discriminatory impact based on M.P.'s denial of admission to Stuyvesant.

As plaintiff has failed to demonstrate that Discovery Program changes are discriminatory, they must be evaluated under a rational basis; and under that standard, the challenged government policy must be upheld if it is rationally related to a legitimate government interest.  Rational basis review affords the government's policy a strong presumption of validity.

The Discovery Program changes would likely be upheld under rational basis review.  The expansion of the Discovery Program is rationally related to the legitimate government interest in fostering diversity and helping more economically disadvantaged students receive a high-quality education.

Q7LVCHEO

Accordingly, I find that the plaintiff has failed to demonstrate a clear or substantial likelihood of success on their equal protection claim.

Both parties acknowledge that plaintiffs' Title VI claim rises and falls with the same intentional discrimination analysis set forth above and, accordingly, plaintiffs have also failed to demonstrate a clear or substantial likelihood of success on their Title VI claim.

With respect to the second factor for a preliminary injunction standard, irreparable harm, irreparable harm is an injury that is not remote or speculative, but actual and imminent, and for which a monetary award cannot be adequate compensation.

In the constitutional context, courts in this district have linked a demonstration of irreparable harm with the likelihood of success on the merits on the constitutional claim, citing *Seventh Regiment Armory Conservancy v. Knight*, 811 F. Supp. 3d 467 (2d Cir. 2025), which indicates that when a constitutional violation is alleged, the two prongs of the preliminary injunction threshold merge into one; in order to show irreparable injury, a plaintiff must show a likelihood of success on the merits.

Here, plaintiff has failed to demonstrate a likelihood of success on their equal protection or Title VI claims. Absent that showing, plaintiff has failed to demonstrate

Q7LVCHEO

irreparable harm.

Further, irreparable harm must not be remote or speculative.  Here, as we have discussed, plaintiff argues that but for the Discovery Program changes, M.P.'s scores would have been sufficient for admission to Stuyvesant, which was three points below that threshold.  The parties this afternoon have vigorously disputed whether or not he would have met that threshold, and I find that there is insufficient evidence before me to determine whether or not he, in fact, would have met the threshold.

With respect to Factors 3 and 4, the balance of equities and the public interest, the balance of the hardships and the public interest factors merge when the government is the opposing party.  And here, citing *Nken v. Holder*, 556 U.S. 418 (2009).

Here, given plaintiff has failed to demonstrate that the Discovery Program changes are unconstitutional or contrary to federal law, the balance of equities and public interest favor maintaining the status quo.  While the admission of M.P. alone may not be a large administrative burden for the city, the city has persuasively argued that such admission could open opportunities for widespread similar litigation and endanger the orderly administration of decisions to specialized high schools.  Absent a showing of constitutional or federal injury, the balance of equities favors the status quo.

Q7LVCHEO

Similarly, the public interest is not served by admitting M.P. to Stuyvesant, contrary to a lawful policy. Accordingly, and again, based just at this juncture and based on the information before me, plaintiffs' request for a preliminary injunction is denied.

And finally, the Court finds that the two students, Ma.P. and P.P., lack standing, as they are in the fourth and first grade and, therefore, their injury is not actual or imminent, and so they are dismissed.

And with that, is there anything else that we should do today, Mr. McGee?

MR. McGEE:  Yes, your Honor.

We're going to consult with our clients about the prospect of what would be styled as an emergency appeal to the Second Circuit.  It's my understanding that there is a procedural requirement that we first make a request before this Court, that we would expect you to deny based on your ruling. We just ask if we do make that request, that you please deny it promptly so that we can take our decision up to the Second Circuit.

THE COURT:  I'm happy to deny it as soon as I receive it.

MR. McGEE:  I figured as much.  Thank you.

THE COURT:  Anything else from you, Ms. Jenerette?

MS. JENERETTE:  Nothing from the city, your Honor.

Q7LVCHEO

Thank you.

THE COURT:  Ms. Khadem?

MS. KHADEM:  No, your Honor.  Thank you.

THE COURT:  So as it appears that the next step will be an application for an appeal to the Second Circuit, there's no need at this point to discuss further procedural steps.

MR. McGEE:  I think that's right at this stage.

THE COURT:  Very well.

So in that event, I want to thank the parties for their very excellent papers and very excellent argument here this afternoon.  As I emphasized at a couple points during my recitation, this decision is, I believe, the appropriate one at this juncture.  There will be additional Discovery, and I'm sure there will be additional arguments.

So I look forward to seeing all of you again.

We're adjourned.

*     *     *

# Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

YI FANG CHEN, individually and on behalf of her minor
children M.P., Ma. P and P.P.

                                                         Plaintiff,

                      -against-

ZOHRAN MAMDANI, in his official capacity as Mayor of
the City of New York; KAMAR H. SAMUELS, in his
official capacity as Chancellor of the New York City
Department of Education; and the NEW YORK CITY
DEPARTMENT OF EDUCATION.

                                             Defendants.

------------------------------------------------------------------------ X

**DECLARATION OF
LIANNA WRIGHT**

26 CV 3355 (ER) (OWT)

      **Lianna Wright**, under penalty of perjury, declares pursuant to 28 U.S.C. §1746, that the following statements are true and correct:

      1.     I am the Executive Director of Research, Analytics, and Policy in the Office of Student Enrollment of the New York City Department of Education ("DOE"). My responsibilities include overseeing the analytical work for admissions processes for 3-K, Pre-K, Kindergarten, Gifted & Talented, middle school and high school, as well as conducting research and data analysis to support and inform policy choices as it relates to these processes. I have held this position since August 2017.

      2.     As such, based on my current role, I am familiar with the facts and circumstances set forth below. Its content is based on my personal knowledge, the books and records of DOE, and discussions with other DOE employees.  I submit this Declaration in support of Defendants' opposition to Plaintiff's motion for a preliminary injunction.

3.      Prior to any changes in the Discovery Program, in 2016, 41% of Discovery Program invitations went to Asian-American students and, in 2017, 42% of Discovery Program invitations went to Asian-American students.  Since the changes to the Discovery Program were implemented, the percentage of Discovery Program invitations to Asian-American students has only increased, and has never dipped below 42%.

4.      Asian-American students have received the following shares of Discovery Program invitations, and rates of approval to participate, since the changes were made in 2017.

     a.  In 2018, they received 43% of Discovery Program invitations, and comprised 62% of students ultimately approved to participate.

     b.  In 2019, they received 54% of Discovery Program invitations, and comprised 65% of students ultimately approved to participate.

     c.  In 2020, they received 50% of Discovery Program invitations, and comprised 59% of students ultimately approved to participate.

     d.  In 2021, they received 53% of Discovery Program invitations, and comprised 63% of students ultimately approved to participate.

     e.  In 2022, they received 43% of Discovery Program invitations, and comprised 59% of students ultimately approved to participate.

     f.  In 2023, they received 49% of Discovery Program invitations, and comprised 61% of students ultimately approved to participate.

     g.  In 2024, they received 47% of Discovery Program invitations, and comprised 56% of students ultimately approved to participate.

     h.  In 2025, they received 52% of Discovery Program invitations, and comprised 63% of students ultimately approved to participate.

      i.   In 2026, they received 53% of Discovery Program invitations, and comprised 62% of students ultimately approved to participate.

5.    Asian-American students have also consistently secured seats to the Specialized High Schools ("SHSs") by testing only, based on their scores on the Specialized High School Admissions Test ("SHSAT").

      a.   In 2016, 54% of students who received an offer to an SHS based on SHSAT score were Asian-American.

      b.   In 2017, 52% of students who received an offer to an SHS based on SHSAT score were Asian-American.

      c.   In 2026, 56% of students who received an offer to an SHS based on SHSAT score were Asian-American.

6.    I understand that the current litigation concerns student M.P.'s admission to an SHS.  M.P. applied to start high school at an SHS in the 2026-2027 year.  On M.P.'s application to the SHSs, his first choice was Stuyvesant High School ("Stuyvesant") and his second choice was Brooklyn Technical High School ("Brooklyn Tech").  M.P. received an offer to Brooklyn Tech.

7.    I understand from my colleagues in the Office of Academic Policy and Systems that there is strong parity between the programs offered by Brooklyn Tech and Stuyvesant.  Based on data from the 2025-2026 school year, Brooklyn Tech offered 60 unique subjects, while Stuyvesant offered 58 unique subjects, with the schools' curricula being substantially similar.

8.     My team also looked at class information for each school.  Despite the fact that enrollment at Brooklyn Tech is greater than at Stuyvesant (approximately 5,700 students at Brooklyn Tech compared to approximately 3,300 at Stuyvesant), Brooklyn Tech has slightly smaller average class sizes.  On average, classes at Stuyvesant have 33 students, while classes at Brooklyn Tech have 31.

Dated:  June 17, 2026
          New York, New York

By:   _____
                    Lianna Wright

# Exhibit F

# 26-847

## United States Court of Appeals
## for the Second Circuit

YI FANG CHEN, individually and on behalf of her minor
children M.P., MA.P., AND P.P.,

*Plaintiff-Appellant,*

against

ZOHRAN MAMDANI, in his official capacity as Mayor of the
City of New York; KAMAR H. SAMUELS, in his official
capacity as Chancellor of the New York City Department of
Education; and NEW YORK CITY DEPARTMENT OF
EDUCATION,

*Defendants-Appellees,*

*(caption continued on next page)*

On Appeal from the United States District Court
for the Southern District of New York

## DECLARATION OF LIANNA WRIGHT
## IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION
## FOR INJUNCTION PENDING APPEAL

*(caption continued from previous page)*

TEENS TAKE CHARGE, DESIS RISING UP AND MOVING;
COALITION FOR ASIAN AMERICAN CHILDREN AND
FAMILIES; VERONICA CARRASQUILLO, on behalf of her minor
child, A.C.; WANG JIN HUA, on behalf of her minor child, A.Z.;
HALIMATOU DIALLO, on behalf of her minor child, K.D.;
JENNIFER VELEZ, on behalf of her minor child, G.R.,

*Intervenor-Defendants-Appellees.*

LIANNA WRIGHT declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am the Executive Director of Research, Analytics, and Policy in the Office of Student Enrollment of the New York City Department of Education. My responsibilities include overseeing the analytical work for admissions processes for 3-K, Pre-K, Kindergarten, Gifted & Talented, middle school and high school, as well as conducting research and data analysis to support and inform policy choices as it relates to these processes. I have held this position since August 2017.

2.     Based on my current role, I am familiar with the facts and circumstances set forth below. Its content is based on my personal knowledge, the books and records of DOE, and discussions with other DOE employees. I submit this declaration in opposition to plaintiff-appellant's Emergency Motion for Injunction Pending Appeal.

3.     In the administration of the Specialized High School Admissions Test (SHSAT) for 2026 admission:

    a. 54 students scored 558;

    b. 25 students scored 559; and

    c. 21 students scored 560.

4. Of the 100 students who scored 558, 559 or 560 on the SHSAT for 2026 admissions, 54 ranked Stuyvesant High School as their first choice.

Dated: New York, New York
August 13, 2026

Lianna Wright

2