# No. 26-847

In The United States Court Of Appeals
For The Second Circuit

YI FANG CHEN, INDIVIDUALLY AND ON BEHALF OF HER MINOR CHILDREN M.P., MA.P., AND P.P.,

Plaintiff – Appellant,

v.

ZOHRAN MAMDANI, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF NEW YORK; KAMAR H. SAMUELS, IN HIS OFFICIAL CAPACITY AS CHANCELLOR OF THE NEW YORK CITY DEPARTMENT OF EDUCATION; AND NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendants – Appellees,

TEENS TAKE CHARGE, DESIS RISING UP AND MOVING, COALITION FOR ASIAN AMERICAN CHILDREN AND FAMILIES, VERONICA CARRASQUILLO, ON BEHALF OF HER MINOR CHILD, A.C., WANG JIN HUA, ON BEHALF OF HER MINOR CHILD, A.Z., HALIMATOU DIALLO, ON BEHALF OF HER MINOR CHILD, K.D., JENNIFER VELEZ, ON BEHALF OF HER MINOR CHILD G.R.,

Intervenor-Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of New York

**APPELLANT'S CONSOLIDATED REPLY TO APPELLEES' AND INTERVENOR-APPELLEES' OPPOSITIONS TO EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL**

*attorneys listed on the next page*

Glenn E. Roper
PACIFIC LEGAL FOUNDATION
1745 Shea Center Dr., Ste. 400
Highlands Ranch, CO 80129
Telephone: (916) 419-7111
GERoper@pacificlegal.org

Dean McGee
Caitlyn Fellner
PACIFIC LEGAL FOUNDATION
3100 Clarendon Boulevard
Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
DMcGee@pacificlegal.org
CFellner@pacificlegal.org

*Counsel for Plaintiff Yi Fang Chen, individually and on behalf of her minor children M.P., Ma.P., and P.P.*

The City accuses Chen of using this Motion as "strategy" to pursue a "quick win." But Chen tried to stop these changes eight years ago, only to be told that M.P.'s injury was too speculative. Now, with the school year days away, an injunction pending appeal is the only way to prevent an injury that will become impossible to fully remedy once M.P.'s freshman year begins. Because M.P. clearly satisfies the factors justifying an injunction, the Motion should be granted.

***Success on the merits***. The SHS admissions changes were adopted not with an incidental awareness of race, but "to use the Discovery program as a lever" to achieve racial goals. Whether referred to as race "playing a role" in a government decision (*Callais*) or outright "racial balancing" (*SFFA*), the result is the same: strict scrutiny—a burden Appellees cannot meet—applies.

***Irreparable Injury***. Appellees insist that M.P. is unharmed by racial discrimination because he will attend his second-choice school. But an equal protection violation itself establishes irreparable harm. And victims of discrimination are still harmed if they have access to a second-best option; holding otherwise would upend discrimination protections and run counter to this Circuit's precedent. Nor can the City feign

uncertainty over whether M.P. would have been admitted absent the new policy: its own analysis shows that the revisions raised Stuyvesant's cutoff by ten points. M.P. missed it by three. His harm is actual and imminent, with his freshman year hanging in the balance.

***Public interest.*** The public interest is served by preventing constitutional violations. And M.P. need not suffer racial discrimination just because other hypothetical plaintiffs might file lawsuits, especially where, as here, those other students have seemingly missed their window to obtain equivalent relief. Chen seeks an extraordinarily narrow remedy: only M.P.'s admission, without displacing any others.

## ARGUMENT

Whether this Court applies the ordinary standard on an injunction pending appeal (as the Supreme Court did in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16 (2020)) or the heightened standard applied in *Agudath Israel of America v. Cuomo*, 980 F.3d 222 (2d Cir. 2020) (per curiam), Chen succeeds: she has established a clear likelihood of success, a strong showing of irreparable harm, and a remedy that serves the public interest.

## I. Chen Is Likely to Succeed on the Merits

### A. Appellees Obfuscate the Legal Standard

"If race played a role in a decision made by a government actor, strict scrutiny applie[s]." *Louisiana v. Callais*, 146 S. Ct. 1131, 1146 (2026) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)). And efforts to reengineer school racial demographics to align with some "percentage within the general population" are "outright racial balancing," which is "patently unconstitutional." *SFFA v. Harvard*, 600 U.S. 181, 223 (2023) (cleaned up). This applies to facially neutral programs because "the prohibition against racial discrimination is levelled at the thing, not the name." *Id.* at 231 (cleaned up).

Appellees rely on *Personnel Administrator of Massachusetts v. Feeney*'s statement that the government must have acted "at least in part 'because of,' not merely 'in spite of,' the adverse effects upon an identifiable group." 442 U.S. 256, 279 (1979). City Br. 14–17; Int. Br. 7. But when applying the "pathmarking" *SFFA* opinion and this Court's *CACAGNY* opinion, the Third Circuit recognized that a facially race-neutral admissions program using geographic criteria as "a proxy for race," or otherwise enacted "to achieve racial proportionality" in "a zero-sum admissions game" triggers strict scrutiny under *Feeney*. *Sargent v.*

*Sch. Dist. of Phila.*, 165 F.4th 727, 740–43 (3d Cir. 2026). Chen has made that showing.[1]

Chen does not contend that "any system with a fixed number of seats can never be changed unless racial proportions stay static." City Br. 17. Policymakers may change admissions policies for any legitimate, nonracial reason, even if racial demographics shift. But when race is a reason for the decision, strict scrutiny applies. Contrary to the City's argument (*id.* 14), Chen has consistently argued that the City acted *because of* race, not merely with awareness of race. City's Ex. D 22, 46.

**B. Appellees Obfuscate the Facts**

This Court already catalogued Appellees' public statements and concluded, based on the record before it, that (1) the "policy [was] designed to increase the numbers of Black and Latino students at the SHSs"; (2) "City officials arrived at the 0.6 ENI threshold after modeling the effects that various ENI cutoffs would have on the racial composition of students at the SHSs"; and (3) "the City's modeling also projected that

[1] Rejecting *Sargent* as "wrongly decided" (Int. Br. 19) means rejecting *CACAGNY*, which the Third Circuit relied on as having "taken a sounder approach than the First and Fourth Circuits" by "explaining that . . . excluding [Asian-Americans] from reserved seats was the injury demonstrating discriminatory impact." *Id.* at 749–50.

the changes to the Discovery Program would decrease the number of Asian-Americans at the SHSs." *CACAGNY*, 116 F.4th 161, 166–67 (2d Cir. 2024). This is race-based decisionmaking, triggering strict scrutiny. The City ignores these statements, while Intervenors recast them as "isolated statement[s]" about which middle schools feed the SHSs. Int. Br. 11–12. That cannot be squared with the statements themselves.

The internal documents—which were not yet available for the *CACAGNY* decision—remove any doubt about the City's racial motivation. Mot. 7–10. Appellees concede the documents' authenticity but dispute their commonsense reading, nitpick who sent them, or act as if they do not present the full picture. City Br. 19–20; Int. Br. 13–17. For example, Intervenors suggest that the DOE Director of Research and Policy's statement about "us[ing] the Discovery program as a 'lever to admit more Black and Hispanic students'" should be disregarded because she was not a "decisionmaker." Int. Br. 13–14. Putting aside the suspect notion that a high-level DOE official was not a decisionmaker, this and the other documents are on-point evidence under *Arlington Heights*, which "contemplates a wide-ranging and penetrating inquiry capable of uncovering hidden forms of discrimination" in order to "smoke out

unconstitutional government conduct." *Saget v. Trump*, 375 F. Supp. 3d 280, 368, 372 (E.D.N.Y. 2019) (examining internal documents and the "sequence of events" to evaluate the government's rationale) (cleaned up); *see also Mhany Mgmt. v. Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (requiring a "sensitive inquiry" into "circumstantial and direct evidence" including "pattern[s] unexplainable on grounds other than race," the "background of the decision," and "administrative history") (citations omitted).

Appellees' effort to recontextualize individual documents fares no better. Intervenors note DOE had concerns about "new types of bias" from alternative admissions approaches and that the 60% ENI threshold corresponded to a citywide poverty measure; while the City emphasizes that DOE considered geographic, socioeconomic, and gender diversity. Int. Br. 14–17; City Br. 19–20. But all that *Feeney* and *Arlington Heights* require is that race was *one of* the goals, and none of Appellees' arguments eliminate the overwhelming evidence of racial purpose.

The City insists Discovery expansion alone "would have no material effect on racial demographics." City Br. 20. But that is why DOE coupled the expansion with an ENI restriction. The "concession" the City invokes

proves the point: Chen acknowledged below only that "pure expansion[,] *if not part of a . . . broader racial balancing goal*, would not trigger an equal protection claim." City Br. 22 (quoting City's Ex. D at 10) (emphasis added). Here, the goal was racial balancing, and the ENI screen cannot be detangled from the Discovery expansion.[2]

The City's demand for a "full record" rings hollow. City Br. 19–20. The documents were produced through discovery in *CACAGNY*, and while accusing Chen of presenting "snippets," the City cannot identify any allegedly missing context. A demand for even more discovery cannot overcome the undisputed contemporaneous record here.

Appellees' reliance on enrollment figures is irrelevant, too. City Br. 6, 18; Int. Br. 8–10. Whether DOE's racial projections proved accurate does not alter *why* the policy was adopted, and *CACAGNY* clarified that "a valid equal protection claim can be based on a showing that any individual has been negatively affected or harmed by that discriminatory

---

[2] It is irrelevant that a chart cited in the Motion projected the Asian-American share of the *ENI-eligible pool*, rather than Discovery admittees. Int. Br. 15–16. The threshold created an eligibility screen, and the chart measures how that screen reshaped eligible students by race.

law or policy based on race, even if there is no disparate impact to members of that racial class in the aggregate." 116 F.4th at 173.[3]

The parallels to *Sargent* are striking. There, Philadelphia announced a goal of increasing the percentage of Black and Hispanic applicants from 33.8% to 52%, and adopted facially neutral geographic preferences to try to advance that objective. 165 F.4th at 742–43. The Third Circuit reversed summary judgment, holding that those actions, "taken together in context," could establish that the policy was adopted "to achieve racial proportionality" and that geography operated as "a proxy for race." *Id.* at 743. This was true even though "some evidence" supported nonracial "rationales of increasing geographic diversity and decreasing subjectivity," and even though there was arguably "a neutral effect across racial groups." *Id.* at 743–44. The record here is stronger, as

[3] Intervenors emphasize that 62% of current Discovery participants are Asian American and that only 10.4% of excluded schools were majority-Asian. Int. Br. 8–9, 16. The first figure ignores the students excluded from Discovery by the ENI screen; the second uses the wrong denominator. Nearly half of majority-Asian schools were excluded, compared with 8% of majority-Black schools and 3% of majority-Hispanic schools. And even assuming the Court may take judicial notice of Intervenors' extra-record statistics, *see id.* 9–10, its newspaper articles may not be noticed for their truth. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425–26 (2d Cir. 2008).

DOE modelled policies by their projected racial output, then selected one calibrated to deliver it. With *Sargent* providing the appropriate framework for *SFFA* and *CACAGNY*, Chen is clearly likely to prevail on the merits.[4]

## II. Chen Will Be Irreparably Harmed Without Relief

### A. The Loss of M.P.'s Freshman Year Is Irreparable

Appellees tacitly concede that if Chen makes a "strong showing" of success on the merits, a finding of irreparable harm should follow. Int. Br. 21; *see also* City Br. 13 (citing *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir. 2000) (adopting a *per se* irreparable injury standard for an Equal Protection violation in a school admission case, and finding irreparable harm even though the student would receive a public education without relief)). But the harm here is actual and imminent regardless, as M.P.'s freshman year, only days away, hangs in the balance.

The Appellees ignore the irreparable harm arguments in Chen's motion (Mot. 25), which include this Court's observation in *CACAGNY*

---

[4] Intervenors seek a referendum on the SHSAT itself. Int. Br 2, 9–10. But the SHSAT is required by state law, and the New York Court of Appeals recently rejected a claim that Hecht-Calandra was discriminatory. *IntegrateNYC, Inc. v. State*, 45 N.Y.3d 176, 193 (2025).

that Stuyvesant is the more prestigious school. 116 F.4th at 169. The City distinguishes *Foulke v. Foulke* by saying that M.P.'s admission to Brooklyn Tech is "assured" (City Br. 12 n.3); but admission to an excellent Westchester public school in *Foulke* was also assured. 896 F. Supp. 158, 160–61 (S.D.N.Y. 1995). The First Circuit likewise recognized that a student discriminatorily denied entry into the prestigious Boston Latin School must be admitted "without delay" because she did "not have the luxury of time." *Wessmann v. Gittens*, 160 F.3d 790, 809 (1st Cir. 1998); *see also McLaughlin v. Bos. Sch. Comm.*, 938 F. Supp. 1001, 1011–12 (D. Mass. 1996) (granting preliminary injunction requiring admission to school the student would have attended but-for discrimination even though she was otherwise receiving "a fine education").[5]

These cases support the common-sense proposition that a student suffers harm when excluded from a preferred school, even if there is a good alternative, and that every day of that exclusion is irreparable.

---

[5] *Pride v. Community School Board*, 488 F.2d 321 (2d Cir. 1973) (City Br. 11) is distinguishable as it found no irreparable harm after concluding that a challenged school assignment plan was nondiscriminatory and the claimed injury was stigma arising from reassignment. *Id.* at 327–28.

### B. M.P.'s Harm Is Not Speculative

The City does not dispute that its own 2019 analysis found that the revised policy raised the cutoff by ten points. (Mot. 16; Roper Dec. Ex. 8). Nor does it dispute that M.P. missed the cutoff by only three points. The observation that cutoffs vary from year to year—including that M.P. would have scored above the cutoff "if he'd been in last year's applicant pool" (City Br. 12)—only buttresses the argument: M.P. sits at the razor's edge where a ten-point effect is decisive.

The City already calculated the number of students who scored 558–560 on the SHSAT, and how many ranked Stuyvesant first. City Ex. F. Yet it avoids providing the one calculation that matters: what the cutoff would have been without the 20% reservation. This Court is clear that "the party with easier access to relevant information" should provide it. *Nat'l Commc'ns Ass'n v. AT&T Corp.*, 238 F.3d 124, 130–31 (2d Cir. 2001). The City tacitly concedes it could provide the calculation.[6]

Lastly, Intervenors speculate that, absent the challenged policy, individual SHSs *could have* voluntarily reserved as many or more seats

[6] Rather than disputing the principle, it quibbles that *Nat'l Commc'ns* addressed burdens at trial. City Br. 12.

for Discovery. Int. Br. 21–22. But that has never happened: as this Court recognized, historically "only approximately 1 percent to 3 percent of students admitted at the SHSs came through the Discovery Program." *CACAGNY*, 116 F.4th at 166.

## III. The Public Interest Will Be Unharmed

Chen seeks an exceptionally narrow remedy: admission to Stuyvesant for one student—something the City concedes is not an "administrative disaster" (in other words, is eminently doable). City Br. 23.

Appellees argue such relief would be unfair to other students who missed Stuyvesant's cutoff. City Br. 23–24; Int. Br. 22. But those students are not before this Court. The requested injunction does not "leapfrog" anyone; it simply "restore[s M.P.] to the position [he] would have occupied in the absence of such conduct." *United States v. City of Yonkers*, 197 F.3d 41, 55 (2d Cir. 1999) (cleaned up); *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 271–72, 320 (1978) (ordering an individual applicant's admission after a finding of discrimination). And this Court has previously rejected concerns that relief would benefit only one plaintiff while similarly situated nonparties remained subject to a

challenged law. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488–89 (2d Cir. 2013).

The possibility that others might seek injunctions—something that seems virtually impossible given the imminent start of this school year—does not prevent relief. And admitting M.P. would not "cast[] unwarranted doubt" on the qualifications of Discovery students (Int. Br. 22); it would say nothing about others' qualifications. Nor would relief circumvent Hecht-Calandra (City Br. 24), which mandates the system that M.P. followed—admission by SHSAT. Regardless, in the school admissions context, state laws "are not sacrosanct" when they conflict with the Constitution, and courts have a duty to provide an appropriate remedy. *Milliken v. Bradley*, 418 U.S. 717, 744 (1974).

## CONCLUSION

The Motion should be granted.

DATED: August 20, 2026.

Respectfully submitted,

/s/ Dean McGee

Glenn E. Roper
PACIFIC LEGAL FOUNDATION
1745 Shea Center Dr., Ste. 400
Highlands Ranch, CO 80129
Telephone: (916) 419-7111
GERoper@pacificlegal.org

Dean McGee
Caitlyn Fellner
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881

DMcGee@pacificlegal.org
CFellner@pacificlegal.org

*Counsel for Plaintiff Yi Fang Chen, individually and on behalf of her minor children M.P., Ma.P., and P.P.*

## CERTIFICATE OF COMPLIANCE

Type-Volume Limit, Typeface Requirements,
and Type-Style Requirements

This document complies with the type-volume limitation of Local Rule 32.1(a)(4), (5) / Fed. R. App. P. 27(d)(2)(C), excluding the parts of the document exempted by Fed. R. App. P. 32(f), because this document contains 2,597 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in font style Century Schoolbook and font size 14.

DATED: August 20, 2026.

s/ Dean McGee
Dean McGee
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Dean McGee
Dean McGee
*Counsel for Plaintiff-Appellant*